LARSON ZIRZOW KAPLAN & COTTNER
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
E-mail: zlarson@lzkclaw.com
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
E-mail: mzirzow@lzkclaw.com
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170
Fax: (702) 382-1169

Proposed Attorneys for Debtors

MCDONALD HOPKINS LLC
SCOTT N. OPINCAR (Ohio Bar# 0064027)
*Pro Hac Vice Pending*
E-mail: sopincar@mcdonaldhopkins.com
MICHAEL J. KACZKA (Ohio Bar# 0076548)
*Pro Hac Vice Pending*
E-mail: mkaczka@mcdonaldhopkins.com
MARIA G. CARR (Ohio Bar# 0092412)
*Pro Hac Vice Pending*
Email: mcarr@mcdonaldhopkins.com
600 Superior Avenue, East, Suite 2100
Cleveland, Ohio 44114-2653
Tel: (216) 348-5400
Fax: (216) 348-5474

Proposed Attorneys for Debtors

*Left margin vertical text:* **LARSON ZIRZOW KAPLAN & COTTNER** 850 E. Bonneville Ave. Las Vegas, Nevada 89101 Tel: (702) 382-1170  Fax: (702) 382-1169

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>GENERATION NEXT FRANCHISE BRANDS, INC.,<br>        Debtor. | Case No. 19-17921-mkn<br>Chapter 11 (Lead Case)<br>(Joint Administration Request Pending) |
| In re:<br>REIS & IRVY'S INC.,<br>        Debtor. | Case No. 19-17922-mkn<br>Chapter 11 |
| In re:<br>PRINT MATES, INC.,<br>        Debtor. | Case No. 19-17923-mkn<br>Chapter 11 |
| In re:<br>19 DEGREES, INC.,<br>        Debtor. | Case No. 19-17924-mkn<br>Chapter 11 |

## OMNIBUS DECLARATION OF RYAN POLK IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Ryan Polk, under penalty of perjury pursuant to 28 U.S.C. § 1746, hereby declare:

1.      I am the Chief Executive Officer ("CEO") of Generation Next Franchise Brands Inc., a Nevada corporation ("Generation Next"), and chairman of the Board of Directors of Generation Next. I also currently serve as the duly-appointed president and sole director of each of Generation Next's wholly-owned subsidiaries: Reis & Irvy's, Inc., a Nevada corporation ("Reis

& Irvy's"), 19 Degrees, Inc., a Nevada corporation ("19 Degrees"), and Print Mates, Inc., a Nevada corporation, f/k/a Generation Next Vending Robots, Inc. ("Print Mates" and collectively with Generation Next, Reis & Irvy's, and 19 Degrees, the "Debtors").  In these capacities, I am familiar with the Debtors' businesses, day-to-day operations, and financial affairs.

2.    I was appointed as Chief Financial Officer and Chief Operating Officer of Generation Next on April 1, 2019.  Prior to that appointment, I was a shareholder of Generation Next and provided periodic services as a consultant, beginning in January 2019.  I have served in various officer positions with founder and private equity-owned consumer products companies with revenues above $150 million.  Before joining Generation Next, I was a principal with Perissos Partners in Irvine, California from June 2017 to March 2019.  I have also various held executive roles at portfolio companies owned by Lacy Diversified Industries, Ltd, a family office based in Indianapolis, Indiana, which actively managed investments in distribution, light manufacturing, and supply chain management.  I have over 18 consecutive years of experience working with international employees, customers, and suppliers.

3.    After the resignation of Nicholas Yates as CEO of Generation Next in September 2019, the company's board of directors appointed me as CEO.  I was also appointed to the board of directors effective October 7, 2019, and elected to serve as Chairman of the Board.  In November 2019, I was appointed as president and sole director of each of 19 Degrees, Print Mates, and Reis & Irvy's by Generation Next's Board, which is the sole shareholder of each of the subsidiaries.

4.    Except as otherwise indicated, all statements set forth in this Declaration are based upon: (i) my personal knowledge as CEO of Generation Next and president of 19 Degrees, Print Mates, and Reis & Irvy's; (ii) information supplied to me by other members of my engagement team or from the Debtors' employees, managers, agents or attorneys; (iii) my review of the Debtors' relevant documents or books and records; and/or (iv) my experience and knowledge of the Debtors' financial condition, business operations and financial affairs.

LARSON ZIRZOW KAPLAN & COTTNER
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

# I. **BACKGROUND**

A. **Introduction.**

5.      On December 15, 2019 (the "Petition Date"), each of the Debtors filed its respective voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Nevada (the "Court"), thereby commencing their respective bankruptcy cases (the "Chapter 11 Cases"), and filed various motions described herein requesting certain immediate relief (collectively, the "First Day Pleadings"). This declaration (the "Declaration") is submitted on behalf of the Debtors and in support of the Debtors' Chapter 11 Cases and the First Day Pleadings.

6.      The First Day Pleadings are intended to enable the Debtors to operate efficiently and effectively during the Chapter 11 Cases, as well as to avoid certain adverse consequences that might otherwise result from the commencement of the Chapter 11 Cases. Among other things, the First Day Pleadings seek relief aimed at sustaining the going concern value of the Debtors. Absent immediate access to financing, use of cash collateral, and the authority to make certain essential payments as sought under and described in greater detail in the First Day Pleadings, the Debtors would suffer immediate and irreparable harm to the detriment of their estates and creditors.

7.      If called to testify, I could and would testify to the facts set forth in this Declaration. I am authorized by the Debtors to submit this Declaration. I have reviewed the First Day Pleadings, and it is my belief that the relief sought therein is necessary to (i) avoid immediate and irreparable harm to the Debtors' businesses, and (ii) maximize and preserve the value of the Debtors' bankruptcy estates. Unless otherwise indicated, the financial information contained herein is unaudited and subject to change.

8.      The Debtors filed their Chapter 11 Cases as a means to maintain the going concern value of their businesses, preserve employment, avoid a piecemeal liquidation of their , and conduct a process to maximize value for stakeholders. This section of the Declaration provides an overview of the Debtors' businesses, a description of the Debtors' capital structure, an explanation of the reasons for the filing of the Chapter 11 Cases, and a roadmap for how the Debtors plans to

LARSON ZIRZOW KAPLAN & COTTNER
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

achieve their goals through this process.

**B.** **Overview of the Debtors' Businesses.**

9.      The Debtors are a leading developers of unattended retail solutions and vending machines.  The Debtors are headquartered in San Diego, California.  Generation Next is a publicly traded company traded in the "over the counter" market under the symbol "VEND."  The company was originally incorporated in 2011 as Green 4 Media, Inc., an eco-marketing and advertising company (the "GEEM Business").  After the transfer of the GEEM business in 2013, the company changed its name from Green 4 Media, Inc. to Fresh Healthy Vending International, Inc. ("Fresh Healthy").  In March 2016, the company changed its name to Generation Next Franchise Brands, Inc.  Shareholders approved a shortened version of the company name "Generation Next" in August 2019, but the names Generation Next and Generation Next Franchise Brands, Inc. are currently used interchangeably by the company and other parties.

10.      While operating as Fresh Healthy, the company became affiliated with non-debtor Fresh Health Vending LLC ("FHV LLC"), a franchisor of healthy drink and snack vending machines.  While this business line was successful for a time, FHV LLC executed an assignment for the benefit of creditors under California law in 2018 and has no current operations.  Two other affiliated, non-debtor entities related to this business line -- FHV Acquisition Corp. and FHV Holdings Corp. -- also do not currently have any operations as a result of the termination of this business line.

11.      Generation Next's vending machine business continued in a different area, however, when the business acquired the intellectual property assets of Robofusion, Inc. ("RFI"), in December 2016.  RFI developed robotic-kiosk vending technology, including frozen yogurt and ice cream vending robots.  Since the acquisition, Generation Next, through its flagship brand Reis & Irvy's, has developed a state-of-the-art robotic soft serving vending robot that serves customized frozen yogurt treats using a fully automated, patented system.  This free-standing system can be placed in a mall, airport, hospital, tourist attraction, casino, resort, college campus, or other high foot-traffic area.  The robots allow consumers to use the kiosk to select and customize a frozen

LARSON ZIRZOW KAPLAN & COTTNER
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

yogurt treat with toppings without the need for on-site staff.  A kiosk is a free-standing, 15 square foot machine that can serve up to 200 cups of frozen yogurt before a refill.  Unlike other frozen yogurt systems, there is a lower cost of entry than traditional frozen yogurt systems, can be operated full or part time, there is no staff required, and the systems are installed in locations where there is already a captive audience.  The proprietary software platform integrated into the vending robots allows the company to monitor sales from each of the machines remotely, including customer trends and purchasing behavior.

12.    Generation Next also worked to raise capital from 2016 through 2018.  During fiscal year 2018, the company raised approximately $17.6 million through a private placement memorandum for the sale of roughly 29.5 million shares of common stock.

13.    Reis & Irvy's sells franchise rights for the vending robots.  In 2018, the first franchisees began operating their robots in the field, and 170 units were installed during the first half of fiscal year 2018.  Franchise owners typically set the retail price and negotiate rent terms with locations hosting the Reis & Irvy's kiosks.

14.    The company has also worked to develop and expand its other subsidiaries during this period of growth.  On March 28, 2019, the company entered into an Asset Purchase Agreement to purchase the Print Mates business, including intellectual property.  Print Mates kiosks offer instant high resolution printing of photographs from touchscreen kiosks.  Print Mates kiosks are operated with a proprietary software interface that takes advantage of the kiosk's large touch-sensitive screen, allowing customers to swipe and scroll through various menus as well as edit and crop their images before printing.  The Company intends to own and operate the kiosks, collecting 100% of the revenues generated, and will sell kiosks and license software to business owners.

15.    19 Degrees, a subsidiary, is the managing member of 19 Degrees Corporate Service, LLC, a robot investment fund (the "Fund") that will allow accredited investors (*i.e.* franchisees and other direct purchase investors) to contribute kiosks to the Fund and receive quarterly distributions of net proceeds from operating the robots.  19 Degrees provides services to 19 Degrees Corporate Services LLC ("19 Degrees Corporate Services"), pursuant to a

LARSON ZIRZOW KAPLAN & COTTNER
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

LARSON ZIRZOW KAPLAN & COTTNER
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Management Services Agreement, and manages the Fund account.   19 Degrees earns a management fee of 1.5% from 19 Degrees Corporate Services for these services.   19 Degrees Corporate Services in managed by 19 Degrees, but a variety of independent parties own its membership units.

16.     The company's aggressive growth, together with some external manufacturing and delivery issues, unfortunately led to a large delay in delivery of kiosks.   In September 2017, Generation Next entered into a Design Services Agreement with Flextronics Industrial, Ltd., n/k/a Flex, Ltd. ("Flex"), to provide certain design and engineering services for its frozen yogurt kiosks, as well as a Manufacturing Services Agreement with Flex to perform various manufacturing services of those products.  Flex repeatedly missed delivery commitments throughout 2018, among other significant delays and issues.  These delays put Generation Next at least 18 months behind schedule delivering kiosks and caused substantial cash withdrawals, leading to research and development overruns at Flex, significant repair expenses from a third-party engineering firm, prepaid inventory in excess of production capacity, ongoing operating expenses, and certain refunds to franchisees who did not want to wait for the delay in the delivery of their units.

17.     In January 2018, the company entered into a Manufacturing Agreement with The Vollrath Company, LLC ("Stoelting") of Kiel, Wisconsin, through which Stoelting was to provide premium soft serve technology and a national service to Reis & Irvy's branded frozen yogurt robots.  In May 2019, this relationship expanded such that Stoelting also included manufacturing and kiosk engineering services for an interim production period.   During Stoelting's interim production period, the company will be transferring assembly know-how to either back to Flex or a new partner such as Foxconn or Jabil.

18.     In January 2019, Generation Next and Flex entered into a Transition and Interim Production Agreement with Flex, which noted that a dispute had arisen between the production and development of the kiosks, and that the parties disagreed regarding their respective obligations under their agreements.   Additionally, this agreement noted that Flex had recently halted production and shipment of kiosks, components, replacement parts and kits designed to retrofit

previously-delivered kiosks with upgrades. This agreement further provided that Generation Next would transition to a new manufacturer and terminate their relationship, but in an effort to mitigate potential losses, they entered into an agreement to govern the manufacture and delivery of kiosks and related retrofit kits and related materials between then and August 31, 2019.

19.    Currently, the Debtors have approximately 15 finished kiosks available for delivery to customers with Pitney Bowes near the installation site, 21 kiosks at Flex that also could be delivered to customers, 5 kiosks at Service 1, which can also be delivered to customers and 46 kiosks that have been removed from locations and are being staged for inspection and repair, certain parts that will be used in the assembly of finished kiosks, and approximately $10.0 million in prepaid balances to suppliers for future delivery of kiosk components or assembly services. The company is also working on a refurbishment process to repair issues with kiosks. A significant portion of the kiosk components can be used for a variety of applications, and are not unique to the company's robot, increasing the potential to recover on these assets. As part of the RFI acquisition, the Company also acquired a patent portfolio relating to the robotic system, including utility and design patents relating to the dispensing stations and a method for frozen confectionary products for assembly of frozen confectionary products.

## C.    Recent Operating Performance.

20.    For the year ending June 30, 2019, Generation Next recognized revenue on 426 kiosks; this equates to revenues of approximately $16.3 million from the sale of vending robots and $1.4 million in franchise fees, respectively. In order to assist franchisees with support and pay for certain administrative costs (such as merchant fees, software fees, etc.), Reis & Irvy's charges a monthly royalty fee of 12% of gross receipts. The company aggregates and controls the bank account that receives the credit card payments by kiosk customers, and this account is settled each month with the franchise owners. The royalties due from each franchisee are netted against the credit card receipts due to each franchise owner. The amount is deducted from the remittance checks Reis & Irvy's cuts to franchisees every month from sales at the kiosks. Reis & Irvy's does not charge a marketing fund fee or other fee. For the year ending June 30, 2019, the company

LARSON ZIRZOW KAPLAN & COTTNER
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

LARSON ZIRZOW KAPLAN & COTTNER
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

recognized approximately $315,000 in franchise royalty revenue.  The company also worked to negotiate certain rebates from consumable suppliers for yogurt sold at the kiosks, which Generation Next expects will turn into further revenue.

21.     The company receives deposits from the sale of franchises.  Typically, the company received a deposit of 40% to 60% of the contract value, and the remainder of the contract value of each machine was typically received within 7 days before or after delivery.   The company had use certain of those deposits to fund operating and debt service, purchase and deliver 430 kiosks, build inventory, and refund certain franchise deposits.

22.     As of June 30, 2019, the company's total revenues were $18.3 million.  For the year ended June 30, 2019, the company had a net loss totaling approximately $19 million with negative cash flows from operations totaling approximately $13.5 million.  Through June 30, 2019 the company's production and installation of kiosks have been slower than anticipated, due to delays caused by engineering and manufacturing deficiencies, which have since been corrected.  The impacts of production delays were decreased revenue recognition and less accounts receivable collections.  Also, the company used cash on hand to retire liabilities associated with the franchise rescissions, for research, development and engineering expenditures related to its robotic soft serve vending kiosks, for warranty expenses and for the purchase of robot inventory.  The combined result of these events was a substantial decrease in the company's cash balances and an increase in its outstanding liabilities.

23.     The company is also currently a defendant in at least thirteen (13) active lawsuits in state and federal court throughout the country brought by disappointed franchisees making a variety of claims, and at least that many additional franchisees have threatened potential litigation.  The company simply lacks the resources to defend all of these active and potential litigations, and satisfy all the concerns raised in them, and these matters were a significant driving force behind the need to seek bankruptcy relief.

**D.     The Company's Attempt to Raise Additional Funding Pre-Petition.**

24.     On or about September 4, 2019, the Debtors hired Stout Risius Ross Advisors, LLC

**LARSON ZIRZOW KAPLAN & COTTNER**
**850 E. Bonneville Ave.**
**Las Vegas, Nevada 89101**
**Tel: (702) 382-1170   Fax: (702) 382-1169**

("Stout") as an investment banker to assist in company's raise of bridge financing with the following goals: fund kiosk production sufficient to reasonably meet franchise backlog (with a goal of delivering 20 to 40 units per month, and a goal of post-bridge fully capitalized operational output in excess of 70 machines per month), restart production with Stoelting and fund a permanent transition to Foxconn or Jabil. The bridge financing would have enabled the company to complete these strategic initiatives by the end of March 2020. The company was also in the process of developing a larger equity raise for the spring of 2020 to complete the company's long term-goals. These goals included, but were not limited to, transitioning to a hybrid model (including both franchise and corporately owned and operated units), launching certain customer loyalty and analytics programs, targeting global growth of Reis & Irvy's, and developing an additional unattended retail platform.

25.     Stout developed certain marketing materials for the bridge financing process, including a teaser and a confidential information memorandum (the "CIM"). Stout also worked to develop a targeted investor list and contacted parties that would be interested in providing bridge financing only or bridge financing only with a follow on equity investment. Upon information and belief, Stout contacted 81 parties about the opportunity, and 33 parties received the teaser. While 21 parties received the CIM and signed a non-disclosure agreement, 18 parties passed upon review and receipt of the CIM (the remaining three were unresponsive), and Stout did not receive any term sheets as a result of the process.

**E.      The Existing Secured Creditors.**

**1.      The Socially Responsible Brands Loan.**

26.     On October 27, 2015, Generation Next, then known as Fresh Healthy, as borrower, entered into a loan arrangement (the "SR Loan") with Socially Responsible Brands, Inc. ("Socially Responsible"), as lender. Nicholas Yates, the former CEO and Chairman of the company, is the 20% owner of Socially Responsible. The SR Loan was set forth in two Secured Promissory Notes (the "SR Notes"), evidencing indebtedness in the original principal amount of $250,000 each, and $500,000 in the aggregate, and have terms of eighteen months and one year, respectively. The

first Note is secured by the Company's fifty (50) corporate-owned micro-markets and the Note principal and interest is repaid according to a schedule based on sale of such micro-markets. The second Note is secured by the Company's franchise royalties and principal and interest is repaid on a schedule based on receipt of combo machine sales, with guaranteed payments of at least $75,000 per quarter during the term of the Note. A true and correct copy of the SR Note is attached as **Exhibit 1**.

27.    The SR Loan was secured by a Security Agreement (the "SR Security Agreement") granting a security interest in all of Generation Next's assets. The SR Loan was also accompanied with a Subordination Agreement (the "SR Subordination Agreement") granting a priority to Socially Responsible over certain existing obligations of Generation Next. The company is unaware whether Socially Responsible actually filed a UCC-1 financing statement or if it remains effective as against the company or its property. True and correct copies of the SR Security Agreement and SR Subordination Agreement are attached as **Exhibits 2-3**.

28.    On January 20, 2017, Socially Responsible agreed to extend the maturity date on their note until December 31, 2017. In connection with the loan extension, the holder may convert their SR Notes into shares of the Company's stock at $0.16 per share. Furthermore, on September 18, 2017, the SR Notes were amended whereby the interest rate was modified to a rate of 20% per annum effective October 1, 2016 and the maturity date was further extended until December 31, 2019 (collectively, the "SR Notes Amendments"). True and correct copies of the foregoing loan amendment agreements are attached as **Exhibits 4-5**.

29.    At present, there is currently a remaining balance of approximately $296,000.00 due on the SR Loan.

**2.    The Presto Yogurt Vending Obligation.**

30.    In February 2019, Reis & Irvy's entered into a Rescission Agreement (the "Presto Rescission Agreement") with Presto Yogurt Vending, LLC ("Presto Yogurt"), which provided that Reis & Irvy's would pay the sum of $70,000 to Presto Yogurt. On February 14, 2019, Reis & Irvy's entered into a Security Agreement with Presto Yogurt (the "Presto Security Agreement"),

LARSON ZIRZOW KAPLAN & COTTNER
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

which granted Presto Yogurt a security interest in two (2) specific robotic soft-serve vending kiosks by serial number (the "Presto Collateral"). Presto Yogurt properly perfected its security interest in its two (2) specific robotic soft-serve vending kiosks by serial number by filing a financing statement with the Nevada Secretary of State on February 17, 2019 against Reis & Irvy's. True and correct copies of the Presto Rescission Agreement, Presto Security Agreement and the relevant filed financing statement are attached as **Exhibits 6-8**.

31.    At present, there is currently a remaining balance of approximately $28,000.00 due under the Presto Rescission Agreement.

**3.    Recent Junior Secured Creditors.**

32.    **Brett Hall.** Dated as of October 22, 2019, Generation Next and Reis & Irvy's, as borrowers, and Brett Hall ("Hall"), as lender, entered into a Business Loan and Security Agreement (the "Hall Loan Agreement") and related Secured Promissory Note (the "Hall Note"). Hall is an individual residing in Carlsbad, California. The Hall Note was in the original principal amount of $25,000.00 and executed by Generation Next, as borrower. The Hall Loan Agreement provided that the Hall Note would bear interest at the rate of 15% per annum, no monthly payments were required, and was due in full in 180 days. The loan from Hall was funded in full on October 22, 2019. The Hall Loan Agreement granted Hall a security interest in and to substantially all of the applicable debtors' assets, but subordinate to the interests of Genext (as hereinafter defined). On December 6, 2019, Hall filed a UCC-1 financing statement to perfect his security interest in and to any collateral. At present, the entire principal balance remains outstanding on the loan from Hall. True and correct copies of the Hall Loan Agreement, Hall Note and the associated financing statement are attached as **Exhibits 9-10**.

33.    **CK Green Partners Loan.** Dated as of November 12, 2019, Generation Next and Reis & Irvy's, as borrowers, and CK Green Partners, LLC, an Ohio limited liability company ("CK Green"), as lender, entered into a Business Loan and Security Agreement (the "CK Green Loan Agreement") and related Secured Promissory Note (the "CK Green Note"). CK Green is an entity owned and controlled by Kenneth Green of Westerville, Ohio. The CK Note was in the original

LARSON ZIRZOW KAPLAN & COTTNER
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

principal amount of $103,725.00 and executed by Generation Next, as borrower.  The CK Green Loan Agreement provided that the CK Green Note would bear interest at the rate of 15% per annum, no monthly payments were required, and was due in full in 180 days.  The loan from CK Green was funded in two tranches:  $32,000 on November 8, 2019, and $65,000 on November 12, 2019.  The CK Green Loan Agreement granted CK Green a security interest in and to substantially all of the Debtor's assets, but subordinate to the interests of Genext (as hereinafter defined).  On November 27, 2019, CK Green filed a UCC-1 financing statement to perfect its security interest in and to any collateral.  At present, the entire principal balance remains outstanding on the CK Green Loan.  True and correct copies of the CK Green Loan Agreement, CK Green Note and the associated financing statement are attached as **Exhibits 11-12**.

34.    **Kenneth Cascarella.**  Dated as of November 12, 2019, Generation Next and Reis & Irvy's, as borrowers, and Kenneth D. Cascarella ("Cascarella"), as lender, entered into a Business Loan and Security Agreement (the "Cascarella Loan Agreement") and related Secured Promissory Note (the "Cascarella Note").  Cascarella is an individual lender based in Eads, Tennessee.  The Cascarella Note was in the original principal amount of $100,000.00 and executed by Generation Next, as borrower.  The Cascarella Loan Agreement provided that the Cascarella Note would bear interest at the rate of 15% per annum, no monthly payments were required, and was due in full on October 22, 2019.  The Cascarella Loan Agreement granted Cascarella a security interest in and to substantially all of the Debtor's assets, but subordinate to the interests of Genext (as hereinafter defined).  On December 6, 2019, Cascarella filed a UCC-1 financing statement to perfect its security interest in and to any collateral.  At present, the entire principal balance remains outstanding on the Cascarella Loan.  True and correct copies of the Cascarella Loan Agreement, Cascarella Note and the associated financing statement are attached as **Exhibits 13-14**.

**4.    The Senior Secured Loans From Genext Loan.**

35.    On or about November 15, 2019, Generation Next, Reis & Irvy's, 19 Degrees, and Generation Next Vending Robots, Inc. (n/k/a Print Mates), as borrowers, entered into a loan

LARSON ZIRZOW KAPLAN & COTTNER
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

LARSON ZIRZOW KAPLAN & COTTNER
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

arrangement with Genext Loan, a Wyoming limited liability company ("Genext"), as lender. Genext is an entity owned and controlled by David L. Chessler.  Mr. Chessler is an entrepeneur based in Sarasota, Florida, who is the managing director of Jordyn Holdings, Chessler Holdings, and Great White Shark Opportunity Fund specializing in growth capital investments, asset-based lending and distressed assets.

36.    Genext's loan was evidenced by a Business Loan and Security Agreement (the "Genext Loan Agreement") that granted Genext a security interest in substantially all of Generation Next's assets.  The Genext Loan Agreement included a Promissory Note in the amount of $300,000 (the "First Genext Note") executed by Generation Next, as borrower, that was due in full in 90 days, plus interest payable of 20% per annum, and with interest payments payable on the last day of each calendar month, in arrears, commencing on the last day of the first full calendar month, in kind by an automatic increase to the principal amount of the Note by the amount of such interest due.  The Genext Loan Agreement granted Genext a security interest in all of Generation Next's assets, wherever located, whenever acquired and successions, accession, attachments thereto and proceeds thereof.  On November 19, 2019, Genext perfected its security interest in all of its collateral by filing a UCC-1 financing statements with the Nevada Secretary of State.  True and correct copies of the Genext Loan Agreement and the First Genext Note are attached as **Exhibit 15**, and its filed financing statements are attached as **Exhibit 16**.

37.    On or about December 3, 2019, Generation Next, Reis & Irvy's, 19 Degrees, and Generation Next Vending Robots, Inc. (n/k/a Print Mates), as borrowers, and Genext, as lender, entered into an additional Secured Promissory Note (the "Second Genext Note") in the principal amount of $25,000, the proceeds of which was used to fund the retention of Genext's counsel to facilitate the negotiation and documentation of a proposed debtor-in-possession loan for the company for its bankruptcy filing.  The additional loan per the Second Genext Note was secured pursuant to the existing Genext Security Agreement.  A true and correct copy of the Second Genext Note is attached as **Exhibit 17**.

38.    On December 5, 2019, the Debtors entered into an Intellectual Property Security

Agreement with Genext Loan (the "IP Agreement"), which confirmed that Genext Loan had been granted a security interest in all of the Debtors' intellectual property assets under the original loan documents. A true and correct copy of the foregoing IP Agreement is attached as **Exhibit 18**.

39.     The Genext Loan is in senior secured position in and to all of the Debtors' property except for the Presto Collateral. At present, there is currently a remaining principal balance of $325,000.00 in the aggregate due on the various loans owing to Genext.

## II.  FACTS IN SUPPORT OF THE FIRST DAY PLEADINGS

### A.    Introduction.

40.     Concurrently with the filing of the Chapter 11 Cases, the Debtors filed a number of First Day Pleadings,[1] each of which is described briefly below. I have reviewed each of the First Day Pleadings (including the exhibits thereto), and I believe that the relief sought in each of the First Day Pleadings: (i) is necessary to enable the Debtors to operate in chapter 11 with a minimum of disruption; and (ii) constitutes a critical element in maintaining the value of the Debtors' assets during the chapter 11 process. The Debtors anticipate that the Court will conduct a hearing soon after the commencement of the Chapter 11 Cases (the "First Day Hearing") at which the Court will hear and consider the First Day Pleadings.

41.     Generally, the First Day Pleadings have been designed to meet the primary goal of continuing the Debtors' operations postpetition in a manner that will minimize any potential impact on the Debtors' business. As such, the First Day Pleadings seek to: (i) obtain the use of postpetition financing; (ii) protect the Debtors' employees and other parties in interest; (iii) maintain the Debtors' operations and business throughout the Chapter 11 Cases; and (iv) efficiently administer the bankruptcy cases. Approval of the First Day Pleadings is in the best interest of the Debtors, their estates, their creditors, and all parties in interest, and is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

---

[1] Capitalized terms used in the descriptions of the First Day Pleadings and not otherwise defined herein have the meanings given to them in the applicable First Day Pleadings. The descriptions of the First Day Pleadings contained herein are only intended to be summaries.

LARSON ZIRZOW KAPLAN & COTTNER
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

**B.      Motion for an Order (i) Directing Joint Administration of Cases; and (ii) Approving Caption for Jointly Administered Cases (the "__Joint Administration Motion__").**

42.      The Debtors are related entities.  Reis & Irvy's, 19 Degrees, and Print Mates are wholly-owned subsidiaries of Generation Next.  The Debtors are each Nevada corporations.  The Debtors are requesting that the Court jointly administer the Debtors' Chapter 11 Cases for procedural purposes only and are not requesting that the cases be substantively consolidated at this time.  Therefore, the rights of parties in interest will not be prejudiced or otherwise affected in any way by the entry of an order directing the joint administration of the Debtors' Chapter 11 Cases.  The expense and potential confusion of running separate Chapter 11 Cases would materially hamper the Debtors' restructuring efforts and drive up administrative costs.

43.      I understand that the Bankruptcy Code and Bankruptcy Rules permit the joint administration of Chapter 11 Cases for procedural purposes only where the Debtors are corporate entities and are affiliated through common ownership.  The Debtors are seeking joint administration of their cases because such joint administration will have a number of beneficial effects.   Joint administration will permit the Clerk of this Court to utilize a single general docket for these cases, which will assist both the Court and all parties in interest to more easily track substantive matters related to the cases.  The Debtors anticipate that numerous notices in these cases will affect each of the Debtors and their estates.  Joint administration will allow the Debtors and the Court, as appropriate, to combine these notices, thus significantly reducing the volume of paperwork and make administrative tasks of the Court and parties and interest less burdensome, costly, and time-consuming.

44.      The Joint Administration Motion also requests a specific official caption to be used by all parties in all pleadings in the jointly administered cases.  The Debtors believe that use of this simplified joint caption will eliminate cumbersome and confusing procedures, and ensure a uniformity of pleading identification.   Such information is included in the petitions for each respective Debtor, and such petitions are publicly available to parties in interest or will be provided by the Debtors upon request.

LARSON ZIRZOW KAPLAN & COTTNER
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

**C.    Motion to Designate Ryan Polk as Responsible Person for Debtors in their Chapter 11 Cases (the "<u>Responsible Person Motion</u>").**

45.    In addition to my positions with the company as previously described, pursuant to each of the Debtor's corporate resolutions authorizing them to file bankruptcy, as attached to their *Voluntary Petition*s filed in these Chapter 11 Cases, the Debtors specifically authorized and approved me to serve as a designated responsible person for the Chapter 11 Cases, and thus the Responsible Person Motion seeks to implement the foregoing. I am suitable for serving as a designated responsible person on behalf of the Debtors in these Chapter 11 Cases.  My contact information is: Ryan Polk, Chief Executive Officer, Generation Next Franchise Brands, Inc., 2620 Financial    Court,    Suite    100,    San    Diego,    California    92117,    Ryan    Polk <ryan.polk@gennextbrands.com>, Tel: (888) 902-7558.

**D.    Motion for Interim and Final Orders: (I) Authorizing Debtors to Obtain Secured Post-Petition Financing; (ii) Authorizing the Use of Cash Collateral; (iii) Granting Adequate Protection; (iv) Modifying the Automatic Stay; (v) Setting a Final Hearing; and (vi) Granting Related Relief (the "<u>DIP Financing Motion</u>").**

46.    The Debtors are in default under the terms of its various prepetition loan agreements, and lack sufficient available cash on hand or access to credit to fund its employee payroll due Friday, December 20, 2019, as well as other necessary operational expenses, as well as to defend all of the various active litigations filed against it.  As a result, the company was left with no other choice but to file their voluntary petitions for relief under chapter 11 of the Bankruptcy Code in order to arrange for additional financing to fund ongoing operations and to allow for an orderly reorganization of its financial affairs and/or a sale of its business.

47.    The Debtors' ability to finance their operations post-petition is essential to their ability to maximize the value of their estates.  The Debtors do not have sufficient liquid assets in its estate available to finance its operations post-petition.  As such, in the absence of the Debtors obtaining credit pursuant to section 364 of the Bankruptcy Code, the estates will suffer immediate and irreparable harm.  The preservation, maintenance, and enhancement of the value of the Debtors is of the utmost significance and importance to a successful restructuring or sale.

48.    The Debtors need approval of and access to the DIP Loan to fund their operations

LARSON ZIRZOW KAPLAN & COTTNER
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

during the pendency of the Chapter 11 Cases, and to fund the Chapter 11 Cases themselves. The Debtors cannot meet their ongoing post-petition obligations unless they has the authorization to execute the DIP Loan Documents and access the proceeds of the DIP Loan. The terms and conditions of the DIP Loan Documents, and the proposed Interim Order, and the related relief requested herein are fair, reasonable, and in the best interests of the Debtors, their creditors, and their estates.

49.     The Debtors believe, based on their discussions with institutional and noninstitutional lenders, that they could not obtain financing from any other lender on terms equally or more favorable than the DIP Loan offered by the DIP Lender, and certainly not before all of the Debtors' limited cash resources were depleted by the search. The Debtors exercised their best business judgment in negotiating the DIP Loan Documents and the Interim Order that is presently before the Court.

50.     The DIP Lender's offer to provide the DIP Loan as an administrative claim and a superpriority priming lien loan, in an amount necessary to meet the Debtors' working capital needs on the terms, and within the time frame provided, simply cannot, in the judgment of the Debtors, be matched by any third-party lender. The DIP Lender has already performed all the due diligence necessary in connection with the DIP Loan and, thus, is well positioned to provide post-petition financing to the Debtors.

51.     The proposed financing is an exercise of the debtor's sound and reasonable business judgment. The financing agreement was negotiated in good faith and at arm's length. No reasonable alternative financing is available on any other basis. The terms of the transaction are fair, reasonable, and adequate, given the circumstances of the Debtors and the proposed lender. The financing is necessary, essential, and appropriate for the continued operation of the Debtors' businesses and the preservation of their estates, and the financing is in the best interests of the estates and their creditors

52.     The Debtors have exercised the utmost level of care in selecting and entering into the DIP Facility. The Debtors' management engaged in extensive deliberations regarding the

company's liquidity and financing options, in consultation with experienced legal and financial advisors.   The Debtors carried out a robust and competitive marketing process, reviewing proposals and selecting the option offering the best terms following multiple rounds of negotiations.  Accordingly, the decision to enter into the DIP Facility is the product of the Debtors' sound business judgment.

53.     The Debtors engaged in a competitive and thorough marketing process to obtain the most favorable postpetition financing available.  The Debtors' marketing process, and the negotiations of the terms of the DIP Facility, were carried out in good faith and at arm's length through experienced legal and financial advisors.  The DIP Facility was sized based upon the Debtors' projected cash flow and liquidity needs for the anticipated duration of these chapter 11 proceedings.  Based on an evaluation of all reasonably available options, the DIP Facility represent the best financing available to the Debtors.

54.     Finally, as described more fully above, the Debtors were unable to obtain financing without agreeing to provide the DIP Lender with certain terms enumerated herein.  The Debtors submit that approving such terms is appropriate under the circumstances because (a) the DIP Lender was unwilling to extend $2.5 million in credit without such terms; and (b) the terms of the DIP Facility are otherwise favorable to the Debtors and their estates.

55.     The Debtors requests that the Court conduct an expedited preliminary hearing on the Motion and (i) authorize the Debtors to obtain DIP Loan in order to (a) maintain and finance their ongoing operations and (b) avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest, and (ii) schedule a Final Hearing on the relief requested herein.  Absent authorization from the Court to access the DIP Loans on an interim basis pending a Final Hearing, the Debtors and their creditors will be immediately and irreparably harmed. Accordingly, the Interim Order should be granted.

56.     Access to the DIP Facility during the Interim Period would provide the Debtors sufficient liquidity to stabilize their operations and fund the administration of these Chapter 11 Cases.   Specifically, the DIP Facility will allow the Debtors to:  (a) acquire supplies that are

LARSON ZIRZOW KAPLAN & COTTNER
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

essential to the Debtors' ability to provide uninterrupted services to its customers; (b) provide the liquidity necessary to stabilize the Debtors' operations; (c) fund payroll obligations coming due in the first month of the Chapter 11 Cases; (d) fund other essential payments made under first day orders; and (e) fund the administrative costs of these Chapter 11 Cases.  Given the nature of the Debtors' businesses, any interruption of the Debtors' ability to pay vendors and operate their businesses could have devastating consequences on its reorganization and/or sale efforts. Accordingly, entry of the Interim Order is necessary to avoid immediate and irreparable harm to the Debtors' estates.

57.    The DIP Facility is the result of the Debtors' reasonable and informed determination that the DIP Lender offered the most favorable terms pursuant to which the Debtors could obtain postpetition financing.  All negotiations regarding the DIP Facility were conducted in good faith and on an arm's length basis.  The terms and conditions of the DIP Facility are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Facility other than as described herein or set forth in the DIP Loan Agreement. Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

58.    The Carve-Out does not directly or indirectly deprive the Debtors' estates or other parties-in-interest of possible rights and powers.  Additionally, the Carve-Out ensures that assets will be available for the payment of fees of the Clerk of Court or the Office of the United States Trustee for the District of Nevada and professional fees of the Debtors and any statutory committee appointed in these Chapter 11 Cases.

**B.    Motion for an Order (i) Authorizing the Debtors to (a) Pay Certain Prepetition Employee Obligations and Related Claims and (b) Continue to Provide Employee Benefits in the Ordinary Course of Business and (ii) Granting Related Relief (the "Employee Wages Motion").**

59.    By this Motion, the Debtors are requesting entry of an order (a) authorizing: (i) the

LARSON ZIRZOW KAPLAN & COTTNER
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Debtors to continue to pay and honor certain prepetition claims for wages, salaries, commissions, reimbursable expenses and other unpaid compensation (collectively, the "Employee Obligations") and withholdings and deductions (the "Withheld Amounts"); (ii) the Debtors to continue providing all employee health benefits and all other employee benefits in the ordinary course of business (collectively, the "Employee Benefits"); (iii) the Debtors to pay all related costs and expenses; and (b) authorizing and directing the Debtors' banks to receive, honor, and pay all checks and electronic transfers related to the foregoing.

60.     To minimize the personal hardship to Employees (as defined below), which will occur if the prepetition Employee Obligations and Employee Benefits are not paid and continued, and as a means of maintaining morale during this critical time, the Debtors seek entry of an order authorizing the Debtors, in their discretion, to pay and honor all Employee Obligations and to forward Withheld Amounts to the appropriate third-party recipient.

61.     In addition, except as set forth herein, the Debtors seek authority, in their discretion, to: (i) continue to maintain and provide all Employee Benefits in the ordinary course of business; and (ii) pay all costs and expenses required to be paid under, or incident to, the Employee Benefits to the extent any amounts accrued prepetition and/or accrued postpetition but are related to the period prior to the Petition Date.

62.     The Debtors further seek authority, in their discretion, and without the need for further Court approval, to modify, cancel, discontinue and/or replace any policies, plans, offerings or programs relating to any Employee Obligations or Employee Benefits as it deems appropriate, and to pay any amounts necessary to effect such modification, cancellation, discontinuance or replacement in the ordinary course of business.

63.     Finally, the Debtors seek entry of an order authorizing and directing their banks and other financial institutions to receive, process, honor and pay all checks presented for payment and electronic payments related to the Employee Obligations and Employee Benefits.

64.     As of the Petition Date, the Debtors' workforce consists of approximately 23 hourly and salaried employees (collectively, the "Employees"), including three part-time employees.  The

LARSON ZIRZOW KAPLAN & COTTNER
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Employees include the Debtors' valuable franchise relation staff, territory managers, sales managers, directors and staff for operations, health and safety, and technology matters, and administrative and corporate management employees. All Employees are employed by Debtor Reis & Irvy's, Inc., but provide certain services to each of the Debtors. The Employees are the backbone of the Debtors' business and their restructuring efforts, and the Debtors require the full and uninterrupted involvement of the Employees throughout the Chapter 11 Cases in order to adequately continue the Debtors' operations and provide quality services.

65.    As of the Petition Date, many Employees were owed, or had accrued, various sums for Employee Obligations, including wages, salaries, commissions, contractual compensation, PTO (as defined below), reimbursable expenses, and other accrued compensation. Certain of these obligations are outstanding as of the Petition Date and will continue to become due in the ordinary course of business after the Petition Date.

66.    In the past, the Debtors usually paid the Employee Obligations and transmitted the Withheld Amounts to the appropriate third parties through a relationship with its payroll vendor, Paychex Insurance Agency, Inc. ("Paychex"), on a bi-weekly basis. The Debtors usually processed Employees' hours and wages and other rights for each pay period and supplies such information to Paychex. The Debtors then provided Paychex a lump sum amount sufficient to pay all Employee Obligations and Withheld Amounts, and Paychex then prepared paychecks for each Employee and transmits Employee Obligations and Withheld Amounts as appropriate. The Debtors funds its payroll on Tuesdays, and Employees are issued checks or receive direct deposit on Fridays twice per month. In assisting with the payroll process, Paychex provided a critical service for the Debtors for a fraction of what it would cost for the Debtors' own Employees to perform the necessary functions. Accordingly, the Debtors seek to continue this relationship with Paychex in the ordinary course of business. At present, the Debtors have accrue one (1) week's worth of wages and salaries to their Employees, which is approximately $50,000.00 in the aggregate.

67.    Employees begin accruing paid time off days every pay period ("PTO") after the

beginning of their employment with the company. Employees are granted PTO in lieu of vacation days, personal days, and sick days, and the Employees may use their set amount of PTO time in their discretion after 90 days of consecutive employment with the Debtors. Employees in their first year of employment with the Debtors accrue PTO at a rate of 3.34 hours per pay period; Employees in their second year of employment with the Debtors accrue PTO at a rate of 5 hours per pay period, and Employees in their third year or more of employment with the Debtors accrue PTO at a rate of 6.67 hours per pay period. PTO rolls over from year to year, but is capped at a maximum of three times the relevant Employee's accrual rate. The Debtors regularly accrue obligations related to PTO obligations for each bi-weekly pay period. As of the Petition Date, the Debtors have accrued approximately $100,000 in outstanding unused PTO obligations. The Debtors believe it is appropriate to allow Employees to retain and use the benefits of their accrued PTO as of the Petition Date and thereafter in the ordinary course. While the Debtors seek to continue the cash-out options available to its Employees upon termination of employment in accordance with past practice, it does not seek to pay out any accrued PTO to any Employee that, when added to any other prepetition Employee Obligations received by such Employee, is greater than the $13,650 priority statutory limitation.

68.    The Debtors also reimburse certain hourly and salaried Employees for certain expenses, including, but not limited to, mileage, hotel stays, rental cars, and certain business-related meals in the ordinary course of its business (the "Reimbursable Expenses"). To enable the Employees to perform their jobs effectively, the Debtors must continue corporate policies of permitting certain Employees to incur business and travel-related expenses and thereafter seek reimbursement by submitting appropriate invoices or vouchers evidencing such expenses. In the ordinary course of the Debtors' business, Employees may travel to meet with vendors, suppliers, franchisees, or potential new franchisees and are reimbursed for expenses incurred in connection therewith. The Employees may be unwilling or unable to continue this vital business practice if they are not reimbursed for these Reimbursable Expenses, thus irreparably injuring the Debtors' business.

LARSON ZIRZOW KAPLAN & COTTNER
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

69.     The Debtors also accrue a small amount of Reimbursable Expenses for employees, officers, and directors on a monthly basis. Some Reimbursable Expenses remained unpaid as of the Petition Date because certain of the Debtors' obligations accrued either in whole or in part prior to the Petition Date, but will not become payable in the ordinary course of the Debtors' business until a later date.  The Debtors usually reimburse Employees for these Reimbursable Expenses in the ordinary course of business; pay dates for reimbursable expenses vary based on the expenses accrued by the Employees. The Debtors seek authority to pay, on the dates that Reimbursable Expenses would be due in the ordinary course, all Reimbursable Expenses that accrued but remained unpaid as of the Petition Date.  As of the Petition Date, less than $15,000.00 remains unpaid in accrued Reimbursable Expenses.

70.     In addition to Employee Obligations, the Debtors makes certain deductions from Employees' paychecks to make payments on behalf of the Employees for, *inter alia*, medical insurance, dental insurance, vision insurance, and life insurance, among other programs, in the ordinary course of its business. From time to time, there may also be garnishments, support payments, and other similar programs, on account of which the Debtors ordinarily deduct a sum of money from an Employee's paycheck and pays that amount to a third party.  All of these amounts withheld from an Employee's pay to be paid to another entity are referred to herein as the "Withheld Amounts."

71.     Employee Obligations and Withheld Amounts may be due and owing as of the Petition Date because, among other things:

- The Debtors filed their chapter 11 petitions in the midst of regular and customary salary, compensation, and hourly wage payroll periods, and thus, Employees have not yet been paid certain amounts of their salaries, contractual compensation and wages for services previously rendered to the Debtors;

- Reimbursable Expenses have accrued but not yet been paid and/or expense reimbursement checks issued to date have not yet been presented for payment or have not yet cleared the banking system and accordingly were not honored and paid as of the Petition Date; or

- Certain other forms of compensation (including, but not limited to, PTO, bonuses, payments into Employee Benefit plans, and withholdings for benefit

LARSON ZIRZOW KAPLAN & COTTNER
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

23

LARSON ZIRZOW KAPLAN & COTTNER
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

plan contributions) related to prepetition services have not yet been paid to or for the benefit of Employees because such benefits, although accrued either in whole or in part prior to the Petition Date, were not payable at such time, but rather will become payable in the future in the ordinary course of the Debtors' business.

72.     The Debtors accrue approximately $100,000 in gross Employee Obligations on a twice per month basis in favor of the Employees.  Moreover, on a twice per month basis, the Debtors accrue approximately $40,000.00 in Withheld Amounts[2] to be paid on behalf of the Employees.  As of the Petition Date, approximately $100,000.00 in prepetition Employee Obligations remains unpaid to the Employees,[3] representing approximately 15 days of work performed but not yet paid.  The Debtors seek authority to pay, on the dates that Employee Obligations and Withheld Amounts would be due in the ordinary course, all Employee Obligations and Withheld Amounts that have accrued but remain unpaid as of the Petition Date.  The total amount of Employee Obligations accrued and payable to any one Employee for prepetition services will not exceed the $13,650 priority statutory limitation.

73.     The Debtors offer its Employees the Employee Benefits through a comprehensive package of benefit programs and plans (collectively, the "Benefit Plans").  The Benefit Plans the Debtors currently provide to the Employees include:

• Employee Healthcare Plan:  The Debtors provide all Employees with comprehensive healthcare coverage through Blue Shield of California ("Blue Shield") and Kaiser Permanente ("Kaiser").  The Debtors provide five healthcare plan options to Employees through Blue Shield, with monthly rates ranging from approximately $100 – $400 per month (plus additional costs for dependents, depending on the type of coverage the Employee has elected.  The Debtors also provide one healthcare plan option through Kaiser.  Regardless of the plan Employees select, the Debtors pay a portion of every employee's healthcare costs every month.

• Employee Dental Plan: The Debtors provide all Employees with two options for dental coverage through UNUM; a low cost plan and a high cost plan.

---

[2] This amount does not include amounts withheld for payment of certain income, FICA, social security, Medicare, Medicaid or other taxes withheld from Employees' pay.  The Debtors have requested to continue paying these taxes in the ordinary course of its business by separate motion.

[3] The last paycheck the Debtors' employees received was dated December 6, 2019, and included prepetition compensation earned through and including November 30, 2019.

LARSON ZIRZOW KAPLAN & COTTNER
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

The costs range from $30 - $190 per month per employee, depending on the type of coverage the Employee has elected. The Debtors pay a portion of the dental plan costs every month, including approximately $30 per month per employee.

• Employee Vision Plan: The Debtors provide all Employees with a vision insurance coverage option through UNUM. Employees pay approximately $7 - $30 per month for vision insurance, depending on the type of coverage the Employee has elected. The Debtors pay $7 per month for each employee who elects vision insurance.

• 401(k) Retirement Plan: The Debtors provide all Employees with a 401(k) retirement plan through Paychex Retirement Services. Employees may elect to have certain sums deducted from their paychecks and deposited into their 401(k) accounts. The Debtors do not provide a match of Employee contributions to the 401(k) plan.

74. In the ordinary course of their business, the Debtors accrue approximately $29,000.00 on a monthly basis in Withheld Amounts and Employee Benefits provided to its Employees covered under the Benefit Plans. Some Employee Benefits remained unpaid as of the Petition Date because certain of the Debtors' obligations under the applicable Benefit Plans accrued either in whole or in part prior to the Petition Date, but will not become payable or due to the Benefit Plans in the ordinary course of the Debtors' business until a later date. The Debtors seek authority, in their discretion, to continue the Benefit Plans and to pay for all Employee Benefits that accrued but remained unpaid as of the Petition Date on the dates that Employee Benefits would be due to another party in the ordinary course. The Debtors estimate that the aggregate amount of accrued prepetition Employee Benefits under the Benefit Plans as of the Petition Date is approximately $67,000.00.

75. The Debtors provide workers' compensation coverage for Employees through a workers' compensation policy with The Hartford. The Debtors pay premiums through its payroll services provider Paychex. Monthly premiums are approximately $2,000. The Debtors estimate that the aggregate amount of accrued prepetition Workers Compensation Premiums are $21,000. To the best of its knowledge, the Company believes the policy automatically renewed on December 15, 2019 with this past due balance. If coverage is not continued as required, the Debtors' estates could be exposed to lawsuits for damages, and the Debtors' officers could be subject to fines applied against them personally. The Debtors seek to continue paying premiums

under this policy in the ordinary course of their businesses.

76.    The vast majority of the Employees rely exclusively on their full compensation and/or reimbursement of prepetition Reimbursable Expenses to continue to pay their daily living expenses.  These individuals will be exposed to significant financial difficulties if the Debtors are not permitted to pay the unpaid Employee Obligations.  Moreover, the Debtors submit that if it is unable to honor their Employee Obligations, Employee morale and loyalty will be jeopardized at a time when such support is critical, thereby posing immediate and irreparable harm to the estates if the obligations are not honored immediately.

77.    The continued maintenance of the Employee Benefits is also crucial to the Debtors' business operations.  If the Debtors are not authorized to pay and to continue these various obligations, many of the Employees will not be reimbursed or have their benefit claims paid.  The Debtors believe such uncertainty will cause significant anxiety for their Employees precisely when the Debtors need their Employees to perform their jobs at peak efficiency.

78.    The Withheld Amounts principally represent Employee earnings that Employees (in the case of voluntarily Withheld Amounts), and judicial authorities (in the case of involuntarily Withheld Amounts) have designated for deduction from Employees' paychecks.  The failure to pay these amounts would result in hardship to Employees, as well as inquiries from third parties regarding the Debtors' failure to remit such funds.  In many cases, the Withheld Amounts are not the Debtors' property, but belong to the Employees or third parties and, therefore, are not property of the Debtors' bankruptcy estates. Moreover, the Debtors' failure to submit these payments could cause the affected Employees, and possibly the Debtors, to face legal action.

79.    Together, the Employees are essential to the orderly and successful restructuring of the Debtors' business operations.  They have an intimate knowledge of the Debtors' businesses, and any deterioration in morale, welfare and focus at this critical time undoubtedly would adversely affect the Debtors, the value of their assets and the businesses, and ultimately, the Debtors' ability to achieve a positive outcome in the Chapter 11 Cases.

LARSON ZIRZOW KAPLAN & COTTNER
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

**E.    Motion for an Order (i) Authorizing Continued Use of Existing Cash Management Systems; (ii) Authorizing Maintenance of Existing Bank Accounts; (iii) Authorizing Continued Use of Existing Business Forms; and (iv) Waiving Certain Investment and Deposit Requirements (the "Cash Management Motion")**

80.    By the Cash Management Motion, the Debtors are seeking entry of an order (i) authorizing the continued use of their existing cash management system (the "Cash Management System"), (ii) authorizing the maintenance of existing bank accounts (the "Bank Accounts"), (iii) authorizing the continued use of existing business forms and checks (the "Business Forms"), and (iv) waiving certain investment and deposit requirements.

81.    I have been informed that the Operating Instructions and Reporting Requirements for Chapter 11 Cases promulgated by the Office of the United States Trustee for the District of Nevada require that a debtor, among other things: (i) close all bank accounts and open new debtor in possession bank accounts; (ii) establish a separate debtor in possession account for all estate monies required for the payment of taxes, including payroll taxes; (iii) maintain separate debtor in possession accounts for cash collateral; and (iv) obtain checks for all debtor in possession accounts which bear the designation "Debtor-In-Possession," the bankruptcy case number, and the type of account.  The relief requested in the Cash Management Motion is designed to maintain the status quo and avoid any significant disruptions to the Debtors' operations.

82.    The Cash Management Motion describes the Debtors' cash management system in detail.  The Debtors' cash management system includes six (6) separate bank accounts maintained at Bank of America (collectively, the "Bank Accounts").  Each of the Bank Accounts at Bank of America is utilized by the Debtors to manage payments from customers and franchisees and to make disbursements, including vendor and supplier payments, payroll, and employee benefits.

83.    The Debtors' cash management system is similar to those commonly employed by companies of comparable size and complexity and allows the Debtors to control and monitor corporate funds, ensure cash availability, and reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balances and presentment information.

84.    Given the Debtors' corporate and financial structure, it would be burdensome for

LARSON ZIRZOW KAPLAN & COTTNER
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

the Debtors to establish an entirely new cash management system. Any disruption of the Debtors' accounting and cash management procedures would be cumbersome and costly to the Debtors' operations, and any delay could have an adverse impact on the Debtors' restructuring efforts, make payments to their employees, and pay other necessary expenses during the chapter 11 process. Thus, under the circumstances, maintaining the Debtors' cash management system is in the best interest of the Debtors' estates, customers, and creditors.

85.     The Cash Management Motion also requests this Court's authority for the Debtors to continue using their existing Bank Accounts on a postpetition basis.  Allowing the Debtors to continue to use their prepetition Bank Accounts will assist the Debtors in making a smooth transition to operating in chapter 11 and ensure that the Debtors' cash flow is not interrupted.

86.     The Cash Management Motion also requests authority for the Debtors to continue using their existing business forms postpetition.  The Debtors use their business forms in the ordinary course of their businesses.  By virtue of the nature and scope of the Debtors' businesses and the number of franchisees and suppliers with whom the Debtors transact business, it is important for the Debtors to continue using their business forms without alteration or change.

87.     To prevent unnecessary delay, confusion, and accrual of further expense to the estates, the Debtors request that the Court waive any requirement of adding a "Debtor-in-Possession" legend or number to the business forms other than checks.  The Debtors, however, will begin using a "Debtor-in-Possession" stamp or legend for all checks as soon as possible.

88.     Finally, the Cash Management Motion requests that this Court waive any applicable investment and deposit guidelines solely with regard to the Bank Accounts during the Debtors' bankruptcy cases.  The Debtors' Bank Accounts are not kept at a high-risk institution or in volatile investments.  Rather, the Debtors hold standard accounts at a highly regarded, substantial, FDIC-insured and bonded financial institution; therefore, any applicable deposit restrictions can be waived.

**F.     Motion for an Order Granting Additional Time to File Schedules and Statements (the "Schedules Extension Motion").**

89.     I understand that the Bankruptcy Code and Bankruptcy Rules require the Debtors

LARSON ZIRZOW KAPLAN & COTTNER
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

to file with the Court within 14 days of the Petition Date: (i) their schedules of assets and liabilities; (ii) their statements of financial affairs; (iii) their schedules of current income and expenditures; (iv) their lists of executory contracts and unexpired leases; and (v) their lists of equity security holders (collectively, the "Schedules and Statements").  By the Schedules Extension Motion, the Debtors are seeking entry of an order extending the time for filing the Schedules and Statements for a period of approximately two (2) weeks, and in particular an extension through and including January 13, 2020.

90.     The Debtors are filing the Extension Motion because they have numerous creditors and other interested parties, and the Debtors require additional time to accurately review and report all of the required information.  Given the current state of their businesses and the large number of parties in interest, the Debtors have not had ample opportunity to gather all of the necessary information to prepare and file their Schedules and Statements.  The Debtors have commenced the task of gathering the necessary information to prepare and finalize the Schedules and Statements, but Debtors believe that the 14-day automatic extension of time to file such Schedules and Statements provided by Bankruptcy Rule 1007(c) is not sufficient to permit completion of the Schedules and Statements.

**G.     Motion for an Order (i) Authorizing the Debtors to Pay Prepetition (a) Trust Fund Taxes and (b) Licensing Fees; and (ii) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Relief (the "Taxes Motion").**

91.     The Debtors pay taxes and fees to various authorities in the ordinary course of their businesses, including employee-related taxes, sales taxes, and business licensing fees. As of the Petition Date, the Debtors have collected certain taxes that accrued during a prepetition period, but are not yet due to the relevant taxing authorities.  The Debtors have also collected certain "trust fund" taxes for the benefit of the taxing authorities, which do not properly constitute property of the Debtors' estates.  The Debtors seek authority to pay all such trust fund taxes in the ordinary course of business.

92.     The Debtors also pay certain fees related to permits and licenses necessary to

LARSON ZIRZOW KAPLAN & COTTNER
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

LARSON ZIRZOW KAPLAN & COTTNER
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

operate their businesses.  The Debtors' remittance of these fees varies greatly based on the various licensing authorities' requirements.  With the exception of some franchise fees and filings (some of which have recently expired), it is the Debtors' practice to remain current with their required payment of Licensing Fees.  In an abundance of caution, however, the Debtors request authority to continue to pay any licensing fees that come due in the ordinary course of business throughout these Chapter 11 Cases, regardless of whether the licensing fees relate in part to a prepetition period.

93.    The Debtors are also seeking authority to pay any unpaid prepetition tax liabilities (including payroll taxes and withheld amounts) that are past due and/or due to Paychex, as a result of the Debtors' temporary cessation of services with Paychex earlier this year.    Immediate payment of these amounts will ensure that the Debtors continue to pay their tax liabilities in a timely manner.  The Debtors wish to remain current on and continue to pay the trust fund taxes in order to prevent potential issues during the Chapter 11 Cases and avoid liability for non-payment.  The Debtors' failure to pay these taxes would have a detrimental impact on their ability to operate their businesses in the ordinary course.   Furthermore, if the Debtors failed to pay these taxes, certain taxing authorities may become involved in the Debtors' bankruptcy cases, possibly creating undue delay and complications to the Debtors' restructuring efforts.

94.    The Debtors' trust fund taxes do not constitute property of the Debtors' estates and such amounts are not available to the Debtors' creditors.  Therefore, immediate payment of the relevant taxes will not adversely affect the Debtors' estates or their creditors.   Uninterrupted operations are necessary for the Debtors to maintain their reputation, avoid significant variations in their cash flow, and preserve the value of the businesses for a sale process.  The Debtors believe that the estates will not be materially harmed if the Court permits the Debtors to pay the relevant trust fund taxes.

**H.    Motion for Interim and Final Orders (i) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services; (ii) Determining That Utilities are Adequately Assured of Payment; and (iii) Establishing Procedures for Determining Requests for Additional Assurance (the "<u>Utilities Motion</u>").**

95.    In connection with the operation of their businesses, the Debtors obtain various utility services, such as gas/electric and telephone/cable/internet (collectively, the "<u>Utility Services</u>") from certain utility companies (collectively, the "<u>Utility Companies</u>") for the Debtors' facility in San Diego, California.  Uninterrupted Utility Services are critical to the Debtors' ability to sustain its operations during the pendency of the Chapter 11 Cases, and, therefore, to the success of its reorganization.  Any interruption of utility services, even for a brief period of time, would disrupt Debtors' ability to continue maintaining its business, thereby negatively affecting revenues and profits.  Such a result could jeopardize Debtors' reorganization efforts and, ultimately, value and creditor recoveries.  It is therefore critical that utility services continue uninterrupted during the Chapter 11 Cases.

96.    The Debtors intend to pay their post-petition utility obligations owed to the Utility Providers in a timely manner and keep them current on a go forward basis from and after the Petition Date.  The Debtors expect that they will have access to such funds from operations, as well as access to debtor in possession financing and cash collateral to pay post-petition obligations to the Utility Providers.  Given the relatively small monthly obligations to Utility Providers, the Debtors assert that there is no need to provide any additional assurance of payment for future services to the Utility Providers.

97.    The relief requested will ensure that the Debtors' operations will not be disrupted, which would severely impact their businesses and prospects for a successful reorganization.  The relief requested provides the Utility Providers with fair and orderly procedures for determining requests for Additional Adequate Assurance, without which the Debtors potentially could be forced to address various requests by Utility Providers in a disorganized manner at a critical period in the Chapter 11 Cases when the Debtors' efforts should be more productively focused on their operations and the administration of the Chapter 11 Cases for the benefit of all parties in interest.

LARSON ZIRZOW KAPLAN & COTTNER
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  December 17, 2019.

/s/ Ryan Polk
RYAN POLK
Chief Executive Officer,
Generation Next Franchise Brands, Inc.

LARSON ZIRZOW KAPLAN & COTTNER
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

# EXHIBIT 1

THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS DOCUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER AND REASONABLY APPROVED BY THE COMPANY), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.

## SECURED PROMISSORY NOTE

October 27, 2015

**$250,000.00**

**FOR VALUE RECEIVED, Fresh Healthy Vending International, Inc.,** a Nevada corporation (the "Company"), with an address of 2620 Financial Court, Suite 100, San Diego, CA 92117, hereby promises to pay to the order of **Socially Responsible Brands Inc,** a Nevada corporation, having an address at **187 E. Warm Springs Road, Suite B276, Las Vegas, Nevada 89119**, or its successors or assigns (the "Holder"), the principal amount of **Two Hundred Fifty Thousand and 00/100 United States Dollars (US$250,000.00)** on or prior to the eighteen (18) month anniversary of the date hereof (the "Maturity Date"), and to pay interest in accordance with the terms hereof. This Secured Promissory Note (this note, and all modifications, extensions, future advances, supplements, and renewals thereof, and any substitutions therefor, hereinafter referred to as the "Note") shall be payable in accordance with the terms set forth below. This Note is "Note 1" referenced in that certain Security Agreement executed on the date hereof by and between the Company and the Holder (the "Security Agreement"), and that certain Subordination Agreement among the Holder of this Note and certain lien holders of the Company (the "Subordination Agreement"). This Note is subject to the terms and conditions contained in the Security Agreement. All capitalized terms not otherwise defined herein shall have the meanings set forth in the Security Agreement.

1.    Payments of Principal and Interest.

(a)    Payment of Interest. This Note is secured by, among other things, an interest in fifty (50) corporate-owned micro markets (each, a "Unit"), as further described in the Security Agreement. Interest on this Note shall be paid by the Company at the rate of $200 per Unit per month until such time as the Unit and/or corporate-owned route applicable to the Unit (collectively, a "Corporate Route") is sold, in whole or in part.[1]  Such monthly payments shall be due and payable on the first (1st) day of each month after the date hereof.

(b)    Payment of Principal. The principal amount of this Note shall be paid to the Holder on or prior to the Maturity Date; provided, that, concurrently with the sale, or partial sale, of a Corporate Route, the Company will pay Five Thousand Dollars ($5,000) per Corporate Route to the Holder, and such amount shall reduce the principal amount payable hereunder and the sale of such Corporate Route will reduce the amount of interest payable thereafter pursuant to subsection (a) above; provided, that in the event that a Corporate Route is sold to a new franchisee (rather than to a third party purchaser that is not a franchisee), the Company will pay Two Thousand Five Hundred Dollars ($2,500) within three (3) Business Days of receiving the deposit from the franchisee (an "Initial Franchisee Payment") and another Two Thousand Five Hundred Dollars ($2,500) within three (3) Business Days after receipt of the balance from the franchisee (a "Final Franchisee Payment").[2]  In the event that the Company sells a Unit to a franchisee(s) that is not part of the Corporate Route during any period in which one or more Final Franchisee Payments are due, the Company will pay Two Thousand Five Hundred Dollars ($2,500) principal per Unit to the Investor within three (3) Business Days of receiving a deposit on the Unit and another Two Thousand Five Hundred Dollars ($2,500) within three (3) Business Days after receipt of the balance from the franchisee, and such amount shall reduce the Final Franchisee Payment(s) due.

(c)    Payment of Default Interest.  Any amount of principal or interest on this Note which is not paid when due shall bear interest from the date due until such past due amount is paid at a rate of interest equal to four percent (4%) per annum (the "Default Rate").

(d)    General Payment Provisions. All payments of principal and interest on this Note shall be made in lawful money of the United States of America by bank check or wire transfer to such account as the Holder may designate by written notice to the Company in accordance with the provisions of this Note. Whenever any amount expressed to be due by the terms of this Note is due on any day which is not a Business Day, the same shall instead

---

[1] See Footnote 2

[2] Example 1: If the entire corporate route is sold after month six of the Transaction, the Company would pay a total of $310,000 (six monthly payments of $10,000, plus $250,000 principal).

Example 2: if 15 units are sold after month six of the Transaction, the Company would pay a total of $135,000 (six monthly payments of $10,000, plus $75,000 principal). Additionally, the Company would continue to make monthly payments of $7,000 ($200 X 35 = $7,000).

be due on the next succeeding Business Day. For purposes of this Note, "Business Day" shall mean any day other than a Saturday, Sunday or a day on which commercial banks in the State of Nevada are authorized or required by law or executive order to remain closed.

(e)    Prepayment. At any time prior to the Maturity Date, the Company may pre-pay this Note in full or in part without penalty upon receiving the written consent of the Holder; provided, however, that such prepayment includes all principal and interest evidenced hereby, including, without limitation, the amounts due under Section 1(a) above. Upon prepayment of this Note in full, the Holder shall have no further rights under this Note (except for such rights that may specifically survive the payment of the Note).

2.    Voting Rights. The Holder shall have no voting rights under this Note, except as required by applicable law, including, but not limited to, the Nevada Corporations Law, and as expressly provided in this Note.

3.    Defaults and Remedies.

(a)    Events of Default. The occurrence of any of the following events shall constitute an "Event of Default" hereunder:

(1)    Nonpayment of Obligations. Any amount due and owing on the Note, whether by its terms or as otherwise provided herein, is not paid on the date such amount is due.

(2)    Misrepresentation. Any written warranty, representation, certificate or statement of the Company in this Agreement, the Security Agreement or any other agreement with Holder (including the Subordination Agreement) (collectively, "Loan Documents") shall be false or misleading in any material respect when made or deemed made.

(3)    Nonperformance. Any failure to perform or default in the performance of any nonmonetary covenant, condition or agreement contained in this Note or any other Loan Document, which failure to perform or default in performance continues for a period of fifteen (15) days after the Company receives notice or knowledge from any source of such failure to perform or default in performance (provided that if the failure to perform or default in performance is not capable of being cured, in Holder's sole discretion, then the cure period set forth herein shall not be applicable and the failure or default shall be an immediate Event of Default hereunder).

(4)    Default under Loan Documents. Any failure to perform or default in the performance by the Company that continues after applicable grace and cure periods under any covenant, condition or agreement contained in any other Loan Document, all of which covenants, conditions and agreements are hereby incorporated in this Agreement by express reference.

3

(5)    Assignment for Creditors. The Company makes an assignment for the benefit of creditors, fails to pay, or admits in writing its inability to pay its debts as they mature; or if a trustee of any substantial part of the assets of the Company is applied for or appointed, and in the case of such trustee being appointed in a proceeding brought against the Company, the Company by any action or failure to act indicates its approval of, consent to, or acquiescence in such appointment and such appointment is not vacated, stayed on appeal or otherwise shall not have ceased to continue in effect within sixty (60) days after the date of such appointment.

(6)    Bankruptcy. Any proceeding involving the Company is commenced by or against the Company under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law or statute of the federal government or any state government, and in the case of any such proceeding being instituted against the Company: (i) the Company, by any action or failure to act, indicates its approval of, consent to or acquiescence therein; or (ii) an order shall be entered approving the petition in such Proceedings and such order is not vacated, stayed on appeal or otherwise shall not have ceased to continue in effect within sixty (60) days after the entry thereof.

(7)    Collateral Impairment. The entry of any judgment, decree, levy, attachment, garnishment or other process, or the filing of any lien against, any of the Collateral or any collateral under a separate security agreement securing any of the obligations hereunder, and such judgment or other process shall not have been, within thirty (30) days from the entry thereof: (i) bonded over to the satisfaction of Holder and appealed; (ii) vacated; or (iii) discharged, or the loss, theft, destruction, seizure or forfeiture, or the occurrence of any material deterioration or impairment of any of the Collateral or any of the Collateral under any security agreement securing any of the obligations hereunder, or any material decline or depreciation in the value or market price thereof (whether actual or reasonably anticipated), which causes the Collateral, in the sole opinion of Holder acting in good faith, to become unsatisfactory as to value or character, or which causes Holder to reasonably believe that it is insecure and that the likelihood for repayment of the obligations hereunder is or will soon be impaired, time being of the essence. The cause of such deterioration, impairment, decline or depreciation shall include, but is not limited to, the failure by the Company to do any act deemed reasonably necessary by Holder to preserve and maintain the value and collectability of the Collateral.

(8)    Other Note. Any Event of Default (as defined therein) under that certain Secured Promissory Note, of even date herewith, evidencing an original principal obligation from Company to Holder in the amount of $250,000 ("Other Note"), which is also secured by the Security Agreement.

(b)    Remedies. Upon the occurrence of an Event of Default, Holder shall have all rights, powers and remedies set forth in this Note, the Security Agreement, and any other Loan Document, in any written agreement or instrument relating to any of the obligations or any security therefor, or as otherwise provided at law or in equity. Without limiting the generality of the foregoing, Holder may, at its option and without further notice, demand

4

or presentment for payment to the Company or others, may declare the then outstanding principal balance of this Note, together with all other sums due under the Note, including, without limitation, the amounts due under Section 1(a) above, immediately due and payable, together with all accrued and unpaid interest thereon and thereafter all such sums shall bear interest at the Default Rate, and all other sums due by the Company hereunder, all without any relief whatsoever from any valuation or appraisement laws and payment thereof may be enforced and recovered in whole or in part at any time by one or more of the remedies provided to the Holder at law, in equity, under this Note, and/or under any other Loan Document. No Event of Default shall be waived by Holder, except and unless such waiver is in writing and signed by Holder. No failure or delay on the part of Holder in exercising any right, power or remedy hereunder shall operate as a waiver of the exercise of the same or any other right at any other time; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder. There shall be no obligation on the part of Holder to exercise any remedy available to Holder in any order. The remedies provided for herein are cumulative and not exclusive of any remedies provided at law or in equity. The Company agrees that in the event that the Company fails to perform, observe or discharge any of its Obligations or liabilities under this Note, the Security Agreement, and/or any other Loan Document, at Holder's option, no remedy of law will provide adequate relief to Holder, and further agrees that Holder shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.

6.      <u>Security for the Note</u>.  To secure the payment and performance by the Company of the obligations hereunder, the Company grants, under and pursuant to the Security Agreement executed by the Company dated as of the date hereof, to Holder, its successors and assigns, a continuing, first-priority security interest in, and does hereby assign, transfer, mortgage, convey, pledge, hypothecate and set over to Holder, its successors and assigns, all of the right, title and interest of the Company in and to the Collateral (as defined in the Security Agreement), whether now owned or hereafter acquired, and all proceeds (including, without limitation, all insurance proceeds) and products of any of the Collateral. At any time upon Holder's request, the Company shall execute and deliver to Holder any other documents, instruments or certificates requested by Holder for the purpose of properly documenting and perfecting the security interests of Holder in and to the Collateral granted hereunder, including any additional security agreements, mortgages, control agreements, and financing statements.

<u>7.</u>      <u>Lost or Stolen Note</u>. Upon notice to the Company of the loss, theft, destruction or mutilation of this Note, and, in the case of loss, theft or destruction, of an indemnification undertaking by the Holder to the Company in a form reasonably acceptable to the Company and customary for similar circumstances in commercial borrower circumstances, and, in the case of mutilation, upon surrender and cancellation of the Note, the Company shall execute and deliver a new Note of like tenor and date and in substantially the same form as this Note.

<u>8.</u>    <u>Cancellation</u>. After all principal, accrued interest and all other sums at any time owed on this Note have been paid in full, this Note shall automatically be deemed canceled, shall be surrendered to the Company for cancellation and shall not be re-issued.

<u>9.</u>    <u>Governing Law</u>. This Note shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Note shall be governed by, the laws of the State of Nevada, without giving effect to provisions thereof regarding conflict of laws. Each party hereto hereby irrevocably submits to the non-exclusive jurisdiction of the state and federal courts sitting in the State of Nevada for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper, provided, however, nothing contained herein shall limit the Holder's ability to bring suit or enforce this Note in any other jurisdiction. Each party hereto hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by sending by certified mail or overnight courier a copy thereof to such party at the address indicated in the preamble hereto and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. **EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION HEREWITH OR ARISING OUT OF THIS NOTE OR ANY TRANSACTION CONTEMPLATED HEREBY.**

<u>10.</u>    <u>Remedies, Characterizations, Other Obligations, Breaches and Injunctive Relief</u>. The remedies of the Holder as provided herein shall be cumulative and concurrent and may be pursued singly, successively or together, at the sole discretion of the Holder, and may be exercised as often as occasion therefor shall occur; and the failure to exercise any such right or remedy shall in no event be construed as a waiver or release thereof.

<u>11.</u>    <u>Specific Shall Not Limit General; Construction</u>. No specific provision contained in this Note shall limit or modify any more general provision contained herein. This Note shall be deemed to be jointly drafted by the Company and the Holder and shall not be construed against any person as the drafter hereof.

<u>12.</u>    <u>Failure or Indulgence Not Waiver</u>. Holder shall not be deemed, by any act of omission or commission, to have waived any of its rights or remedies hereunder, unless such waiver is in writing and signed by Holder, and then only to the extent specifically set forth in the writing. A waiver on one event shall not be construed as continuing or as a bar to or waiver of any right or remedy to a subsequent event.

13.    <u>Notice</u>. Notice shall be given to each party at the address indicated in the preamble hereto or at such other address as provided to the other party in writing.

14.    <u>Usury Savings Clause</u>. In the event the total liability of payments of interest and payments in the nature of interest, including, without limitation, all charges, fees, exactions or other sums which may at any time be deemed to be interest, shall, for any reason whatsoever, result in an effective rate of interest, which for any month or other interest payment period exceeds the limit imposed by the usury laws of the jurisdiction governing this Note, all sums in excess of those lawfully collectible as interest for the period in question shall, without further agreement or notice by, between, or to any party hereto, be applied to the reduction of the outstanding principal balance of this Note immediately upon receipt of such sums by the Holder hereof, with the same force and effect as though the Company had specifically designated such excess sums to be so applied to the reduction of such outstanding principal balance and the Holder hereof had agreed to accept such sums as a penalty-free payment of principal; provided, however, that the Holder of this Note may, at any time and from time to time, elect, by notice in writing to the Company, to waive, reduce, or limit the collection of any sums in excess of those lawfully collectible as interest rather than accept such sums as a prepayment of the outstanding principal balance. It is the intention of the parties that the Company does not intend or expect to pay nor does the Holder intend or expect to charge or collect any interest under this Note greater than the highest non-usurious rate of interest that may be charged under applicable law.

15.    <u>Binding Effect</u>. This Note shall be binding upon the Company and the successors and assigns of the Company and shall inure to the benefit of Holder and the successors and assigns of Holder.

16.    <u>Severability</u>. In the event any one or more of the provisions of this Note shall for any reason be held to be invalid, illegal, or unenforceable, in whole or in part, in any respect, or in the event that any one or more of the provisions of this Note operates or would prospectively operate to invalidate this Note, then and in any of those events, only such provision or provisions shall be deemed null and void and shall not affect any other provision of this Note. The remaining provisions of this Note shall remain operative and in full force and effect and shall in no way be affected, prejudiced, or disturbed thereby.

17.    <u>Participations</u>. Holder may from time to time sell or assign, in whole or in part, or grant participations in this Note and/or the obligations evidenced hereby. The holder of any such sale, assignment or participation, if the applicable agreement between Holder and such holder so provides, shall be: (a) entitled to all of the rights, obligations and benefits of Holder (to the extent of such holder's interest or participation); and (b) deemed to hold and may exercise the rights of setoff or banker's lien with respect to any and all obligations of such holder to the Company (to the extent of such holder's interest or participation), in each case as fully as though the Company was directly indebted to such holder. Company may not assign any of its rights or obligations hereunder and any attempt to do so shall be null and void and of no force or effect whatsoever.

7

18.   <u>Amendments</u>.   The provisions of this Note may be changed only by a written agreement executed by the Company and Holder.

19.   <u>Time</u>.   Time is hereby declared of the essence with respect to each term and condition hereof.

20.   <u>Collection Costs</u>.   Company shall pay any and all expenses and costs incurred or paid by Holder in the collection of amounts due hereunder, preservation and enforcement of the rights and remedies of Holder, and the duties and liabilities of Company hereunder, including, but not by way of limitation, attorneys' fees, court costs, witness fees, expert witness fees, collection costs, and costs and expenses paid by Holder in performing for Company's account any obligation of Company under this instrument or under any other Loan Document.  The foregoing obligation shall be applicable regardless of whether an Event of Default has occurred or whether or not a lawsuit if filed.

21.   <u>Waiver</u>.   Company hereby irrevocably waives presentment, demand or protest, or other notice of any kind, anything contained herein to the contrary notwithstanding.

*[Signature pages follows]*

**IN WITNESS WHEREOF,** the Company has caused this Note to be executed on and as of the date set forth above.

FRESH HEALTHY VENDING
INTERNATIONAL, INC.

By: _____

Name: Nicholas Yates

Title: Chairman

*[ signature page to Promissory Note ]*

9

# EXHIBIT 2

# SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (this "Agreement"), is dated as of October 27, 2015, by and between **FRESH HEALTHY VENDING INTERNATIONAL, INC.**, a Nevada corporation (the "Debtor"), and **SOCIALLY RESPONSIBLE BRANDS INC**, a Nevada corporation, ("Secured Party"). All capitalized terms not otherwise defined herein shall have the meanings set forth in the Note.

**WHEREAS**, the Debtor desires to borrow funds and obtain financial accommodations from the Secured Party pursuant to that certain Secured Promissory Note issued to Secured Party as of the date hereof evidencing an indebtedness in the original principal amount of $250,000 ("Note 1") and that certain Secured Promissory Note issued to Secured Party as of the date hereof evidencing an indebtedness in the original principal amount of $250,000 ("Note 2" and together with Note 1, collectively and individually referred to herein as the "Note"); and

**WHEREAS**, the Debtor has agreed to secure all of its obligations under the Note (the "Obligations") by granting to Secured Party a lien upon the Collateral (as defined below), pursuant to the terms hereof.

**WHEREAS**, the Secured Party is also party to that certain Subordination Agreement of even date herewith (the "Subordination Agreement").

**WHEREAS**, capitalized terms used but not defined herein shall have the meanings set forth in the Note.

**NOW, THEREFORE**, in consideration of the mutual covenants and other agreements contained in this Agreement, the Debtor and Secured Party hereby agree as follows:

1. <u>Security for the Obligations</u>. As security for the payment and performance of the Obligations, the Debtor does hereby pledge, assign, transfer, deliver and grant to Secured Party, a continuing and unconditional first priority security interest in and to "all assets" and "all personal property" of Debtor, as permitted by NRS 104.9504, including, without limitation, a continuing and unconditional first priority security interest in and to Debtor's fifty (50) corporate-owned micro markets, and a continuing and unconditional first priority security interest in and to the Debtor's franchise royalties pursuant to the Debtor's agreements with its franchisees (all of which property, along with the products and proceeds therefrom, are individually and collectively referred to as the "Collateral").

2. <u>Possession and Transfer of Collateral</u>. Until an Event of Default has occurred, the Debtor shall be entitled to possession and use of the Collateral. The cancellation or surrender of any promissory note evidencing any Obligation, upon payment or otherwise, shall not affect the right of Secured Party to retain the Collateral for any other of the Obligations, except upon payment in full of the Obligations. Debtor shall not sell, assign (by operation of law or otherwise), license, lease, pledge, or otherwise dispose of, or grant any option with respect to any of the Collateral.

3.    Financing Statements. The Debtor authorizes Secured Party to prepare and file such financing statements, amendments and other documents and do such acts as Secured Party deems necessary in order to establish and maintain valid, attached and perfected, first priority security interests in the Collateral in favor of Secured Party, free and clear of all liens and claims and rights of third parties whatsoever (collectively, "Liens"). The Debtor shall make appropriate entries on its books and records disclosing the security interests of Secured Party in the Collateral. The Debtor hereby agrees that a photogenic or other reproduction of this Security Agreement is sufficient for filing as a financing statement and the Debtor authorizes Secured Party to file this Security Agreement as a financing statement in any jurisdiction, and/or file any other financing statements perfecting a security interest in the Collateral.

4.    Preservation of the Collateral. The Debtor shall have the sole responsibility for taking such action as may be necessary, from time to time, to preserve all rights of the Debtor and Secured Party in the applicable Collateral against prior or third parties.

5.    Other Actions as to any and all Collateral. The Debtor further agrees to take any other reasonable action to ensure the attachment, perfection and first priority of, and the ability of Secured Party to enforce, the security interest of Secured Party, for its own benefit and as agent for its Affiliates, in any and all of the Collateral, including, without limitation: (i) causing Secured Party's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of the bank to enforce, the security interest of Secured Party in such Collateral; (ii) complying with any provision of any statute, regulation or treaty of the United States as to any material portion of the Collateral as soon as possible but not more than forty-five (45) days after the date hereof if compliance with such provision is a condition to attachment, perfection or priority of, or ability of Secured Party to enforce, the security interest of Secured Party in such Collateral; (iii) obtaining governmental and other third party consents and approvals, including, without limitation, any consent of any licensor, lessor or other Person with authority or control over or an interest in any material portion of the Collateral as soon as possible but not more than forty-five (45) days after the date hereof; (iv) obtaining waivers from mortgagees and landlords in form and substance reasonably satisfactory to Secured Party which affect any material portion of the Collateral as soon as possible but not more than forty-five (45) days after the date hereof; and (v) taking all actions required by the UCC in effect from time to time or by other law, as applicable in any relevant UCC jurisdiction, or by other law as applicable in any foreign jurisdiction. The Debtor further agrees to indemnify, defend, and hold Secured Party harmless against claims of any Persons not a party to this Security Agreement concerning disputes arising over the Collateral, except to the extent resulting from the gross negligence or willful misconduct of Secured Party or its Affiliates.  Without limiting any of the foregoing: (i) within ten (10) days after the date hereof, Debtor shall provide to Secured Party a guest ID and password for Debtor's banking information and account(s); and (ii) Debtor shall provide monthly updated lists of its franchisees, combo vending machines sold and delivered, and Micro Markets sold and delivered.

6.    Collateral in the Possession of a Warehouseman or Bailee. If any material portion of the Collateral at any time is in the possession of a warehouseman or bailee, the Debtor shall promptly notify Secured Party thereof, and, as soon as possible, but not more than forty-five (45) days later, shall obtain a Collateral Access Agreement in form and substance reasonably

satisfactory to Secured Party from such warehouseman or bailee.

       7.    <u>Debtor Representations and Warranties</u>.  The Debtor hereby represents and warrants to and agrees with Secured Party that:

       (a)    <u>Debtor Organization and Name</u>. The Debtor is a corporation or other legally recognized form of entity, as applicable, duly organized, existing and in good standing under the laws of its State or country of organization, with full and adequate power to carry on and conduct its business as presently conducted. The Debtor is duly licensed or qualified in all foreign jurisdictions wherein the nature of its activities requires such qualification or licensing. The exact legal name of the Debtor is as set forth in the first paragraph of this Security Agreement, and no Debtor currently conducts, nor has it during the last five (5) years conducted, business under any other name or trade name.

       (b)    <u>Authorization</u>. The Debtor has full right, power and authority to enter into this Security Agreement and to perform all of its duties and obligations under this Security Agreement. The execution and delivery of this Security Agreement and the other Loan Documents will not, nor will the observance or performance of any of the matters and things herein or therein set forth, violate or contravene any provision of law or of the articles of incorporation, by-laws, operating agreement or other governing documents, as applicable, of the Debtor. All necessary and appropriate action has been taken on the part of the Debtor to authorize the execution and delivery of this Security Agreement.

       (c)    <u>Validity and Binding Nature</u>. This Security Agreement is the legal, valid and binding obligation of the Debtor, enforceable against the Debtor in accordance with its terms, subject to bankruptcy, insolvency and similar laws affecting the enforceability of creditors' rights generally and to general principles of equity.

       (d)    <u>Consent; Absence of Breach</u>. The execution, delivery and performance of this Security Agreement and any other documents or instruments to be executed and delivered by the Debtor in connection herewith, do not and will not: (a) require any consent, approval, authorization, or filings with, notice to or other act by or in respect of, any governmental authority or any other Person, including, without limitation, federal and state securities laws (other than any consent or approval which has been obtained and is in full force and effect); (b) conflict with: (i) any provision of law or any applicable regulation, order, writ, injunction or decree of any court or governmental authority; (ii) the articles of incorporation, bylaws, operating agreement, or other organic or governance document applicable to the Debtor; or (iii) any agreement, indenture, instrument or other document, or any judgment, order or decree, which is binding upon Debtor or any of its properties or assets including, without limitation, any franchise agreement; or (c) require, or result in, the creation or imposition of any Lien on any asset of any Debtor, other than Liens in favor of Secured Party created pursuant to this Security Agreement.

       (e)    <u>Ownership of Collateral; Liens</u>. The Debtor is the sole owner of all the Collateral applicable to the Debtor, free and clear of all Liens, charges and claims (including

infringement claims with respect to patents, trademarks, service marks, copyrights and other intellectual property rights).

   (f) <u>Adverse Circumstances</u>. No condition, circumstance, event, agreement, document, instrument, restriction, litigation or proceeding (or threatened litigation or proceeding or basis therefor) exists which: (i) would have a material adverse effect upon Debtor; or (ii) would constitute an Event of Default.

   (g) <u>Security Interest</u>. This Security Agreement creates a valid security interest in favor of Secured Party in the Collateral and, when properly perfected by filing in the appropriate jurisdictions, or by possession or control of such Collateral by Secured Party or delivery of such Collateral to Secured Party, shall constitute a valid, perfected, first-priority security interest in such Collateral.

   (h) <u>Complete Information</u>. This Security Agreement and all financial statements, schedules, certificates, confirmations, agreements, contracts, and other materials and information heretofore or contemporaneously herewith furnished in writing by any Debtor to Secured Party for purposes of, or in connection with, this Security Agreement and the transactions contemplated hereby is, and all written information hereafter furnished by or on behalf of any Debtor to Secured Party pursuant hereto or in connection herewith will be, true and accurate in every material respect on the date as of which such information is dated or certified, and none of such information is or will be incomplete by omitting to state any material fact necessary to make such information not misleading in light of the circumstances under which made.

   8. <u>Remedies</u>. Upon the occurrence of any default in the payment or performance of any of the covenants, conditions and agreements contained in this Security Agreement or any other Event of Default, Secured Party shall have all rights, powers and remedies set forth in this Security Agreement and the Note or in any other written agreement or instrument relating to any of the Obligations or any security therefor, as a secured party under the UCC or as otherwise provided at law or in equity. Without limiting the generality of the foregoing, Secured Party may, at its option upon the occurrence of an Event of Default, declare all Obligations to be immediately due and payable, all without demand, notice or further action of any kind required on the part of Secured Party. The Debtor hereby waives any and all presentment, demand, notice of dishonor, protest, and all other notices and demands in connection with the enforcement of Secured Party's rights under this Security Agreement and the Note, and hereby consents to, and waives notice of release, with or without consideration, of any Collateral, notwithstanding anything contained herein or in the Note to the contrary. In addition to the foregoing:

   (a) <u>Possession and Assembly of Collateral</u>. Secured Party may, without notice, demand or the initiation of legal process of any kind, take possession of any or all of the Collateral (in addition to Collateral of which Secured Party already has possession), wherever it may be found, and for that purpose may pursue the same wherever it may be found, and may at any time enter into any of Debtors' premises where any of the Collateral may be or is supposed to be, and search for, take possession of, remove, keep and store any of the Collateral until the same shall be sold or otherwise disposed of and Secured Party shall have the right to store and

conduct a sale of the same in any of Debtor's premises without cost to Secured Party. At Secured Party's request, the Debtor will, at the Debtor's sole expense, assemble the Collateral and make it available to Secured Party at a place or places to be designated by Secured Party which is reasonably convenient to Secured Party and Debtor.

(b)      Sale of Collateral. Secured Party may sell any or all of the Collateral at public or private sale, upon such terms and conditions as Secured Party may deem proper, and Secured Party may purchase any or all of the Collateral at any such sale. The Debtor acknowledges that Secured Party may be unable to effect a public sale of all or any portion of the Collateral because of certain legal and/or practical restrictions and provisions which may be applicable to the Collateral and, therefore, may be compelled to resort to one or more private sales to a restricted group of offerees and purchasers. The Debtor consents to any such private sale so made even though at places and upon terms less favorable than if the Collateral were sold at public sale. Secured Party shall have no obligation to clean-up or otherwise prepare the Collateral for sale. Secured Party may apply the net proceeds, after deducting all costs, expenses, attorneys' and paralegals' fees incurred or paid at any time in the collection, protection and sale of the Collateral and the Obligations, to the payment of the Obligations, returning the excess proceeds, if any, to Debtors. The Debtor shall remain liable for any amount remaining unpaid after such application, with interest at the Default Rate. Any notification of intended disposition of the Collateral required by law shall be conclusively deemed reasonably and properly given if given by Secured Party at least ten (10) calendar days before the date of such disposition. The Debtor hereby confirms, approves and ratifies all acts and deeds of Secured Party relating to the foregoing, and each part thereof, and expressly waives any and all claims of any nature, kind or description which it has or may hereafter have against Secured Party or its representatives, by reason of taking, selling or collecting any portion of the Collateral. The Debtor consents to releases of the Collateral at any time (including prior to default) and to sales of the Collateral in groups, parcels or portions, or as an entirety, as Secured Party shall deem appropriate. The Debtor expressly absolves Secured Party from any loss or decline in market value of any Collateral by reason of delay in the enforcement or assertion or non-enforcement of any rights or remedies under this Security Agreement.

(c)      Standards for Exercising Remedies. To the extent that applicable law imposes duties on Secured Party to exercise remedies in a commercially reasonable manner, the Debtor acknowledges and agrees that it is not commercially unreasonable for Secured Party: (i) to incur expenses deemed necessary by Secured Party to prepare Collateral for disposition or otherwise to complete raw material or work-in-process into finished goods or other finished products for disposition; (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of; (iii) to fail to exercise collection remedies against Customers or other Persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral; (iv) to exercise collection remedies against Customers and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists; (v) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature; (vi) to contact other Persons, whether or not in the same business as Debtors, for expressions of interest in acquiring all or any portion of the Collateral;

(vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature; (viii) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets; (ix) to dispose of assets in wholesale rather than retail markets; (x) to disclaim disposition warranties, including any warranties of title; (xi) to purchase insurance or credit enhancements to insure Secured Party against risks of loss, collection or disposition of Collateral or to provide to Secured Party a guaranteed return from the collection or disposition of Collateral; or (xii) to the extent deemed appropriate by Secured Party, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Secured Party in the collection or disposition of any of the Collateral. The Debtor acknowledges that the purpose of this section is to provide non-exhaustive indications of what actions or omissions by Secured Party would not be commercially unreasonable in Secured Party's exercise of remedies against the Collateral and that other actions or omissions by Secured Party shall not be deemed commercially unreasonable solely on account of not being indicated in this Section. Without limitation upon the foregoing, nothing contained in this Section shall be construed to grant any rights to Debtors or to impose any duties on Secured Party that would not have been granted or imposed by this Security Agreement or by applicable law in the absence of this Section.

(d)    <u>UCC and Offset Rights</u>. Secured Party may exercise, from time to time, any and all rights and remedies available to it under the UCC or under any other applicable law in addition to, and not in lieu of, any rights and remedies expressly granted in this Security Agreement or in any other agreements between any Obligor and Secured Party, and may, without demand or notice of any kind, appropriate and apply toward the payment of such of the Obligations, whether matured or unmatured, including costs of collection and attorneys' and paralegals' fees and costs, and in such order of application as Secured Party may, from time to time, elect, any indebtedness of Secured Party to any Obligor, however created or arising, including balances, credits, deposits, accounts or moneys of such Obligor in the possession, control or custody of, or in transit to Secured Party. The Debtor, on behalf of itself and any Obligor, hereby waives the benefit of any law that would otherwise restrict or limit Secured Party in the exercise of its right, which is hereby acknowledged, to appropriate at any time hereafter any such indebtedness owing from Secured Party to any Obligor.

9.    <u>Additional Remedies</u>. Upon the occurrence of an Event of Default, Secured Party shall have the right and power to:

(a)    instruct Debtor, at its own expense, to notify any parties obligated on any of the Collateral, including any customers, to make payment directly to Secured Party of any amounts due or to become due thereunder, or Secured Party may directly notify such obligors of the security interest of Secured Party, and/or of the assignment to Secured Party of the Collateral and direct such obligors to make payment to Secured Party of any amounts due or to become due with respect thereto, and thereafter, collect any such amounts due on the Collateral directly from such Persons obligated thereon;

(b)    enforce collection of any of the Collateral, by suit or otherwise, or make any compromise or settlement with respect to any of the Collateral, or surrender, release or

exchange all or any part thereof, or compromise, extend or renew for any period (whether or not longer than the original period) any indebtedness thereunder;

(c) take possession or control of any proceeds and products of any of the Collateral, including the proceeds of insurance thereon;

(d) extend, renew or modify for one or more periods (whether or not longer than the original period) the Obligations or any obligation of any nature of any other obligor with respect to the Obligations;

(e) grant releases, compromises or indulgences with respect to the Obligations, any extension or renewal of any of the Obligations, any security therefor, or to any other obligor with respect to the Obligations;

(f) make an election with respect to the Collateral under Section 1111 of the Bankruptcy Code or take action under Section 364 or any other section of Bankruptcy Code; provided, however, that any such action of Secured Party as set forth herein shall not, in any manner whatsoever, impair or affect the liability of Debtors hereunder, nor prejudice, waive, nor be construed to impair, affect, prejudice or waive Secured Party's rights and remedies at law, in equity or by statute, nor release, discharge, nor be construed to release or discharge, Debtors, any guarantor or other Person liable to Secured Party for the Obligations; and

(g) at any time, and from time to time, accept additions to, releases, reductions, exchanges or substitution of the Collateral, without in any way altering, impairing, diminishing or affecting the provisions of this Security Agreement, the Loan Documents, or any of the other Obligations, or Secured Party's rights hereunder, under the Obligations.

The Debtor hereby ratifies and confirms whatever Secured Party may do with respect to the Collateral and agrees that Secured Party shall not be liable for any error of judgment or mistakes of fact or law with respect to actions taken in connection with the Collateral.

10. _Attorney-in-Fact_. The Debtor hereby irrevocably makes, constitutes and appoints Secured Party (and any officer of Secured Party or any Person designated by Secured Party for that purpose) as the Debtor's true and lawful proxy and attorney-in-fact (and agent-in-fact) in Debtor's name, place and stead, with full power of substitution, to: (i) take such actions as are permitted in this Security Agreement; (ii) execute such financing statements and other documents and to do such other acts as Secured Party may require to perfect and preserve Secured Party's security interest in, and to enforce such interests in the Collateral; and (iii) upon the occurrence of an Event of Default, carry out any remedy provided for in this Security Agreement, or through law or equity. The Debtor hereby acknowledges that the constitution and appointment of such proxy and attorney-in-fact are coupled with an interest and are irrevocable. The Debtor hereby ratifies and confirms all that such attorney-in-fact may do or cause to be done by virtue of any provision of this Security Agreement.

11. _No Marshaling_. Secured Party shall not be required to marshal any present or future collateral security (including this Security Agreement and the Collateral) for, or other

assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order. To the extent that it lawfully may, the Debtor hereby agrees that it will not invoke any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of Secured Party's rights under this Security Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, the Debtor hereby irrevocably waives the benefits of all such laws.

12.     No Waiver. No Event of Default shall be waived by Secured Party except in writing. No failure or delay on the part of Secured Party in exercising any right, power or remedy hereunder shall operate as a waiver of the exercise of the same or any other right at any other time; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder. There shall be no obligation on the part of Secured Party to exercise any remedy available to Secured Party in any order. The remedies provided for herein are cumulative and not exclusive of any remedies provided at law or in equity. The Debtor agrees that in the event that the Debtor fails to perform, observe or discharge any of its Obligations or liabilities under this Security Agreement or any other agreements with Secured Party, no remedy of law will provide adequate relief to Secured Party, and further agrees that Secured Party shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.

13.     Application of Proceeds. Secured Party will, within three (3) Business Days after receipt of cash or solvent credits from collection of items of payment, proceeds of Collateral or any other source, apply the whole or any part thereof against the Obligations secured hereby. Secured Party shall further have the exclusive right to determine how, when and what application of such payments and such credits shall be made on the Obligations, and such determination shall be conclusive upon Debtors. Any proceeds of any disposition by Secured Party of all or any part of the Collateral may be first applied by Secured Party to the payment of expenses incurred by Secured Party in connection with the Collateral, including reasonable attorneys' fees and legal expenses and costs.

14.     Miscellaneous.

(a)     Notices. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery or facsimile, addressed as set forth in the preamble paragraph hereto or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery at the address designated on the signature page hereto (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the

second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur.

(b)    Entire Agreement.  The Loan Documents and the Other Loan Documents constitute the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by both parties hereto.  Neither the Debtor nor Secured Party has relied on any representations not contained or referred to in this Agreement and the documents delivered herewith.

(c)    Counterparts/Execution.  This Agreement may be executed in any number of counterparts and by the different signatories hereto on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute but one and the same instrument.  This Agreement may be executed by facsimile transmission, PDF, electronic signature or other similar electronic means with the same force and effect as if such signature page were an original thereof.

(d)    Law Governing this Agreement.    This Agreement shall be delivered and accepted in and shall be deemed to be a contract made under and governed by the internal laws of the State of Nevada, and for all purposes shall be construed in accordance with the laws of such State, without giving effect to the choice of law provisions of such State.

**WAIVER OF DEFENSES. EACH DEBTOR WAIVES EVERY PRESENT AND FUTURE DEFENSE, CAUSE OF ACTION, COUNTERCLAIM OR SETOFF WHICH THE DEBTOR MAY NOW HAVE OR HEREAFTER MAY HAVE TO ANY ACTION BY SECURED PARTY IN ENFORCING THIS SECURITY AGREEMENT. PROVIDED SECURED PARTY ACTS IN A COMMERCIALLY REASONABLE MANNER, EACH DEBTOR RATIFIES AND CONFIRMS WHATEVER SECURED PARTY MAY DO PURSUANT TO THE TERMS OF THIS SECURITY AGREEMENT. THIS PROVISION IS A MATERIAL INDUCEMENT FOR SECURED PARTY GRANTING ANY FINANCIAL ACCOMMODATION TO DEBTORS.**

**MANDATORY FORUM SELECTION.    TO INDUCE SECURED PARTY TO MAKE CERTAIN FINANCIAL ACCOMMODATIONS TO DEBTORS, EACH DEBTOR IRREVOCABLY AGREES THAT ANY DISPUTE ARISING UNDER, RELATING TO, OR IN CONNECTION WITH, DIRECTLY OR INDIRECTLY, THIS AGREEMENT OR RELATED TO ANY MATTER WHICH IS THE SUBJECT OF OR INCIDENTAL TO THIS AGREEMENT ANY OTHER LOAN DOCUMENT, OR THE COLLATERAL (WHETHER OR NOT SUCH CLAIM IS BASED UPON BREACH OF CONTRACT OR TORT) SHALL BE SUBJECT TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE STATE AND/OR FEDERAL COURTS LOCATED IN CLARK COUNTY, NEVADA.  THIS PROVISION IS INTENDED TO BE A "MANDATORY" FORUM SELECTION CLAUSE AND GOVERNED BY AND INTERPRETED CONSISTENT WITH NEVADA LAW. EACH DEBTOR HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION AND VENUE OF ANY STATE OR FEDERAL COURT HAVING ITS SITUS IN SAID COUNTY, AND EACH WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS.**

**EACH DEBTOR HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND CONSENT THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO A DEBTOR, AS APPLICABLE, AS SET FORTH HEREIN IN THE MANNER PROVIDED BY APPLICABLE STATUTE, LAW, RULE OF COURT OR OTHERWISE.**

**WAIVER OF JURY TRIAL. EACH DEBTOR AND SECURED PARTY, AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, EACH KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE IRREVOCABLY, ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS SECURITY AGREEMENT, ANY NOTE, ANY OTHER LOAN DOCUMENT, ANY OF THE OTHER OBLIGATIONS, THE COLLATERAL, OR ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR ARISING FROM ANY LENDING RELATIONSHIP EXISTING IN CONNECTION WITH ANY OF THE FOREGOING, OR ANY COURSE OF CONDUCT OR COURSE OF DEALING IN WHICH SECURED PARTY AND ANY DEBTOR ARE ADVERSE PARTIES, AND EACH AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR SECURED PARTY GRANTING ANY FINANCIAL ACCOMMODATION TO DEBTORS.**

(e)  Severability. In the event that any provision of this Agreement or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law.  Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement.  Each party hereto hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Agreement by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof.  Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.

(f)  Counsel; Ambiguities.   Each party and its counsel have participated fully in the review and revision of this Agreement and the other Transaction Documents.  The parties understand and agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply in interpreting this Agreement or the other Transaction Documents. The language in this Agreement and the other Transaction Documents shall be interpreted as to its fair meaning and not strictly for or against any party.

*10*

(g)    <u>Captions</u>. The captions of the various sections and paragraphs of this Agreement have been inserted only for the purposes of convenience; such captions are not a part of this Agreement and shall not be deemed in any manner to modify, explain, enlarge or restrict any of the provisions of this Agreement.

(h)    <u>Costs, Fees and Expenses</u>. Debtors shall pay or reimburse Secured Party for all reasonable costs, fees and expenses incurred by Secured Party or for which Secured Party becomes obligated in connection with the enforcement of this Security Agreement, including search fees, costs and expenses and attorneys' fees, costs and time charges of counsel to Secured Party and all taxes payable in connection with this Security Agreement. In furtherance of the foregoing, Debtors shall pay any and all stamp and other taxes, UCC search fees, filing fees and other costs and expenses in connection with the execution and delivery of this Security Agreement to be delivered hereunder, and agrees to save and hold Secured Party harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omission to pay such costs and expenses. That portion of the Obligations consisting of costs, expenses or advances to be reimbursed by Debtors to Secured Party pursuant to this Security Agreement or the other Loan Documents which are not paid on or prior to the date hereof shall be payable by Debtors to Secured Party on demand. If at any time or times hereafter Secured Party: (a) employs counsel for advice or other representation: (i) with respect to this Security Agreement; (ii) to represent Secured Party in any litigation, contest, dispute, suit or proceeding or to commence, defend, or intervene or to take any other action in or with respect to any litigation, contest, dispute, suit, or proceeding (whether instituted by Secured Party, any Debtor, or any other Person) in any way or respect relating to this Security Agreement; or (iii) to enforce any rights of Secured Party against any Debtor or any other Person under of this Security Agreement; (b) takes any action to protect, collect, sell, liquidate, or otherwise dispose of any of the Collateral; and/or (c) attempts to or enforces any of Secured Party's rights or remedies under this Security Agreement, the costs and expenses incurred by Secured Party in any manner or way with respect to the foregoing, shall be part of the Obligations, payable by Debtors to Secured Party on demand.

(i)    <u>Termination</u>. This Security Agreement and the Liens and security interests granted hereunder shall not terminate until the full and complete performance and satisfaction and payment in full of all the Obligations (other than contingent indemnification obligations to the extent no claim giving rise thereto has been asserted). Upon termination of this Security Agreement, Secured Party shall also deliver to Debtors (at the sole expense of Debtors) such UCC termination statements, certificates for terminating the liens on the Motor Vehicles (if any) and such other documentation, without recourse, warranty or representation whatsoever, as shall be reasonably requested by Debtors to effect the termination and release of the Liens and security interests in favor of Secured Party affecting the Collateral, provided, however, to the extent any such terminations or releases require Secured Party to expend any sums in terminating or releasing any such Liens, Secured Party may refrain from terminating or releasing such Liens unless and until Debtors pay to Secured Party the estimated cost, as reasonably determined by Secured Party, of effectuating such terminations or releases.

(j)    <u>Reinstatement</u>.  This Security Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against any Debtor for liquidation or reorganization, should any Debtor become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver or trustee be appointed for all or any significant part of any Debtor's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

[signature page follows]

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be executed on and as of the date set forth above.

**DEBTOR:**

**FRESH HEALTHY VENDING INTERNATIONAL, INC.,** a Nevada corporation

By: _____
Name: _Nicholas Yates_
Title: _Chairman_
Address: _2620 Financial Court Ste 100_
Entity No.: _E0328562011-8_   _San Diego, CA 92117_

**SECURED PARTY:**

**SOCIALLY RESPONSIBLE BRANDS INC,** a Nevada corporation

By: _____
Name: _Nicholas Yates_
Title: _Shareholder_

*[Signature Page to Fresh Healthy Vending International, Inc.  Security Agreement]*

# EXHIBIT 3

## SUBORDINATION AGREEMENT

This Subordination Agreement (this "Agreement") is made and entered into as of October 27, 2105, by and among the secured lenders set forth on the signature page hereof (each, a "Creditor" and collectively, the "Creditors") and the secured lender set forth on the signature page hereof (the "Priority Lender"), and acknowledged and consented to by Fresh Healthy Vending International, Inc., a Nevada corporation ("Debtor").

## WITNESSETH:

WHEREAS, the Creditors have made certain loans and other financial accommodations to Debtor which are or may be from time to time secured by assets and property of Debtor.

WHEREAS, pursuant to two (2) Secured Promissory Notes and a Security Agreement, by and between Debtor and the Priority Lender, each dated as of the date hereof (the "Transaction Documents"), the Priority Lender has made or will make certain loans and other financial accommodations to Debtor in the original principal amount of $500,000.

WHEREAS, in order to induce the Priority Lender to extend credit to Debtor pursuant to the Transaction Documents, the Creditors and the Priority Lender desire to agree on the relative priority of their respective security interests in and liens on the Collateral and Priority Collateral (defined below) and certain other rights, priorities and interests;

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereby agree as follows:

1.    **Subordination; Priority of Liens.**

(a)    The Creditors, and each of them, hereby jointly and severally subordinate to the Priority Lender any security interest or lien that the Creditors may have in any assets or personal property of Debtor, including, without limitation, the fifty (50) Debtor owned micro-markets and Debtor's franchise royalties pursuant to the Debtor's agreements with its franchisees, pursuant to the Security Agreement (the "Collateral"). Notwithstanding the respective dates of attachment or perfection of the security interest of the Priority Lender and the security interest of the Creditors, the security interest of the Priority Lender in the Collateral shall at all times be prior to the security interest of the Creditors. No Creditor will exercise any remedy with respect to the Collateral until such time as all the Senior Debt is fully paid in cash.

(b)    All of Debtor's indebtedness and obligations to the Creditors, whether presently existing or arising in the future (the "Subordinated Debt") is subordinated in right of payment to all obligations of Debtor to the Priority Lender under the Transaction Documents, together with all costs of collecting such obligations (including attorneys' fees), including, without limitation, all interest accruing after the commencement by or against Debtor of any bankruptcy, reorganization or similar proceeding (the "Senior Debt"). The foregoing notwithstanding, each Creditor shall be entitled to receive each regularly scheduled payment of interest or principal that

constitutes Subordinated Debt, provided that a default under the Senior Debt has not occurred and is not continuing and would not exist immediately after such payment. Nothing in the foregoing paragraph shall prohibit any Creditor from converting all or any part of the Subordinated Debt into equity securities of Debtor.

(c)    No Creditor shall contest the validity, perfection, priority or enforceability of any lien or security interest granted to the Priority Lender by Debtor, and each of the Creditors hereby agrees to cooperate in the defense of any action contesting the validity, perfection, priority or enforceability of such liens or security interest.

2.    Bankruptcy.

(a)    In the event of Debtor's insolvency, reorganization or any case or proceeding under any bankruptcy or insolvency law or laws relating to the relief of debtors, these provisions shall remain in full force and effect, and Priority Lender's claims against Debtor and the estate of Debtor shall be paid in full before any payment is made to any Creditor. For the avoidance of any doubt, Senior Debt includes, without limitation, the Priority Lender's claims against Debtor and the estate of Debtor arising from the granting of credit under Section 364 or the use of cash collateral under Section 363 of the United States Bankruptcy Code, and each Creditor agrees that it will raise no objection thereto.

(b)    Until the Senior Debt is fully paid in cash, and all of Priority Lender's obligations owing to Debtor have been terminated, each Creditor irrevocably appoints Priority Lender as such Creditor's attorney-in-fact, and grants to Priority Lender a power of attorney with full power of substitution, in the name of Creditor or in the name of Priority Lender, for the use and benefit of Priority Lender, without notice to Creditor, to perform at Priority Lender's option the following acts in any bankruptcy, insolvency or similar proceeding involving Debtor: (i) to file the appropriate claim or claims in respect of the Subordinated Debt on behalf of Creditor if Creditor does not do so prior to 30 days before the expiration of the time to file claims in such proceeding and if Priority Lender elects, in its sole discretion, to file such claim or claims; and (ii) to accept or reject any plan of reorganization or arrangement on behalf of Creditor and to otherwise vote Creditor's claims in respect of any Subordinated Debt in any manner that Priority Lender deems appropriate for the enforcement of its rights hereunder.

(c)    Nothing contained herein shall limit or restrict the independent right of any Creditor to initiate actions in any bankruptcy, reorganization, compromise, arrangement, insolvency, readjustment or debt, dissolution or liquidation or similar proceeding in its individual capacity and to appear or be heard on any matter before the bankruptcy or other applicable court in any such proceeding. This Agreement shall be and remain enforceable notwithstanding any bankruptcy or other insolvency proceeding by or against Debtor.

3.    Sale of Collateral. Until the Senior Debt is fully paid in cash, and all of Priority Lender's obligations owing to Debtor have been terminated, each Creditor agrees that it will not object to or oppose the sale of the Collateral, if Priority Lender has consented to such sale. If requested by Priority Lender, each Creditor shall affirmatively consent to such sale or disposition and shall take all necessary actions and execute such documents and instruments as Priority Lender may reasonably request in connection with and to facilitate such sale or disposition.

SUBORDINATION AGREEMENT
October 23, 2015

4.    <u>Amendment of Subordinated Debt</u>. Each Creditor shall immediately affix a legend to the instruments evidencing the Subordinated Debt stating that the instruments are subject to the terms of this Agreement. No amendment of the documents evidencing or relating to the Subordinated Debt shall directly or indirectly modify the provisions of this Agreement in any manner which might terminate or impair the subordination of the Subordinated Debt or the subordination of the security interest or lien that such Creditor may have in any property of Debtor. By way of example, such instruments shall not be amended to (i) increase the rate of interest with respect to the Subordinated Debt, or (ii) accelerate the payment of the principal or interest or any other portion of the Subordinated Debt.

5.    <u>Enforcement</u>.

(a)    This Agreement shall remain effective for so long as Debtor owes any amounts to Priority Lender. If, at any time after payment in full of the Senior Debt, any payments of the Senior Debt must be disgorged by Priority Lender for any reason (including, without limitation, the bankruptcy of Debtor), this Agreement and the relative rights and priorities set forth herein shall be reinstated as to all such disgorged payments as though such payments had not been made and each Creditor shall immediately pay over to Priority Lender all payments received with respect to the Subordinated Debt to the extent that such payments would have been prohibited hereunder. At any time and from time to time, without notice to any Creditor, Priority Lender may take such actions with respect to the Senior Debt and the Collateral as Priority Lender, in its sole discretion, may deem appropriate, including, without limitation, terminating advances to Debtor, increasing the principal amount, extending the time of payment, increasing applicable interest rates, renewing, compromising or otherwise amending the terms of any documents affecting the Senior Debt and the Collateral, judicial foreclosure, nonjudicial foreclosure, exercise of a power of sale, and taking a deed, assignment or transfer in lieu of foreclosure as to any of the Collateral, and enforcing or failing to enforce any rights against Debtor or any other person. No such action or inaction shall impair or otherwise affect Priority Lender's rights hereunder. Each Creditor agrees not to assert against Priority Lender (a) any rights which a guarantor or surety could exercise; but nothing in this Agreement shall constitute Creditor a guarantor or surety; (b) the right, if any, to require Priority Lender to marshal or otherwise require Priority Lender to proceed to dispose of or foreclose upon any of the Collateral in any manner or order; and (c) any right of subrogation, contribution, reimbursement, or indemnity which it may have against Debtor arising directly or indirectly out of this Agreement. Creditor waives the benefits, if any, of California Civil Code Sections 2799, 2808, 2809, 2810, 2815, 2819, 2820, 2821, 2822, 2839, 2845, 2847, 2848, 2849, 2850, 2899 and 3433. Pursuant to Section 2856 of the California Civil Code, each Creditor waives all rights and defenses that Creditor may have because the Senior Debt may be secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

6.    <u>Excluded Collateral Rights</u>.

(a)    Subject only to any express provision of this Agreement that requires a Creditor to take or refrain from taking an action, each Creditor may exercise its good faith discretion with respect to exercising or refraining from exercising any of its rights and remedies or commencing the enforcement with respect to any property and interests in property of Debtor <u>*other than the Collateral*</u> in which there is both a duly perfected lien or security interest and a duly perfected lien or security interest, whether or not perfected by the Creditors, or any of them (the "<u>Excluded Collateral</u>") of any of the default remedies under any of applicable Creditor agreements

SUBORDINATION AGREEMENT
October 23, 2015

(the "Creditor Documents"), the UCC or other applicable laws; or appropriating, setting off, or applying any part or all of such Excluded Collateral in the possession of, or coming into the possession of, a Creditor or its agent or bailee, to the obligations under the Creditor Documents.

(b)     The Priority Lender and the Creditors agree that, so long as the proceeds for any sale, dispositions on collection of the Collateral are applied as required hereby, any UCC collection, sale or other disposition of any Excluded Collateral by any Creditor in accordance with the terms hereof shall be free and clear of any security interest, lien, claim or offset of the Priority Lender in such Excluded Collateral.  To the extent reasonably requested by any Creditor, the Priority Lender will cooperate in providing any necessary or appropriate releases to permit a collection, sale or other disposition of Excluded Collateral by a Creditor in accordance with the provisions hereof.

(c)     Each Creditor agrees that it will give the Priority Lender a written notice at least five (5) business days prior to commencing any enforcement action.  Each Creditor agrees to give to the Priority Lender (a) copies of any notice of the occurrence or existence of an event of default under any Creditor Document sent to Debtor simultaneously with the sending of such notice to Debtor, and (b) notice of any acceleration of any of any obligation thereunder, promptly after such acceleration, but the failure to give any such copy or notice shall not affect the validity of any such notice of event of default or such acceleration or create a cause of action against the party failing to give such copy or notice or create any claim or right on behalf of any third party. The sending of any such copy of such notice of event of default shall not give the recipient the obligation to cure such event of default.

7.     Successors and Assigns.  This Agreement shall bind any successors or assignees of each Creditor and shall benefit any successors or assigns of Priority Lender. This Agreement is solely for the benefit of the Creditors and Priority Lender and not for the benefit of Debtor or any other party. Each Creditor further agrees that if Debtor is in the process of refinancing a portion of the Senior Debt with a new lender, and if Priority Lender makes a request of such Creditor, Creditor shall agree to enter into a new subordination agreement with the new lender on substantially the terms and conditions of this Agreement.

8.     Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

9.     Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Nevada, without giving effect to conflicts of law principles. Each Creditor and Priority Lender submit to the exclusive jurisdiction of the state and federal courts located in Clark County, Nevada. EACH CREDITOR AND LENDER WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN.

10.     Entire Agreement.  This Agreement represents the entire agreement with respect to the subject matter hereof, and supersedes all prior negotiations, agreements and commitments. Each Creditor is not relying on any representations by Priority Lender or Debtor in entering into this Agreement, and each Creditor has kept and will continue to keep itself fully apprised of the financial and other condition of Debtor. This Agreement may be amended only by written instrument signed by each Creditor and Priority Lender.

11.    <u>Expenses</u>.  In the event of any legal action to enforce the rights of a party under this Agreement, the party prevailing in such action shall be entitled, in addition to such other relief as may be granted, all reasonable costs and expenses, including reasonable attorneys' fees, incurred in such action.

12.    <u>Representations and Warranties of the Creditors</u>.  Each Creditor hereby represents and warrants to the Priority Lender that as of the date hereof: (a) Creditor is duly formed and validly existing under the laws of its jurisdiction of organization; (b) Creditor has the power and authority to enter into, execute, deliver and carry out the terms of this Agreement, all of which have been duly authorized by all proper and necessary action on the part of Creditor; (c) the execution of this Agreement by Creditor will not violate or conflict with any of its organizational documents, any material agreement binding upon Creditor or any law, regulation or order or require any consent or approval which has not been obtained; and (d) this Agreement is the legal, valid and binding obligation of Creditor, enforceable against Creditor in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by equitable principles.

13.    <u>Execution in Counterparts</u>.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which counterparts, when so executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same Agreement.  This Agreement shall become effective upon the execution and delivery of a counterpart hereof by each of the parties hereto.

*[Signature Page Follows]*

34

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

**CREDITORS:**

By: ~~Wndt~~
Name: MENRL KONIEN
Title: MEMBEL

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

**PRIORITY LENDER:**

SOCIALLY RESPONSIBLE BRANDS INC, a Nevada corporation

By: _____
Name: Nicholas Yates
Title: Shareholder

Acknowledged and Agreed:

**DEBTOR:**

FRESH HEALTHY VENDING INTERNATIONAL, INC., a Nevada corporation

By: _____
Name: Nicholas Yates
Title: Chairman

SUBORDINATION AGREEMENT
October 23, 2015

35

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

**CREDITORS:**

By: _____
Name: *Roth Holdings, LLC*
Title: Manager

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

**PRIORITY LENDER:**

SOCIALLY RESPONSIBLE BRANDS INC, a Nevada corporation

By: _____
Name: _____
Title: _____

Acknowledged and Agreed:

**DEBTOR:**

FRESH HEALTHY VENDING INTERNATIONAL, INC., a Nevada corporation

By: _____
Name: Nicholas Yates
Title: Chairman

SUBORDINATION AGREEMENT
October 23, 2015

36

# EXHIBIT 4

**AMENDMENT TO SECURED PROMISSORY NOTES**

This Amendment to Secured Promissory Notes ("Amendment") is effective January 20, 2017 ("Effective Date") by and between Generation NEXT Franchise Brands, Inc. (f/k/a Fresh Healthy Vending International, Inc.) ("Maker" or "Company") and Socially Responsible Brands, Inc. ("Holder").  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Notes (defined below).

**Recitals**

WHEREAS, Maker and Holder are parties to two Secured Promissory Notes dated October 27, 2015, as they have been amended previously, pursuant to which Maker promised to pay Holder the principal amount of Two Hundred Fifty Thousand and 00/100 Dollars ($250,000), plus interest, for each note (individually, a "Note," and collectively, the "Notes").

WHEREAS, Maker and Holder desire to amend the Notes to extend the payment deadlines of the Notes and make the Notes convertible.

**Agreement**

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties hereto, the parties hereby agree as follows:

1.  Extension of Payment Deadline; Payment of Interest; Future Extensions. Notwithstanding anything to the contrary contained in the Note, the parties agree to the following amendments:

    a.  The Maturity Date shall be extended to December 31, 2017. At any time prior to the Maturity Date and/or Conversion Date (as defined in this Amendment), Maker may pre-pay the Note in part or in full without penalty.

    b.  On or before July 31, 2017, Maker shall pay Holder the amount of interest accrued through June 30, 2017.

    c.  Maker may unilaterally extend the Maturity Date for an additional six months to June 30, 2018, by (i) sending Holder written notice of such extension and (ii) paying Holder the amount of interest accrued between July 1, 2017 and December 31, 2017.  Such notice and payment shall be submitted to Holder by Maker no later than five (5) calendar days before the December 31, 2017 Maturity Date. Such extension of the Maturity Date will also extend the Maturity Date with regard to Holder's conversion option set forth below.

2.  Conversion Option.  With this Amendment the parties make the Notes convertible at Holder's option.  To that end, the following provisions are added to the Notes.

    a.  The parties acknowledge and agree that at any time and from time to time up to the Maturity Date, this Note may be, at the sole option of the Holder, converted

may partially convert.  At Holder's sole discretion, partial conversion may be for unpaid interest first.  If less than the full principal and accrued but unpaid interest amount of the Notes is submitted for conversion, no new Note shall be issued.

3) <u>Record Holder</u>. The Person(s) entitled to receive the shares of Common Stock issuable upon a conversion of the Notes shall be treated for all purposes as the record holder(s) of such shares of Common Stock as of the Conversion Date.

4) <u>Transfer Taxes</u>. The issuance of certificates for shares of the Common Stock on conversion of the Notes shall be made without charge to the Holder hereof for any documentary stamp or similar taxes, or any other issuance or transfer fees of any nature or kind that may be payable in respect of the issue or delivery of such certificates, any such taxes or fees, if payable, to be paid by the Company.

e. <u>Adjustments to Conversion Price</u>.

1) <u>Stock Dividends and Stock Splits</u>.  If the Company, at any time while the Notes is outstanding: (i) pays a stock dividend or otherwise makes a distribution or distributions payable in shares of Common Stock on outstanding shares of Common Stock, (ii) subdivides outstanding shares of Common Stock into a larger number of shares, (iii) combines (including by way of a reverse stock split) outstanding shares of Common Stock into a smaller number of shares, or (iv) issues, in the event of a reclassification of shares of Common Stock, any shares of capital stock of the Company, then the Conversion Price shall be multiplied by a fraction, the numerator of which shall be the number of shares of Common Stock (excluding any treasury shares of the Company) outstanding immediately before such event, and the denominator of which shall be the number of shares of Common Stock outstanding immediately after such event. Any adjustment made pursuant to this Section shall become effective immediately after the record date for the determination of stockholders entitled to receive such dividend or distribution and shall become effective immediately after the effective date in the case of a subdivision, combination, or re-classification.

2) <u>Fundamental Transaction</u>. If, at any time while the Notes is outstanding: (i) the Company effects any merger or consolidation of the Company with or into another Person, (ii) the Company effects any sale of all or substantially all of its assets in one transaction or a series of related transactions, (iii) any tender offer or exchange offer (whether by the Company or another Person) is completed pursuant to which holders of Common Stock are permitted to tender or exchange their shares for other securities, cash or property, or (iv) the Company effects any reclassification of the Common Stock or any compulsory share exchange pursuant to which the Common Stock is effectively converted into or exchanged for other securities, cash or property (in any such case, a

3

shall cause to be filed at each office or agency maintained for the purpose of conversion of the Notes, and shall cause to be delivered to the Holder at its last address as it shall appear upon the Company's records, at least thirty (30) calendar days prior to the applicable record or effective date hereinafter specified, a notice stating: (x) the date on which a record is to be taken for the purpose of such dividend, distribution, redemption, rights or warrants, or if a record is not to be taken, the date as of which the holders of the Common Stock of record to be entitled to such dividend, distributions, redemption, rights or warrants are to be determined, or (y) the date on which such reclassification, consolidation, merger, sale, transfer or share exchange is expected to become effective or close, and the date as of which it is expected that holders of the Common Stock of record shall be entitled to exchange their shares of the Common Stock for securities, cash or other property deliverable upon such reclassification, consolidation, merger, sale, transfer or share exchange, provided that the failure to deliver such notice or any defect therein or in the delivery thereof shall not affect the validity of the corporate action required to be specified in such notice.  The Holder is entitled to convert the Notes during the 10-day period commencing on the date of such notice through the effective date of the event triggering such notice.

f.  <u>Reservation of Common Stock.</u>  The Company shall reserve and keep available out of its authorized but unissued shares of Common Stock, solely for the purpose of effecting the conversion of the Notes, such number of shares of Common Stock as shall from time to time be sufficient to effect such conversion, based upon the Conversion Price.

g.  <u>Voting Rights</u>.  The Holder shall have no voting rights under the Notes, except as required by applicable law, and as expressly provided in the Notes.

h.  <u>Short Sales</u>.  Holder represents and agrees, as applicable: (i) Holder has not prior to the date hereof, entered into or effected any Short Sales; and (ii) so long as the Note remains outstanding, Holder will not enter into or effect any Short Sales.  The Company acknowledges and agrees that upon submission of a Conversion Notice as set forth herein, Holder immediately owns the Common Stock described in the Conversion Notice and any sale of that Common Stock issuable under such Conversion Notice would not be considered Short Sales.  For purposes herein, "Short Sales" shall mean entering into any short sale or other hedging transaction which establishes a net short position with respect to the Company's Common Stock.

i.  <u>Lost or Stolen Note</u>.  Upon notice to the Company of the loss, theft, destruction or mutilation of the Notes, and, in the case of loss, theft or destruction, of an indemnification undertaking by the Holder to the Company in a form reasonably acceptable to the Company and customary for similar circumstances in commercial lender/borrower circumstances, and, in the case of mutilation, upon surrender and cancellation of the Note, the Company shall execute and deliver a new Note of like

tenor and date and in substantially the same form as the Notes; *provided, however*, the Company shall not be obligated to re-issue a Note if the Holder contemporaneously requests the Company to convert such remaining principal amount and interest into Common Stock.

j.  Cancellation. After all principal, accrued interest and all other sums at any time owed on the Notes have been paid in full, the Notes shall automatically be deemed canceled, shall be surrendered to the Company for cancellation and shall not be re-issued.

3.  No Other Amendments or Modifications. Except for the modifications to the Notes set forth herein, each of the provisions of the Notes shall remain in full force and effect as originally set forth in the Notes.

IN WITNESS WHEREOF, Maker and Holder have executed this Amendment as of the day and year first above written.

**MAKER:**

**GENERATION NEXT FRANCHISE BRANDS, INC.**

By: _____

Arthur Budman
CEO and CFO

**HOLDER:**

**SOCIALLY RESPONSIBLE BRANDS, INC.**

By: _____

Robert Wheat

6

## EXHIBIT A

### NOTICE OF CONVERSION

The undersigned hereby elects to convert principal and/or interest under the Convertible Promissory Note (the "Note") of Fresh Healthy Vending International, Inc. (the "Company"), into shares of common stock (the "Common Shares"), of the Company in accordance with the conditions of the Note, as of the date written below.

Based solely on information provided by the Company to Holder, the undersigned represents and warrants to the Company that its ownership of the Common Shares does not exceed the amounts determined in accordance with Section 13(d) of the Exchange Act of 1934, as amended, specified in the Note.

Conversion calculations

Effective Date of Conversion: _____

Principal Amount and/or Interest to be Converted: _____

Number of Common Shares to be Issued: _____

### "HOLDER"

By: _____

Name: _____

Title: _____

Address: _____

_____

_____

7

# EXHIBIT 5

## AMENDMENT TO SECURED PROMISSORY NOTE

This Amendment to Secured Promissory Note ("Amendment") is effective December 30, 2017 ("Effective Date") by and between Generation NEXT Franchise Brands, Inc. (f/k/a/ Fresh Healthy Vending International, Inc.) ("Maker" or "Company") and Socially Responsible Brands, Inc. ("Holder"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Note (defined below).

### Recitals

WHEREAS, Maker and Holder are parties to a Senior Secured Promissory Note dated October 27, 2015, as amended previously, pursuant to which Maker promised to pay Holder the principal amount of Two Hundred Fifty Thousand and 00/100 Dollars ($250,000), plus interest (the "Note").

WHEREAS, Maker and Holder desire to amend the Note to extend the payment deadlines of the Note.

### Agreement

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties hereto, the parties hereby agree as follows:

1. Extension of Payment Deadline; Payment of Interest; Future Extensions. Notwithstanding anything to the contrary contained in the Note, the parties agree to the following amendments:

   a. The Maturity Date shall be extended to December 31, 2018. Maker may not pre-pay the Note in part or in full.

   b. Holder may unilaterally extend the Maturity Date for an additional six months to June 30, 2019, by (i) sending Maker written notice of such extension and (ii) informing Maker that it must pay Holder the amount of interest accrued between July 1, 2018 and December 31, 2018. Such notice and payment shall be submitted to Holder by Maker no later than five (5) calendar days before the December 31, 2018 Maturity Date with regard to Holder's conversion option set forth in a prior amendment.

   c. Subject to the provisions of Section 1 above, Holder may convert the Note at any time.

2. No Other Amendments or Modifications. Except for the modifications to the Note set forth herein, each of the provisions of the Note shall remain in full force and effect as originally set forth in the Note.

*[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, Maker and Holder have executed the Amendment as of the day and year first written above.

**MAKER:**

**GENERATION NEXT FRANCHISE BRANDS, INC.**

By: _____
Arthur Budman
CEO and CFO

**HOLDER:**

**SOCIALLY RESPONSIBLE BRANDS, INC.**

By: _____

# EXHIBIT 6

## RESCISSION AGREEMENT

This Rescission Agreement ("Agreement") is made as of February 14, 2019 ("Effective Date"), by and between Presto Yogurt Vending, LLC ("Franchisee") and Reis & Irvy's, Inc. ("R&I"). Franchisee and R&I are sometimes referred to individually as "Party" and collectively as "Parties."

## RECITALS

The Agreement is made with reference to the following facts:

1. On July 12, 2016, Franchisee and R&I entered into a Franchise Agreement as well as subsequent addendums (collectively the "Franchise Agreement").

2. The Parties desire to settle and compromise any and all claims between them arising out of their relationship to date. Therefore, it is understood and agreed that this Agreement is a compromise of disputed claims that remain contested, that the terms and conditions of this Agreement are in no way to be construed as an admission of liability on the part of the Parties.

## AGREEMENT

Now, therefore, incorporating the Recitals above, and in consideration of the promises and mutual covenants of this Agreement,

**IT IS HEREBY AGREED AMONG THE PARTIES AS FOLLOWS:**

1. Non-Economic Terms.

    A. Rescission of Franchise Agreement. The Parties mutually agree to rescind the Franchise Agreement.

2. Economic Terms.

    A. R&I agrees to refund Franchisee the $70,000 paid under the Franchise Agreement in ten (10) monthly payments of $7,000 beginning in February 2019. All payments are to be made by wire transfer. The initial payment will be due by the 15th of February, with each additional monthly payment due by the 7th of each month. After a ten (10) day period, late payments will cary a penalty of 1.5% on the unpaid balance.

    B. The Parties will be responsible for their own attorneys' fees and costs incurred prior to the full execution of this Agreement. If either Party seeks to enforce this Agreement, the prevailing Party(ies) shall be entitled to recover all related costs, including reasonable attorneys' fees, against the other Party(ies).

    C. Franchisee is responsible for any taxes owed as a result of this Agreement, and R&I makes no representation of the tax treatment contemplated by this Agreement.

3. <u>Mutual and General Release</u>.

A.    Except for the promises and agreements expressly set forth in this Agreement, Franchisee, for himself and for his present and former heirs, executors, trustees, trusts, members, administrators, employees, officers, agents, directors, shareholders, professional associations or partnerships, parents, subsidiaries, sister companies or any related and affiliated corporations or business entities, successors, privies and assigns, hereby fully and forever release and discharge R&I, and their present and former heirs, executors, trustees, trusts, members, administrators, employees, officers, agents, directors, shareholders, professional associations or partnerships, parents, subsidiaries, sister corporations or any related and affiliated corporations or business entities, successors, privies and assigns, from all claims, actions, causes of action, demands, cross-claims, counterclaims, obligations, contracts, indemnity, contribution, suits, debts, sums, accounts, controversies, rights, damages, costs, attorney's fees, losses, expenses, and liabilities whatsoever (contingent, accrued, mature, direct, derivative, subrogated, personal, assigned, discovered, undiscovered, inchoate, or otherwise) which they may now have or have had from the beginning of time to the date of this Agreement or which may hereafter accrue, individually, collectively, or otherwise in connection with, relating to or arising out of the dealings between the Parties prior to the date of this Agreement, provided that nothing in this paragraph will release R&I under the Security Agreement entered into herewith.

B.    Except for the promises and agreements made in this Agreement, R&I, for themselves and for their present and former heirs, executors, trustees, trusts, members, administrators, employees, officers, agents, directors, shareholders, professional associations or partnerships, parents, subsidiaries, sister companies or any related and affiliated corporations or business entities, successors, privies and assigns, hereby fully and forever release and discharge Franchisee and their present and former heirs, executors, trustees, trusts, members, administrators, employees, officers, agents, directors, shareholders, professional associations or partnerships parents, subsidiaries, sister corporations or any related and affiliated corporations or business entities, successors, privies and assigns, from all claims, actions, causes of action, demands, cross-claims, counterclaims, obligations, contracts, indemnity, contribution, suits, debts, sums, accounts, controversies, rights, damages, costs, attorney's fees, losses, expenses, and liabilities whatsoever (contingent, accrued, mature, direct, derivative, subrogated, personal, assigned, discovered, undiscovered, inchoate, or otherwise) which they may now have or have had from the beginning of time to the date of this Agreement or which may hereafter accrue, individually, collectively, or otherwise in connection with, relating to or arising out of the dealings between the Parties prior to the date of this Agreement.

C.    The releases granted by all Parties will also apply to the Parties' past, present, and future members, officers, directors, stockholders, shareholders, attorneys, agents, servants, representatives, employees, parents, subsidiaries, affiliates, partners, predecessors and successors in interest, and assigns, and all other persons, firms, corporations or entities with whom any of the former have been, are now, or may hereafter be affiliated.

4. <u>Waiver of Section 1542 of the Civil Code</u>. The Parties hereby waive any and all rights that they may have under the provisions of any rule of law that exists or that may be adopted by the State of California that provides that a release does not extend to claims that are unknown or

unsuspected at the time of executing the Agreement, which if known would have materially affected the provisions of the Agreement, including, but not limited to California Civil Code section 1542. Section 1542 provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or his favor at the time of executing the release, which if known by him or his must have materially affected his or his settlement with the debtor.

Each Party expressly waives and relinquishes any and all rights and benefits which they may have under, or which may be conferred upon it, by the provisions of section 1542 of the California Civil Code, as well as any other similar state or federal statute or common law principle, to the fullest extent they may lawfully waive such rights and benefits. The Parties acknowledge and agree that this waiver is an essential and material term of the Agreement, and that without such waiver the payment and releases that constitute the consideration for the Agreement would not have been made.

5. Confidentiality. This Agreement (including its existence, all negotiations and the specific terms of the Agreement itself) shall be deemed to be "Confidential Information," provided that Confidential Information shall not include information which is or becomes publicly available other than as a result of a disclosure in violation of this Agreement. Accordingly, the Parties hereby agree that, with the exception of their attorneys, spouses/domestic partners, accountants, auditors, tax advisors and those employees with a need to know, the Parties will not discuss, disclose or reveal Confidential Information to any other persons, entities or organizations, except that a Party may disclose Confidential Information to persons, entities or organizations already aware of such Confidential Information other than as a result of disclosure in violation of this Agreement, and provided further that a Party may disclose Confidential Information as required by law, regulation or judicial process. Other than as provided for above, the Parties will not volunteer or otherwise provide information about their dealings with one another.

6. Non-Disparagement.

A. Franchisee and their counsel agree not to make any statements, written or verbal, and agree not to cause or encourage others to make any statements, written or verbal, that defame, disparage, or in any way criticize the personal or business reputation, practices or conduct of R&I, their respective parent entities, sister entities and/or subsidiaries, and their respective employees, directors, and/or officers. Franchisee and their counsel acknowledge and agree that this prohibition extends to statements, written or verbal, made to anyone in any format whatsoever, including but not limited to those made via social media, bulletin board services, blogs, email, physical mail, or any other method to any person or entity, including but not limited to the news media, investors, potential investors, any board of directors or advisory board or individual directors, industry analysts, competitors, strategic partners, vendors, and employees (past and present).

B. R&I and their counsel agree not to make any statements, written or verbal, or cause or encourage others to make any statements, written or verbal, that defame, disparage, or in

any way criticize the personal or business reputation, practices or conduct of Franchisee, their respective parent entities, sister entities and/or subsidiaries, and his respective employees, directors, and/or officers. R&I and their counsel acknowledge and agree that this prohibition extends to statements, written or verbal, made to anyone in any format whatsoever, including but not limited to those made via social media, bulletin board services, blogs, email, physical mail, or any other method to any person or entity, including but not limited to the news media, investors, potential investors, any board of directors or advisory board or individual directors, industry analysts, competitors, strategic partners, vendors, and employees (past and present).

C. Nothing in this Agreement may be construed to prevent Franchisee or his counsel from making verbal or written statements in the course of representation or potential representation of clients about the personal or business reputation, practices or conduct of R&I, their respective parent entities, sister entities and/or subsidiaries, and their respective employees, directors, and/or officers. Statements made by any Party or their counsel in the scope of litigation, court documents, rulings, and judgments which are a matter of public record are not considered disparaging under this section.

7. <u>Entire Agreement</u>. This Agreement constitutes the entire written agreement of compromise and settlement among the Parties, and there are no other agreements modifying or affecting its terms. This Agreement supersedes all other agreements, written, oral, or implied, relating to the same subject. This Agreement can only be modified by a writing signed by the Parties and expressly stating that such modification is intended.

8. <u>California Law to Govern</u>. This Agreement is being made and delivered and is intended to be performed in the State of California and the execution, validity, construction, and performance of this Agreement will be construed and enforced in accordance with the laws of California.

9. <u>Agreement as Defense</u>. This Agreement may be pleaded as a full and complete defense and may be used as the basis for an injunction against any action, suit or proceeding which may be prosecuted, instituted or attempted by any Party in breach thereof.

10. <u>Severability</u>. If any provision of this Agreement, or part thereof, is held invalid, void or voidable as against public policy or otherwise, the invalidity will not affect other provisions, or parts thereof, which may be given effect without the invalid provision or part. To this extent, the provisions, and parts thereof, of this Agreement are declared to be severable.

11. <u>No Admission of Liability</u>. This Agreement is the compromise of disputed claims, causes of action, denials, and defenses made or to be made by any of the Parties hereto and is being entered into for the sole purpose of bringing to an end between the Parties hereto the real or potential claims referred to herein. This Agreement embodies a compromise of claims and will not be used or construed as an admission of liability or fault for any purpose.

12. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which together shall constitute one and the same agreement. This

Agreement may be executed and delivered by email in a PDF file or via facsimile transmission with the same force and effect as an ink-signed document.

13. Warranties of Authority and Against Prior Assignment. Each person who signs this Agreement on behalf of a Party warrants and represents to every other Party that they have the authority to make this Agreement on behalf of the Party for which they sign. Each of the Parties to this Agreement represents and warrants that it is the sole and exclusive owner of the rights, claims and causes of action herein released and that it has not heretofore assigned or transferred or purported to assign or transfer to any other person or entity any obligations, rights, claims, or causes of action herein released. Each Party to this Agreement shall defend and hold each other Party harmless from and against any rights, claims, or causes of action asserted by any person that, if established, would be a breach of the above representations and warranties, and any and all loss, expense, attorneys' fees, and liability arising directly or indirectly out of the breach of any of the above representations and warranties.

14. Cooperation. The Parties hereto agree that, for their respective selves, heirs, executors and any permitted assigns, they will abide by this Agreement, the terms of which are meant to be contractual, and further agree that they will do such acts and prepare, execute and deliver such documents as may reasonably be required in order to carry out the objectives of this Agreement.

15. Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and to their respective representatives, successors and assigns. Any assignment does not relieve a Party of its obligations under this Agreement.

16. Interpretation. Each Party declares and represents that this Agreement is being made without reliance upon any statement or representation not expressly contained herein of any other Party, or of any agent or attorney of any other Party. Each Party represents to each other Party that it has reviewed each term of this Agreement with its counsel and that it shall never dispute the validity of this Agreement on the ground that it did not have advice of its counsel. This Agreement shall be construed and enforced according to its fair meaning as if prepared by all Parties after extensive negotiation; no part of this Agreement shall be construed against any Party on the ground that the attorney for that Party drafted it.

17. Knowing, Free and Voluntary Making. This Agreement has been carefully read by the Parties, and the Parties acknowledge that they know and fully understand its contents. The Parties acknowledge that they have fully discussed this Agreement with their respective attorneys and fully understand the consequences of this Agreement. No Party is being influenced by any statement made by or on behalf of any of the other Party to this Agreement. The Parties have relied and are relying solely upon their own judgment, belief and knowledge of the nature, extent, effect and consequences relating to this Agreement and/or upon the advice of their own legal counsel concerning the legal and income tax consequences of this Agreement. The Agreement is freely and voluntarily signed by the Parties.

[Signature Page to Follow]

IT IS SO AGREED.

PRESTO YOGURT VENDING, LLC

_____
Frank Hotz, Member

_____
Thomas Holtz, Member

REIS & IRVY'S, INC.

_____
Art Budman. CFO

# EXHIBIT 7

## SECURITY AGREEMENT

On this 14th day of February 2019, Reis & Irvy's, Inc. ("Debtor"), for valuable consideration, receipt of which is acknowledged, grants to Presto Yogurt Vending, LLC ("Secured Party") a security interest in the following property of Debtor (the "Collateral") two robotic soft serve vending kiosks with serial numbers 1-1810-0241 and 1-1808-0155 to secure payment of the following obligations of Debtor to Secured Party (the "Obligations") payment of $70,000 as provided under the Rescission Agreement agreed to between the parties.

1.  **Warranties and Covenants of Debtor**. Debtor warrants and covenants that:

(a)    No other creditor has a security interest in the Collateral.

(b)    Debtor is the owner of the Collateral free from any adverse lien or encumbrance except this lien and the others described in this Security Agreement.

(c)    Debtor will defend the Collateral against all claims of other persons.

(d)    Debtor will immediately notify the Secured Party in writing of any change in name or address.

(e)    Debtor will do all such things as Secured Party at any time or from time to time may reasonably request to establish and maintain a perfected security interest in the Collateral.

(f)    Debtor will pay the cost of filing this agreement in all public offices where recording is deemed by Secured Party to be necessary or desirable. A photographic or other reproduction of this agreement is sufficient as a financing statement.

(g)    Debtor will not transfer or encumber the Collateral other than subject to this Security Agreement.

(h)    Debtor will keep the Collateral free from any adverse lien and in good repair, will not waste or destroy the Collateral, and will not use the Collateral in violation of any law or policy of insurance. Secured Party may examine and inspect the Collateral at any reasonable time.

(i)    Debtor will pay promptly when due all taxes and assessments upon the Collateral or for its use or operation or upon this Agreement or upon any note evidencing the Obligations.

2.  **Events of Default**. Debtor shall be in default under this Agreement upon the occurrence of any of the following events or conditions: (a) the failure to perform any of the Obligations or this Agreement; (b) the loss, theft, substantial damage, destruction, transfer or encumbrance of the Collateral; (c) the making of any levy, seizure or attachment upon the Collateral; or (d) the filing by Debtor or by any third party against Debtor of any petition under any Federal bankruptcy statute, the appointment of a receiver of any part of the property of Debtor, or any assignment by Debtor for the benefit of creditors.

3.    **Remedies**.    UPON DEFAULT AND AT ANY TIME THEREAFTER, SECURED PARTY MAY DECLARE ALL OBLIGATIONS IMMEDIATELY DUE AND PAYABLE AND SHALL HAVE THE REMEDIES OF A SECURED PARTY UNDER THE UNIFORM COMMERCIAL CODE.

**Presto Yogurt Vending, LLC:**

_____
Frank Holtz, Member

**Reis & Irvy's, Inc.:**

_____
Art Budman, CFO

SECURITY AGREEMENT                                                      PAGE 2

# EXHIBIT 8

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) | |
|---|---|
| DENNIS LOY | 586-775-2917 |

B. E-MAIL CONTACT AT FILER (optional)
DENNIS_LOY@LOYLAW.COM

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

DENNIS LOY
DENNIS K. LOY, P.C.
2651 OXFORD CIRCLE
ANN ARBOR, MI 48103

Filed in the office of

*Barbara K. Cegavske*
Barbara K. Cegavske
Secretary of State
State of Nevada

Document Number
**2019005329-2**

Filing Date and Time
**02/17/2019 12:43 PM**

(This document was filed electronically.)

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| REIS & IRVY'S, INC. | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2620 FINANCIAL COURT #100 | SAN DIEGO | CA | 92117 | |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| PRESTO YOGURT VENDING LLC | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 16957 EIGHTEEN MILE ROAD | CLINTON TOWNSHIP | MI | 48038 | |

4. COLLATERAL: This financing statement covers the following collateral:

TWO (2) ROBOTIC SOFT SERVE VENDING KIOSKS WITH SERIAL NUMBERS 1-1810-0241 AND 1-1808-0155

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)      International Association of Commercial Administrators (IACA)

# EXHIBIT 9

## BUSINESSS LOAN AND SECURITY AGREEMENT

This Business Loan and Security Loan Agreement (this "Loan Agreement"), is made effective as of 22 October 2019 (the "Effective Date"), by and between Generation Next Franchise Brands, Inc., a Nevada corporation and Reis & Irvy's, Inc., a Nevada corporation (collectively, jointly and severally, the "Borrower") and Brett Hall, located in Carlsbad, CA ("Lender").

### BACKGROUND:

A. Borrower and Lender desire in the Loan Agreement to set forth their agreement with respect to a business loan as documented herein and by that certain "Note" attached hereto as Exhibit A. Exhibit A, along with this Loan Agreement, that certain "Subordination Agreement" dated of even date herewith by and between Lender and Socially Responsible Brands, Inc. ("Creditor") and all other agreements, documents and instruments evidencing or securing said Note and/or entered into in connection herewith, now or in the future, are referred to collectively herein and therein as the "Loan Documents."

B. As an inducement to Lender to enter into this Loan Agreement and the Loan Documents and issue the loan amount to the Borrower and accept the Note, Borrower wishes to, among other things, grant a lien upon and security interest in and to the Collateral (as defined below).

### TERMS AND CONDITIONS:

For the reasons described above, in consideration of the mutual promises and covenants set forth in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Lender and Borrower hereby agree as follows:

1. CERTAIN DEFINED TERMS. Unless the context otherwise requires, as used in this Loan Agreement the following terms shall have the following meanings:

    (a)    "Business" shall mean the business of the Borrower and any and all additions, successions, and appreciation thereof.

    (b)    "Change in Control" shall mean:

        (i)    any sale, lease, exchange, or other transfer (in one transaction or series of related transactions during the twelve month period ending on the date of the most recent sale, lease, exchange or other transfer) of all or substantially all of the assets of the Borrower to any person or persons acting as a group (as determined pursuant to Treasury Regulations Section 1.409A-3(i)(5)(v)(B) and Internal Revenue Service interpretations thereunder (a "Group")), other than to a person or Group holding, directly or indirectly, at least fifty percent (50%) of the total fair market value of the outstanding and issued equity interests of the Seller, as constituted immediately preceding such event; or

        (ii)    the acquisition by any person or Group of more than fifty percent (50%) of the total fair market value of the outstanding and issued equity interests in the Borrower, other than any event as a result of which partners or owners (or their affiliates) of the Borrower, as constituted immediately preceding such event, hold greater than one-half

(50%) of the total fair market value of the outstanding and issued equity interests of the Borrower.

(c)    "Closing Date" shall mean the date of this Loan Agreement.

(d)    "Code" shall mean the Uniform Commercial Code as, from time to time, in effect in the State of Nevada.

(e)    "Collateral" shall mean all of the assets and property of the Borrower and the Business, wheresoever located and whensoever acquired, contracted or arising, including without limitation the following (capitalized terms in this section have the meaning ascribed to them in the Code):

(i)    all of the Business and Borrower's rights, title and interests in, to and under all of their Accounts, Deposit Accounts, Chattel Paper, Commercial Tort Claims, Electronic Chattel Paper, Documents, Equipment, Property, Inventory, Receivables, Goods, Instruments, Inventory, Investment Property, Letter of Credit Rights, Payment Intangibles, including, without limitation, all Proceeds, and all software, licenses, and permits related thereto, whether designed or issued by the Borrower, or otherwise;

(ii)    all rights of the Business and Borrower to the payment of money now or hereafter arising out of / in connection with the sale, lease or other disposition of the foregoing property, including, without limitation, amounts due from affiliates, tax refunds, and insurance proceeds;

(iii)    all files, records (including, without limitation, computer programs, tapes and related electronic data processing software) and writings of the Business and Borrower or in which the Borrower has an interest in any way relating to the foregoing property; and

(iv)    as to each of the foregoing, all products and proceeds thereof, substitutions therefore and Accessions thereto.

(f)    "Default Rate" shall mean Eighteen Percent (18%) per annum.

(g)    "Enforcement Costs" shall have the meaning ascribed to it in Section 7(l).

(h)    "Event of Default" shall have the meaning ascribed to it in Article V.

(i)    "General Intangibles" shall mean all general intangibles (within the meaning of the Code), whether now existing or hereafter created, arising or acquired.

(j)    "Inventory" shall mean all of the Borrower's inventory (within the meaning of the Code).

(k)    "Lender Expenses" has the meaning ascribed to it in 2(d).

(l)    "Loan Documents" shall have the meaning ascribed to it in the Recitals.

2

(m)     "Material Adverse Effect" means, in the reasonable discretion of Lender, a material adverse effect on (i) the business operations or condition (financial or otherwise) of Borrower and its Subsidiaries taken as a whole or (ii) the ability of Borrower to repay the Obligations or otherwise perform its obligations under the Loan Documents.

(n)     "Maturity Date" means the day before 180-day anniversary of the Closing Date.

(o)     "Obligations" shall mean, collectively, all obligations and liabilities (primary, secondary, direct, indirect, contingent, sole, joint or several, whether similar or dissimilar or related or unrelated) of any and all of the Borrower in favor of the Lender, due or to become due, now existing or hereafter incurred, contracted or acquired, whether arising under, out of or in connection with the Loan Documents or otherwise.

(p)     "Proceeds" has the meaning ascribed to that term under the Uniform Commercial Code as in effect in the State of Nevada on the date hereof.  For purposes of this Agreement, the term "Proceeds" includes whatever is receivable or received when Collateral or proceeds of the Collateral are sold, collected, exchanged, or otherwise disposed of, whether the disposition is voluntary or involuntary, and includes, without limitation, all rights to payment in whatever form and however arising.

(q)     "Property" shall mean any and all interests in real and/or personal property of the Borrower.

(r)     "Receivables" shall mean all accounts (within the meaning of the Code), Accounts, accounts receivable, book debts, notes, drafts, acceptances and other forms of obligations, now or hereafter owing to the Borrower, arising from the sale or lease of the Inventory by Borrower any obligation that might be characterized as an account, contract right, general intangible or chattel paper under the Code, all of the Borrower's rights in, to and under all purchase orders, now or hereafter received by the Borrower for such Inventory, and all monies due or to become due to the Borrower under all contracts for the sale, lease, or other disposition of the Inventory (whether or not yet earned by performance) or in connection with any other transaction (including, without limitation, the right to receive the proceeds of said purchase orders and contracts), and all collateral security and guarantees of any kind given by any obligor, with respect to any of the foregoing.

(s)     "Subsidiary" shall mean any corporation, association or other business entity of which more than 50% of the shares of stock or other interests entitled to vote in the election of directors, managers or trustees thereof at that time is owned or controlled, directly or indirectly, by the Borrower.

2.  LOAN AND TERMS OF PAYMENT.

(a)     Subject to the terms and conditions of this Loan Agreement, Lender agrees to loan the Borrower $25,000, distributed or distributable to Borrower on or about the Closing Date; Borrower shall execute and deliver to Lender on the date hereof the Note.

(b)     Interest Rates, Payments, and Calculations.

(i)     Interest Rate.  The Note shall bear interest at a rate equal to FIFTEEN percent (15%) per year.

(ii)　　　Loan Fees.  Borrower shall pay a loan fee of SEVEN HUNDERED AND FIFTY DOLLARS ($750) due and payable at Closing.

(iii)　　　Default Rate.  All Obligations shall bear interest, from and after the occurrence and during the continuance of an Event of Default, at the Default Rate.

(iv)　　　Nothing contained herein shall be deemed to establish or require the payment of a rate of interest or other charges in excess of the maximum permitted by applicable law.  The Borrower does not intend or expect to pay, nor does the Lender or any subsequent holder hereof intend or expect to charge, accept or collect any interest greater than the highest legal rate of interest which may be charged under the laws of the State of Nevada, and if, from any circumstances whatsoever, fulfillment of any provision of the Note or any Loan Document in any manner relating thereto, at the time performance of said provision shall be due, shall involve transcending the limit of validity prescribed by any applicable law governing usury, then, _ipso facto_, the obligation to be fulfilled shall be reduced to the limit of such validity so that in no event shall exaction be possible under this Loan Agreement or any document relating thereto in excess of the limit of such validity, but such obligation shall be fulfilled to the limit of such validity and if, under any circumstances whatsoever, interest in excess of the limit of such validity will have been paid by the Borrower in connection with the indebtedness evidenced by the Note and Loan Documents, such excess shall be applied to the unpaid and outstanding principal due under the Note, and not to the payment of interest.  The provisions of this paragraph shall control every other provision of all other agreements executed by the Borrower or Lender in connection with this transaction.

(v)　　　No Monthly Payments Required.  The total outstanding principal and all accrued but unpaid interest hereunder shall be due and payable on or before the Maturity Date. Payment of principal and interest shall be made in United States dollars. Borrower may but is not obligated to make payments of accrued and unpaid interest at any time prior to Maturity Date.

(vi)　　　Computation.  All interest chargeable under the Loan Documents shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed.

(c)　　　Crediting Payments.  The receipt by Lender of any wire transfer of funds, check, or other item of payment shall be immediately applied to conditionally reduce Obligations, but shall not be considered a payment on account unless such wire transfer is of immediately available federal funds or unless and until such check or other item of payment is honored when presented for payment. Payments received by Lender hereunder, including from any sale or assignment of all or any portion of the Collateral after an Event of Default, will, whether received before or after an Event of Default, be credited on a daily basis first to Interest, second to any other amounts owed to Lender hereunder, then to the outstanding balance of the Note when received in Lender's bank account.

(d)　　　Fees.  Borrower shall pay to Lender the following fees ("Lender Expenses"): any and all costs of Lender arising out of or in connection with the loan being made hereunder, including without limitation recording fees, documentary stamps, intangible taxes and all

4

reasonable legal fees of Lender for the preparation of the Loan Documents as well as for any future dealings with Borrower following the Closing Date, including without limitation bankruptcy proceedings. On the Closing Date, Borrower will pay Lender Expenses incurred through the Closing Date and, after the Closing Date, all Lender Expenses as they become due, including without limitation Enforcement Costs.

(e)    Term. This Loan Agreement shall become effective once duly executed and authorized by Borrower and Lender and shall continue in full force and effect for a term ending on the date which all Obligations of Borrower have been discharged and paid in full, or on such earlier date as the parties agree in writing. Notwithstanding the foregoing, Lender shall have the right to terminate this Loan Agreement immediately and without notice upon the occurrence of an Event of Default and Borrower shall have the right to terminate this Loan Agreement immediately upon payment in full of its Obligations then outstanding hereunder. Notwithstanding any termination of this Loan Agreement, all of Lender's security interest in all of the Collateral and all of the terms and provisions of this Loan Agreement shall continue in full force and effect until all Obligations have been paid and performed in full, and no termination shall impair any right or remedy of Lender, nor shall any such termination relieve Borrower of any Obligation to Lender until all of the Obligations have been paid and performed in full.

3.    PREPAYMENT. Borrower may prepay principal, interest, or both without penalty.

4.    THE COLLATERAL. As collateral security for the payment and performance of all of the Obligations, the Borrower hereby extends, sells, assigns, conveys, mortgages, pledges, transfers, and grants to the Lender a continuing security interest in the Collateral. Any security interest will be subordinated to all existing security interests in the Collateral, except as provided in any subordination agreement. Prepayment by the Borrower of any portion of the principal and accrued interest pursuant to the terms of this Loan Agreement shall not reduce or otherwise impair the security interest of Lender in the Collateral, except that complete repayment of all Obligations shall release and redeem to the Borrower all interest in the Collateral securing the Obligations. Borrower hereby authorizes Lender to file financing statements, without notice to Borrower, with all appropriate jurisdictions to perfect or protect Lender's interest or rights hereunder, including a notice that any disposition of the Collateral, by either Borrower or any other Person, shall be deemed to violate the rights of Lender. Such financing statements may indicate the Collateral as "all assets of the Debtor" or words of similar effect, or as being of an equal or lesser scope, or with greater detail, all in Lender's discretion.

5.    EVENTS OF DEFAULT.

(a)    The occurrence of any of the following events, in addition to any other Events of Default as defined in any Loan Document, shall constitute an "Event of Default" hereunder:

(i)        Any provision of this Loan Agreement or any Loan Document, and any amendments thereto, is breached or is untrue or misleading in any material respect;

(ii)        Any warranty, representation, or statement made or furnished to Lender by Borrower or Guarantors in connection with any of the Loan Documents, is untrue or misleading in any material respect;

(iii)        Borrower is in default under any provision of any Loan Document and/or any amendments thereto, including without limitation if the Borrower shall fail to pay on the due date any payment of money, whether as principal, interest, late charge, or Enforcement Costs (as defined below), as required under this Loan Agreement or any Loan Document, with any applicable notice having been given and time to cure expired;

(iv)        The Insolvency of the Borrower.  For purposes hereof,  the term "Insolvency" shall mean: (i) the appointment, by the order of a court of competent jurisdiction, of a trustee, receiver, or liquidator of the Borrower, if such order shall not be discharged or dismissed within sixty (60) days after such appointment; (ii) application for, or consent in writing to, the appointment of a receiver, trustee, or liquidator of all or substantially all of the assets of the Borrower; (iii) the filing of a voluntary petition in bankruptcy or the admission in writing of inability to pay debts as they become due; (iv) a general assignment for the benefit of creditors; (v) the filing of a petition or an answer seeking a reorganization (other than a reorganization not involving the liabilities of the Borrower) or an arrangement with creditors or taking advantage of any bankruptcy or insolvency law; (vi) the filing of an answer admitting the material allegations of a petition filed against the Borrower in any bankruptcy, reorganization, or insolvency proceeding; (vii) the insolvency of Borrower; (viii) the Borrower has suffered a Material Adverse Effect in the reasonable discretion of the Lender; or (ix) the entering of an order, judgment, or decree by any court of competent jurisdiction on the application of a creditor adjudicating the Borrower as bankrupt or insolvent, or the appointment of a receiver, trustee, or liquidator of the Borrower, or of all or substantially all of the assets of the Borrower, if such order, judgment or decree continues unstayed and in effect for a period of sixty (60) days from the date entered;

(v)        A Change in Control of Borrower.  If there occurs a Change in Control of Borrower.

(b)        Notwithstanding anything herein to the contrary, Borrower shall have a three (3) calendar day grace period after notice from Lender to cure any non-monetary default hereunder; provided however that such grace period does not cause a Material Adverse Effect.  There shall be no grace period for monetary default and no notice required by Lender for such default to be immediate and material.  Time is of the essence for all Obligations hereunder.

(c)        If an Event of Default shall occur for any reason whatsoever (and whether such occurrences shall be voluntary or involuntary, or come about or be effected by operation of law or pursuant to or in compliance with any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body) then, or at any time thereafter, the Lender may, without written notice, take any or all of the following actions, at the same or different times: (A) accelerate the maturity of the Obligations and demand the immediate payment thereof, and to

charge the Default Rate on such Obligations without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived; (B) require the Borrower to assemble the Collateral and the records pertaining thereto and deliver possession of same to the Lender, as well as to permit Lender to have unrestricted access to the Borrower's premises and the Collateral so as to allow Lender to take control thereof for purposes of disposition of the Collateral and the collection of all Obligations; and (C) take any and all action and pursue any and all remedies as may be permitted under the Loan Documents or by applicable law or otherwise, including exercising all rights of counterclaim or set-off.

(d)     Upon the occurrence of an Event of Default, the Lender may (i) at any time thereafter in its discretion transfer any securities or other property constituting Collateral into its own name or that of its nominee and receive the income thereon and hold the same as security for the Obligations or apply it on any or all amounts due on the Obligations in such order as Lender may elect in its sole discretion, (ii) enter the premises peacefully at the address(es) listed herein, and take control of the Business and (ii) require each Borrower to establish, at Borrower's expense, a lock box account with such bank acceptable to Lender, into which Borrower shall promptly deposit and direct their account debtors to directly  remit all payments on Receivables and, which such payments or deposits shall be the property solely of the Lender. Insofar as the Collateral shall consist of Receivables, other claims and rights to the payment of money, insurance policies, instruments, choses in action or the like, the Lender may, without notice to or demand on the Borrower, demand, collect, receipt for, settle, compromise, adjust, use, sue for, foreclose or realize upon the Collateral as the Lender may determine, whether or not the obligations or the Collateral are then due and for the purpose of realizing the Lender's rights therein, the Lender may receive, open and dispose of mail addressed to the Borrower and endorse notes, checks, drafts, money orders, documents of title or other evidences of payment, shipment or storage or any form of the Collateral on behalf of and in the name of Borrower. The powers conferred on the Lender by this Section are solely to protect the interest of the Lender and shall not impose any duties on the Lender to exercise any powers.  All acts of said attorney or designee are hereby ratified and approved by the Borrower and the Lender and said attorney or designee shall not be liable for any acts of commission or omission nor for any error of judgment or mistake of fact or law. This power, being coupled with an interest, is irrevocable so long as any of the Obligations remains outstanding.  Borrower hereby irrevocably appoints Lender (and any of Lender's designated officers, or employees) as Borrower's true and lawful attorney to: (a) send requests for verification of Accounts or notify account debtors of Lender's security interest in the Accounts; (b) endorse Borrower's name on any checks or other forms of payment or security that may come into Lender's possession; (c) sign Borrower's name on any invoice or bill of lading relating to any Account, drafts against account debtors, schedules and assignments of Accounts, verifications of Accounts, and notices to account debtors; (d) make, settle, and adjust all claims under and decisions with respect to Borrower's policies of insurance; (e) settle and adjust disputes and claims respecting the accounts directly with account debtors, for amounts and upon terms which Lender determines to be reasonable; (f) to modify, in its sole discretion, any intellectual property security agreement entered into between Borrower and Lender without first obtaining Borrower's approval of or signature to such modification to include reference to any right, title or interest in any copyrights, patents or trademarks acquired by Borrower after the execution hereof or to delete any reference to any right, title or interest in any copyrights, patents or trademarks in which Borrower no longer has or claims any right, title or interest; (g) to file, in its sole discretion, one or more financing or continuation statements and amendments thereto, relative to any of the Collateral without the

signature of Borrower where permitted by law. The appointment of Lender as Borrower's attorney in fact, and each and every one of Lender's rights and powers, being coupled with an interest, is irrevocable until all of the Obligations have been fully repaid and performed.

6. REPRESENTATIONS AND WARRANTIES. As a material inducement for Lender to enter into this Loan Agreement, Borrower hereby represents and warrants to Lender as follows:

(a) Borrower is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada and has the power and authority carry on its business as is now being conducted.

(b) Borrower has all requisite power and authority to enter into this Loan Agreement and the other Loan Documents contemplated hereby and to assume and perform fully its obligations hereunder and thereunder. The execution and delivery by Borrower of this Loan Agreement and the other Loan Documents contemplated hereby and the performance by Borrower of their Obligations hereunder and thereunder have been duly and validly authorized by all necessary corporate action of Borrower.

(c) The execution and delivery of this Loan Agreement and the other Loan Documents contemplated hereby and the performance by Borrower hereunder and thereunder (i) do not and will not conflict with or violate any provision of the articles of incorporation or bylaws of Borrower and (ii) do not and will not (A) conflict with or result in a breach of the terms, conditions or provisions of, (B) constitute a default under, (C) result in the creation of any encumbrance, lien or other restriction of any nature upon the Borrower's assets pursuant to, (D) give any third party the right to modify, terminate or accelerate any obligation under, (E) result in a violation of, or require any authorization, consent, approval, exemption or other action by or notice to any third party pursuant to, any agreement, instrument, order, judgment, license, permit, decree, law, regulation, ordinance or judgment to which any of Borrower or the Collateral or is a party or is subject or bound.

(d) No filings with, notices to, or approvals or consents of, any federal, state or local governmental or regulatory agency or body or any other Person are required to be obtained by Borrower in connection with the consummation of the transactions contemplated by the Loan Documents. "Person" means any individual, sole proprietorship, partnership, limited liability partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, entity or government (whether foreign, federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof), and shall include such Person's successors and assigns.

(e) There are no charges, complaints, claims, actions, suits, disputes, investigations, arbitrations, demands or other proceedings pending or, to the best knowledge of Borrower, threatened before or by any court, governmental agency or instrumentality, arbitrator, Person to which Borrower is, or are threatened to be, a party or to which, to the best knowledge of Borrower, any employee, independent contractor or affiliate of Borrower is or is threatened to be a party, or which relate to Borrower, the business of Borrower, or any of the assets of Borrower or any other agreement related hereto. To the best knowledge of Borrower, there is no basis or grounds for any of the foregoing. Borrower is not subject to or bound by any injunction, order or decree of any court or governmental or administrative agency.

8

(f)     There are no existing defaults, events of default, breaches or other circumstances, facts or events that with the passage of time or giving of notice, or both, would constitute a default, event of default or breach on the part of Borrower under any agreement of Borrower or otherwise.

(g)     Borrower has obtained and maintained all required local, state and federal licenses and permits necessary to operate Borrower's business and all such licenses and permits are in good standing and Borrower has no knowledge of any actions, claims or violations that are pending that would result in any limitations on or suspension or termination of such licenses.

(h)     All financial statements and reports relating to the Borrower and the Company provided by Borrower and/or Guarantors or made available or disclosed to Lender and its accountants, attorneys and other agents are complete, accurate and fairly present the financial position and performance of Borrower and the Company in all material respects for the periods to which they relate, and there has been no adverse change in the condition, financial or otherwise, of Borrower since the last disclosed statement.

(i)     All of the representations and warranties made by Borrower contained in the Loan Documents contemplated hereby and all information delivered in any schedule, attachment, certificate or exhibit hereto are true, correct and complete on the date of this Loan Agreement, throughout the term of this Loan Agreement.  Borrower has not omitted to state to Lender any fact relating to the Borrower, which (i) is necessary to make the information given by or on behalf of Borrower not misleading, (ii) if disclosed would reasonably affect the decision of a Person considering making a loan to Borrower or (iii) has or which could reasonably be expected to have an adverse effect upon the Borrower or the profits, condition (financial or otherwise) or prospects of the Borrower's business.

(j)     Borrower is the record and beneficial owner of, and has good and marketable title to the Collateral and there are no unrecorded liens or encumbrances on the Collateral.

(k)     Borrower agrees that Borrower will not for any reason change banking institutions or instructions for payment of policies and/or Receivables to any other account without the express written consent of Lender.

(l)     There are no actions or proceedings pending or, to Borrower's knowledge, threatened by or against Borrower or any Subsidiary in which an adverse decision could, with reasonable likelihood, cause a Material Adverse Effect.

(m)     All consolidated financial statements for Borrower delivered to Lender fairly present in all material respects Borrower's consolidated financial condition and Borrower's consolidated results of operations. There has not been any material deterioration in Borrower's consolidated financial condition since the date of the most recent financial statements submitted to Lender.

(n)     This Loan Agreement is entered into by Borrower for the Business Purpose.

7.  AFFIRMATIVE COVENANTS.  From the date hereof and so long as any of the Loan Documents remains in effect or any of the Obligations shall be unpaid, each Borrower will:

(a)     Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its corporate existence, rights, licenses, permits and franchises and comply with all applicable laws, and operate its business in substantially the manner in which it is presently conducted and operated;

(b)     At all times preserve all Property (except for such property as is disposed of in the ordinary course of business) used or useful in the conduct of the Business and keep the same in good repair, working order and condition (subject to normal wear and tear), and from time to time make, or cause to be made, all necessary and proper repairs, whether pursuant to a warranty or otherwise, renewals, replacements, betterments and improvements thereto;

(c)     Execute such other documents and instruments as Lender may reasonably request, duly executed by Borrower, to further implement and effectuate the purposes of this Loan Agreement;

(d)     Keep the insurable Collateral and other properties insured at all times at the replacement value thereof, by financially sound and reputable insurers, and maintain or cause to be maintained such other insurance to such extent and against such risks, including fire and other risks insured against by extended coverage, as is, the Borrower's best judgment, customary with companies in the same or similar business, and maintain in full force and effect public liability insurance against claims for personal injury, death or property damage occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by it and manufacturer's liability insurance against claims for personal injury or death occurring in connection with the use of any products assembled, manufactured or sold by it in such amount as the Borrower shall in good faith deem necessary, or as may be reasonably required by the Lender and maintain such additional insurance as may be required by law.  In respect of the Collateral, the Lender shall be loss payee under all policies of insurance maintained thereon. The Lender shall be entitled to at least 30 days' prior written notice of the insurer's intention to cancel or reduce any policies of insurance required by this Subsection (d), and, at its election and without any obligation whatsoever, shall have an opportunity to cure any defaults thereunder during such time. In addition, the Borrower shall deliver renewals of all such policies not less than 30 days prior to the expiration date of such policies. The Borrower shall furnish to the Lender full information as to the insurance carried (including a copy or the original, as required hereby, of all insurance policies), as well as proof of payment therefor, and pay for all insurance obtained in accordance herewith upon the terms of invoices therefor.

(e)     Pay all indebtedness and obligations promptly and in accordance with their respective terms if the failure to make such payments would cause a Material Adverse Effect, or affect the rights of the Lender hereunder, and pay and discharge promptly all taxes, assessments, and governmental charges or levies imposed upon it or in respect of its property, before the same shall become in default, as well as all lawful material claims for labor, materials, and supplies or otherwise which, if unpaid, might become a lien or charge upon such property or any part thereof, and timely comply with all applicable laws and governmental rules and regulations; provided, however that the Borrower shall not be required to pay or discharge or cause to be paid or discharged any such tax, assessment, charge, lien or claim, or timely comply with laws and governmental rules so long as the validity thereof shall be contested by appropriate legal proceedings timely initiated and conducted in good faith, and (i) in the case of an unpaid tax, assessment, governmental charge or levy, lien, encumbrance, charge or claim, such proceedings

10

shall be effective to suspend the collection thereof from the Borrower, and its properties; (ii) neither such properties nor any part thereof, nor any interest therein would be in any danger of being sold, forfeited or lost; (iii) in the case of a law and governmental rule or regulation, neither the Borrower nor the Lender would be in any danger of criminal liability for failure to comply therewith; and (iv) there shall have been established such reserve or other appropriate provision, if any, with respect thereto on the books of the Borrower, as shall be required by generally accepted accounting principles with respect to any such tax, assessment, charge, lien, claim, encumbrance, law, rule or regulation, so contested.

(f)     Furnish to Lender on a monthly basis, balance sheets, statements of income and loss, and statements of cash flow, prepared in accordance with GAAP, and all such other information regarding the operation, business, affairs and financial condition of the Borrower and Company as the Lender may reasonably request, including without limitation the ratio of cash on deposit in the Company and Borrower's operating accounts to outstanding Obligations.

(g)     Give the Lender prompt telephonic or email notice (to be confirmed within 48 hours by written notice as provided below) of any Event of Default or of any event which, with notice or the passage of time, or both, would constitute such an Event of Default, specifying the nature and extent thereof and the action which the party giving such notice proposes to take with respect thereto.

(h)     Keep its place of business and chief executive office and the office where it keeps its records concerning Receivables at its current location.

(i)     Keep its deposit account(s) at the bank(s) presently utilized by Borrower as its operating account(s).

(j)     At all reasonable times during business hours and as often as the Lender may reasonably request, permit any authorized representative of the Lender to visit and inspect any of the properties of the Borrower, including, without limitation, the Collateral, and the books in respect thereof, and to make extracts from such books and to discuss the affairs, finances and accounts with any of their respective chief financial officers or such other person as may be designated by the chief executive officer of the Borrower.

(k)     Promptly, from time to time as the Lender may reasonably request, perform such acts and execute, acknowledge, deliver, file, register, deposit or record any and all further instruments, agreements and documents whether to continue, preserve, renew, record or perfect interests conferred by this Loan Agreement or any of the other Loan Documents, as well as the priority thereof, or otherwise in connection with the Obligations.

(l)     Pay all costs and expenses incurred from time to time by the Lender with respect to any modification, consent or waiver of the provisions of any Loan Document and any enforcement of the Note and the Loan Documents, including, without limitation, reasonable attorneys' fees and expenses,  court costs, transcript costs, fees of experts, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other out-of-pocket disbursements or expenses of the types customarily incurred in connection with modifying terms and/or an action to collect payment, or an appeal from such action (collectively "Enforcement Costs").

(m)    Utilize the loan proceeds solely in connection with the Business for the Business Purpose.

8.  NEGATIVE COVENANTS.  Except for the Genext Loan LLC Business Loan and Security Agreement dated November 15, 2019 and any financing authorized by a bankruptcy court under 11 USC § 364, from the date hereof and so long as the Loan Agreement remains in effect and any of the Obligations shall be unpaid, each Borrower will not, without the prior written consent of the Lender:

(a)    Either,  directly or indirectly, incur, create, assume or permit to exist any Lien with respect to any Collateral now owned or hereafter acquired, or be bound by or subject to any agreement or option to do so, except liens granted, incurred or created in favor of the Lender in connection with the Loan Documents;

(b)    Incur, create, assume or permit to exist any indebtedness or liability on account of deposits or advances or progress payments under any contract or any indebtedness or liability for borrowed money, or any other indebtedness or liability evidenced by notes, bonds, debentures or similar obligations, except indebtedness to trade creditors incurred in the ordinary course of business or upon terms and conditions acceptable to Lender in its sole discretion.

9.  BORROWER'S INDEMNITY.  Borrower shall indemnify, defend and hold harmless Lender and its members, agents, partners, employees and independent contractors, at all times from and after the Closing Date, from and against any and all claims, actions, damages, liabilities, losses (including consequential losses), judgments, penalties, interest, fines, expenses, and/or other costs (including attorneys' fees and court costs) arising from or relating to:

(a)    any negligent action or omission of Borrower or any of the Borrower's employees, contractors, agents or any other Person acting under Borrower's supervision or control prior to, as of, or following the Closing Date;

(b)    any inaccuracy or breach of any representation or warranty made by Borrower in this Loan Agreement or any other Loan Document, document or instrument executed or delivered by Borrower in connection with this Loan Agreement or any breach or non-performance of any covenant or agreement made by Borrower in this Loan Agreement or any other Loan Document, document or instrument executed or delivered by Borrower in connection with this Loan Agreement;

(c)    any Loan Document and the payments due thereunder, including without limitation Enforcement Costs;

(d)    the willful misconduct of Borrower, their agents or employees;

(e)    the misapplication or conversion by Borrower of any insurance proceeds paid by reason of any loss, damage or destruction to the Collateral;

(f)    Any state or local documentary stamp taxes, intangible taxes, personal property taxes and sales tax, if any, imposed by virtue of the execution and acceptance of this Loan Agreement, the Loan Documents, Lender's perfection of its security interest in the Collateral,

including without limitation deeds of trust filed with regard to the Receivables, and the transactions contemplated hereby and thereby.

10. <u>WAIVER</u>. The Borrower hereby waives diligence, presentment, protest, notice of protest, notice of dishonor, and notice of nonpayment of the Note, and specifically consents to and waives notice of any renewal or extension of this Loan Agreement. The Borrower hereby waives benefits of the statute of limitations to the maximum extent allowed by law. No delay by the Lender in exercising any power or privilege hereunder, nor the single or partial exercise of any power or privilege hereunder, shall preclude any other or further exercise thereof, or the exercise of any other power or privilege hereunder.

11. <u>NOTICES</u>. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by reputable courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be:

| | |
|---|---|
| If to Borrower: | Generation Next Franchise Brands, Inc.<br>ATTN: Ryan Polk<br>2620 Financial Court, Suite 100<br>San Diego, CA 92117<br>T: 858-210-4200<br>F: |
| With a copy sent (which shall not constitute notice) to: | McDonald Hopkins<br>ATTN: Scott Opincar<br>600 Superior Avenue East, Suite 2100<br>Cleveland, OH 44114<br>T: 216-248-5753<br>F: 216-348-5753 |
| If to Lender: | Brett Hall<br>1466 Turquoise Dr<br>Carlsbad, CA 92011<br>T: 303.638.1530<br>F: |

13

Any party hereto may from time to time change its address for notices under this Section by giving at least ten (10) days' prior written notice of such changed address or facsimile number to the other party hereto.

12. MISCELLANEOUS.

(a)    THE PARTIES HERETO IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF ANY STATE, DISTRICT OR FEDERAL COURT SITTING IN HENDERSON COUNTY IN THE STATE OF NEVADA OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS LOAN AGREEMENT TO THE EXCLUSION OF ANY OTHER COURT OR TRIBUNAL. THE PARTIES IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION, OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. The parties agree the substantive law of the State of Nevada shall govern this Loan Agreement exclusive of its Conflict of Laws doctrine. Final judgment in any such suit, action, or proceeding brought in any such court shall be conclusive and binding upon a party hereto and may be enforced in any court in which such party is subject to jurisdiction by a suit upon such judgment provided that service of process is effected upon such party as permitted by applicable law.

(b)    No modification or waiver of any provision of this Loan Agreement or any other Loan Document nor consent to any departure by the Borrower therefrom shall in any event be effective against the Lender unless the same shall be in writing and signed by all parties hereto, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on the Borrower in any case shall entitle such parties to any other or further notice or demand in the same, similar or other circumstances.

(c)    The remedies of the Lender contained in this Loan Agreement are cumulative with one another and with any other remedies which the parties hereto may have at law, in equity, under any agreements of any type or otherwise and no failure or delay on the part of the Lender in exercising any right, power or privilege under the Loan Documents shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise or the exercise of any other right, power or privilege.

(d)    In case any one or more of the provisions contained in the Loan Documents should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

(e)    In the event of any conflict, inconsistency or ambiguity between the provisions of this Loan Agreement and the provisions of any other Loan Document, the provision which best assures the payment and performance of the Obligations or enlarges the security interest of the Lender in and to the Collateral, shall prevail.

(f)    The name of this Loan Agreement, as well as Section headings used herein, are for convenience of reference only and are not to affect the construction of, or be taken into

14

consideration, in interpreting this Loan Agreement. No language in any Loan Document will be construed against any party as the drafter.

(g)    Any term used herein shall be equally applicable to both the singular and plural forms.

(h)    This Loan Agreement, any schedules or exhibits hereto, constitute the entire understanding and agreement between Borrower and Lender and supersedes any and all prior or contemporaneous oral or written representation, understanding, agreement or communication relating thereto.

(i)    The covenants and agreements contained in this Loan Agreement shall be binding on, and shall inure to the benefit of, the legal and personal representatives, heirs, successors, and permitted assignees of the parties. This Agreement may be executed in one or more facsimile or emailed PDFs, each of which will be deemed to be an original and all of which together will be deemed to be one and the same document.

*Remainder of page blank: Subsection (j) and signature page follows.*

(j)    <u>Waiver of Right to Jury Trial</u>.   BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN. FURTHER, THE BORROWER HEREBY CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF THE LENDER NOR THE LENDER'S COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE LENDER WOULD NOT, IN THE EVENT OF SUCH LITIGATION, SEEK TO ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL PROVISION. FINALLY, THE BORROWER ACKNOWLEDGES THAT THE LENDER HAS BEEN INDUCED TO ENTER INTO THIS LOAN AGREEMENT BY, INTER ALIA, THE PROVISIONS OF THIS SECTION.

IN WITNESS WHEREOF, the Borrower and the Lender have entered into this Loan Agreement as of the date and year first above written.

**LENDER:**

Brett Hall

By:     Brett Hall

**BORROWER:**

Generation Next Franchise Brands, Inc.

By:     Ryan Polk
Its:     Chief Executive Officer

Reis & Irvy's, Inc.

By:     Ryan Polk
Its:     President

16

EXHIBIT A

PROMISSORY NOTE

$25,000.00

22 October 2019

THIS PROMISSORY NOTE is issued by Generation Next Franchise Brands, Inc., a Nevada corporation (the "Borrower")

FOR VALUE RECEIVED, the Borrower promises to pay to the order of Brett Hall ("Lender"), at such place as the holder hereof may designate, in lawful money of the United States of America, the aggregate unpaid principal amount of $25,000, plus interest, at the rates and in accordance with the terms of the Loan and Security Agreement between Borrower and Lender of even date herewith, as amended from time to time (the "Loan Agreement"). The entire principal amount and all accrued interest shall be due and payable on or before the day before the 180-day anniversary of this Note, or on such earlier date, as provided for in the Loan Agreement.

Borrower irrevocably waives the right to direct the application of any and all payments at any time hereafter received by Lender from or on behalf of Borrower, and Borrower irrevocably agrees that Lender shall have the continuing exclusive right to apply any and all such payments against the then due and owing obligations of Borrower as Lender may deem advisable. In the absence of a specific determination by Lender with respect thereto, all payments shall be applied in the following order: (a) then due and payable fees and expenses; (b) then due and payable interest payments and mandatory prepayments; (c) then accrued and unpaid interest; and (d) then due and payable principal payments and optional prepayments.

Borrower promise to pay Lender all Enforcement Costs (as defined in the Loan Agreement), whether or not suit is filed, unless a final court of competent jurisdiction finds in an unappealable ruling that the Lender acted with gross negligence or willful misconduct. Borrower waives presentment, demand, protest, notice of protest, notice of dishonor, notice of nonpayment, and any and all other notices and demands in connection with the delivery, acceptance, performance, default or enforcement of this Note, as well as any applicable statute of limitations. No delay by Lender in exercising any power or right hereunder shall operate as a waiver of any power or right. Time is of the essence as to all obligations hereunder.

This Note is issued pursuant to the Loan Agreement, which shall govern the rights and obligations of Borrower with respect to all obligations hereunder.

Borrower expressly acknowledges that the indebtedness evidenced by this Note is a "business loan" within the meaning of the Nevada Revised Statutes.

This Note shall be binding upon Borrower and Borrower's heirs, personal representatives, successors and assigns. This Note shall inure to the benefit of Lender, its successors and assigns, including any parties to whom this Note may be assigned.

If any provision of this Note is held to be invalid, illegal or unenforceable in any respect, or operates, or would if enforced operate to invalidate this Note, then that provision shall be

deemed null and void. Nevertheless, its nullity shall not affect the remaining provisions of this Note, which shall in no way be affected, prejudiced or disturbed.

The law of the State of Nevada shall apply to this Note. BORROWER ACCEPT FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, UNCONDITIONALLY, THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN HENDERSON COUNTY, NEVADA IN ANY ACTION, SUIT, OR PROCEEDING OF ANY KIND, AGAINST IT WHICH ARISES OUT OF OR BY REASON OF THIS NOTE OR THE LOAN AGREEMENT.

BORROWER WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS (AS DEFINED IN THE LOAN AGREEMENT) OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. BORROWER RECOGNIZE AND AGREE THAT THE FOREGOING WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR IT TO ENTER INTO THIS LOAN AGREEMENT. BORROWER REPRESENTS AND WARRANTS THAT BORROWER HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

IN WITNESS WHEREOF, the Borrower has set its hand and seal to this Note as of 22 October 2019.

BORROWER:

Generation Next Franchise Brands, Inc.

_____

By:    Ryan Polk
Its:    Chief Executive Officer

18

# EXHIBIT 10

**STATE OF NEVADA**

*BARBARA K. CEGAVSKE*
*Secretary of State*



*Commercial Recordings & Notary Division*
*202 N. Carson Street*
*Carson City, NV 89701*
*Telephone (775) 684-5708*
*Fax (775) 684-7138*

*North Las Vegas City Hall*
*2250 Las Vegas Blvd North, Suite 400*
*North Las Vegas, NV 89030*
*Telephone (702) 486-2880*
*Fax (702) 486-2888*

*KIMBERLEY PERONDI*
*Deputy Secretary for*
*Commercial Recordings*

**OFFICE OF THE**
**SECRETARY OF STATE**

Andrew Allman
250 East Broad Street Suite 250
Columbus, OH 43215

**Work Order #:** W2019120601445
December 6, 2019
Receipt Version: 1

**Special Handling Instructions:**

**Submitter ID:** 150037

**Charges**

| Description | Filing Number | Filing Date/Time | Filing Status | Qty | Price | Amount |
|---|---|---|---|---|---|---|
| UCC-1 | 2019056996-6 | 12/6/2019 2:58:32 PM | Approved | 1 | $30.00 | $30.00 |
| Total | | | | | | $30.00 |

**Payments**

| Type | Description | Payment Status | Amount |
|---|---|---|---|
| Credit Card | 5756730846346717103066 | Success | $30.00 |
| Total | | | $30.00 |

**Credit Balance:**    $0.00

Andrew Allman
250 East Broad Street Suite 250
Columbus, OH 43215

**STATE OF NEVADA**

*BARBARA K. CEGAVSKE*
*Secretary of State*

*Commercial Recordings Division*
*202 N. Carson Street*
*Carson City, NV 89701*
*Telephone (775) 684-5708*
*Fax (775) 684-7138*

*North Las Vegas City Hall*
*2250 Las Vegas Blvd North, Suite 400*
*North Las Vegas, NV 89030*
*Telephone (702) 486-2880*
*Fax (702) 486-2888*

*KIMBERLEY PERONDI*
*Deputy Secretary for*
*Commercial Recordings*



**OFFICE OF THE
SECRETARY OF STATE**

## Filing Acknowledgement

December 6, 2019 02:58 PM

| | |
|---|---|
| **Work Order Number** | **Initial Filing Number** |
| W2019120601445 | 2019056996-6 |
| **Filing Description** | **Document Filing Number** |
| UCC-1 | 2019056996-6 |

**Debtors**

GENERATION NEXT FRANCHISE BRANDS, INC.    2620 FINANCIAL COURT
SUITE 100
SAN DIEGO, CA 92117

**Secured Parties**

HALL BRETT                                1466 TURQUOISE DRIVE
CARLSBAD, CA 92011

The Nevada Secretary of State, Uniform Commercial Code Division has filed the attached documents. The filing number, date, and time are shown on each document. The filing number can be used to reference the document in the future.

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| Andrew Allman |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| andrew@stansburyweaver.com |

| C. SEND ACKNOWLEDGMENT TO:  (Name and Address) |
|---|
| Mark@stansburyweaver.com |

| Filed in the Office of | Initial Filing Number |
|---|---|
| *Barbara K. Cegavske* | 2019056996-6 |
| | Filed On |
| | December 6, 2019 02:58 PM |
| Secretary of State | Number of Pages |
| State Of Nevada | 2 |

1. DEBTOR'S NAME:  Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| OR | 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | GENERATION NEXT FRANCHISE BRANDS, INC. | | | |
| | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2620 FINANCIAL COURT SUITE 100 | SAN DIEGO | CA | 92117 | USA |

2. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| OR | 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | | | | |
| | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only <u>one</u> Secured Party name (3a or 3b)

| OR | 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | | | | |
| | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | HALL | BRETT | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1466 TURQUOISE DRIVE | CARLSBAD | CA | 92011 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
ALL ASSETS AND PROPERTY OF THE DEBTOR AND DEBTOR'S BUSINESS, WHERESOEVER LOCATED AND WHENSOEVER ACQUIRED, CONTRACTED OR ARISING, INCLUDING, WITHOUT LIMITATION, THE FOLLOWING (CAPITALIZED TERMS HAVE THE MEANING ASCRIBED TO THEM IN THE UNIFORM COMMERCIAL CODE AS, FROM TIME TO TIME, IN EFFECT IN THE STATE OF NEVADA):

(A) ALL OF DEBTOR'S AND DEBTOR'S BUSINESS' RIGHTS, TITLE, AND INTERESTS IN, TO, AND UNDER ALL OF THEIR ACCOUNTS, DEPOSIT ACCOUNTS, CHATTEL PAPER, COMMERCIAL TORT CLAIMS, ELECTRONIC CHATTEL PAPER, DOCUMENTS, EQUIPMENT, PROPERTY, INVENTORY, RECEIVABLES, GOODS, INSTRUMENTS, INVENTORY, INVESTMENT PROPERTY, LETTER OF CREDIT RIGHTS, PAYMENT INTANGIBLES, INCLUDING, WITHOUT LIMITATION, ALL PROCEEDS, AND ALL SOFTWARE, LICENSES, AND PERMITS RELATED THERETO, WHETHER DESIGNED OR ISSUED BY THE DEBTOR, OR OTHERWISE;

(B) ALL OF DEBTOR'S AND DEBTOR'S BUSINESS' RIGHTS TO THE PAYMENT OF MONEY NOW OR HEREAFTER ARISING OUT OF OR IN CONNECTION WITH THE SALE, LEASE, OR OTHER DISPOSITION OF THE FOREGOING PROPERTY, INCLUDING, WITHOUT LIMITATION, AMOUNTS DUE FROM AFFILIATES, TAX REFUNDS, OR INSURANCE PROC

5. Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

| 6a. Check <u>only</u> if applicable and check <u>only</u> one box: | | 6b. Check <u>only</u> if applicable and check <u>only</u> one box: | |
|---|---|---|---|
| ☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility | | ☐ Agricultural Lien  ☐ Non-UCC Filing | |

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

## UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank
   because Individual Debtor name did not fit, check here ☐

| | |
|---|---|
| | 9a. ORGANIZATION'S NAME |
| OR | 9b. INDIVIDUAL'S SURNAME |
| | FIRST PERSONAL NAME |
| | ADDITIONAL NAME(S)/INITIAL(S)  ·  SUFFIX |

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name;
    do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| | | | | | |
|---|---|---|---|---|---|
| | 10a. ORGANIZATION'S NAME | | | | |
| OR | 10b. INDIVIDUAL'S SURNAME | | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |
| 10c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |

11. ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| | | | | |
|---|---|---|---|---|
| | 11a. ORGANIZATION'S NAME | | | |
| OR | 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 11c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE · COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
   **EEDS;**

   **(C) ALL FILES, RECORDS (INLCUDING, BUT NOT LIMITED TO, COMPUTER PROGRAMS, TAPES, AND RELATED ELECTRONIC DATA-PROCESSING SOFTWARE), AND WRITINGS OF DEBTOR AND DEBTOR'S BUSINESS OR IN WHICH THE DEBTOR HAS AN INTEREST RELATING IN ANYWAY TO THE FOREGOING PROPERTY; AND**

   **(D) AS TO EACH OF THE FOREGOING, ALL PRODUCTS AND PROCEEDS THEREOF, SUBSTITUTIONS THEREFORE, AND ACCESSIONS THERETO.**

| 13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT:  ☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing |
|---|---|
| 15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | 16. Description of real estate: |

17. MISCELLANEOUS:

# EXHIBIT 11

## BUSINESSS LOAN AND SECURITY AGREEMENT

This Business Loan and Security Loan Agreement (this "Loan Agreement"), is made effective as of 12 November 2019 (the "Effective Date"), by and between Generation Next Franchise Brands, Inc., a Nevada corporation and Reis & Irvy's, Inc., a Nevada corporation (collectively, jointly and severally, the "Borrower") and CK Green Partners, LLC, a Ohio limited liability company ("Lender").

### BACKGROUND:

A.  Borrower and Lender desire in the Loan Agreement to set forth their agreement with respect to a business loan as documented herein and by that certain "Note" attached hereto as Exhibit A. Exhibit A, along with this Loan Agreement, that certain "Subordination Agreement" dated of even date herewith by and between Lender and Socially Responsible Brands, Inc. ("Creditor") and all other agreements, documents and instruments evidencing or securing said Note and/or entered into in connection herewith, now or in the future, are referred to collectively herein and therein as the "Loan Documents."

B.  As an inducement to Lender to enter into this Loan Agreement and the Loan Documents and issue the loan amount to the Borrower and accept the Note, Borrower wishes to, among other things, grant a lien upon and security interest in and to the Collateral (as defined below).

### TERMS AND CONDITIONS:

For the reasons described above, in consideration of the mutual promises and covenants set forth in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Lender and Borrower hereby agree as follows:

1.  <u>CERTAIN DEFINED TERMS</u>.  Unless the context otherwise requires, as used in this Loan Agreement the following terms shall have the following meanings:

(a)  "Business" shall mean the business of the Borrower and any and all additions, successions, and appreciation thereof.

(b)  "Change in Control" shall mean:

(i)  any sale, lease, exchange, or other transfer (in one transaction or series of related transactions during the twelve month period ending on the date of the most recent sale, lease, exchange or other transfer) of all or substantially all of the assets of the Borrower to any person or persons acting as a group (as determined pursuant to Treasury Regulations Section 1.409A-3(i)(5)(v)(B) and Internal Revenue Service interpretations thereunder (a "Group")), other than to a person or Group holding, directly or indirectly, at least fifty percent (50%) of the total fair market value of the outstanding and issued equity interests of the Seller, as constituted immediately preceding such event; or

(ii)  the acquisition by any person or Group of more than fifty percent (50%) of the total fair market value of the outstanding and issued equity interests in the Borrower, other than any event as a result of which partners or owners (or their affiliates) of the Borrower, as constituted immediately preceding such event, hold greater than one-half

(50%) of the total fair market value of the outstanding and issued equity interests of the Borrower.

(c)    "Closing Date" shall mean the date of this Loan Agreement.

(d)    "Code" shall mean the Uniform Commercial Code as, from time to time, in effect in the State of Nevada.

(e)    "Collateral" shall mean all of the assets and property of the Borrower and the Business, wheresoever located and whensoever acquired, contracted or arising, including without limitation the following (capitalized terms in this section have the meaning ascribed to them in the Code):

(i)    all of the Business and Borrower's rights, title and interests in, to and under all of their Accounts, Deposit Accounts, Chattel Paper, Commercial Tort Claims, Electronic Chattel Paper, Documents, Equipment, Property, Inventory, Receivables, Goods, Instruments, Inventory, Investment Property, Letter of Credit Rights, Payment Intangibles, including, without limitation, all Proceeds, and all software, licenses, and permits related thereto, whether designed or issued by the Borrower, or otherwise;

(ii)    all rights of the Business and Borrower to the payment of money now or hereafter arising out of / in connection with the sale, lease or other disposition of the foregoing property, including, without limitation, amounts due from affiliates, tax refunds, and insurance proceeds;

(iii)    all files, records (including, without limitation, computer programs, tapes and related electronic data processing software) and writings of the Business and Borrower or in which the Borrower has an interest in any way relating to the foregoing property; and

(iv)    as to each of the foregoing, all products and proceeds thereof, substitutions therefore and Accessions thereto.

(f)    "Default Rate" shall mean Eighteen Percent (18%) per annum.

(g)    "Enforcement Costs" shall have the meaning ascribed to it in Section 7(l).

(h)    "Event of Default" shall have the meaning ascribed to it in Article V.

(i)    "General Intangibles" shall mean all general intangibles (within the meaning of the Code), whether now existing or hereafter created, arising or acquired.

(j)    "Inventory" shall mean all of the Borrower's inventory (within the meaning of the Code).

(k)    "Lender Expenses" has the meaning ascribed to it in 2(d).

(l)    "Loan Documents" shall have the meaning ascribed to it in the Recitals.

(m)    "Material Adverse Effect" means, in the reasonable discretion of Lender, a material adverse effect on (i) the business operations or condition (financial or otherwise) of Borrower and its Subsidiaries taken as a whole or (ii) the ability of Borrower to repay the Obligations or otherwise perform its obligations under the Loan Documents.

(n)    "Maturity Date" means the day before 180-day anniversary of the Closing Date.

(o)    "Obligations" shall mean, collectively, all obligations and liabilities (primary, secondary, direct, indirect, contingent, sole, joint or several, whether similar or dissimilar or related or unrelated) of any and all of the Borrower in favor of the Lender, due or to become due, now existing or hereafter incurred, contracted or acquired, whether arising under, out of or in connection with the Loan Documents or otherwise.

(p)    "Proceeds" has the meaning ascribed to that term under the Uniform Commercial Code as in effect in the State of Nevada on the date hereof.  For purposes of this Agreement, the term "Proceeds" includes whatever is receivable or received when Collateral or proceeds of the Collateral are sold, collected, exchanged, or otherwise disposed of, whether the disposition is voluntary or involuntary, and includes, without limitation, all rights to payment in whatever form and however arising.

(q)    "Property" shall mean any and all interests in real and/or personal property of the Borrower.

(r)    "Receivables" shall mean all accounts (within the meaning of the Code), Accounts, accounts receivable, book debts, notes, drafts, acceptances and other forms of obligations, now or hereafter owing to the Borrower, arising from the sale or lease of the Inventory by Borrower any obligation that might be characterized as an account, contract right, general intangible or chattel paper under the Code, all of the Borrower's rights in, to and under all purchase orders, now or hereafter received by the Borrower for such Inventory, and all monies due or to become due to the Borrower under all contracts for the sale, lease, or other disposition of the Inventory (whether or not yet earned by performance) or in connection with any other transaction (including, without limitation, the right to receive the proceeds of said purchase orders and contracts), and all collateral security and guarantees of any kind given by any obligor, with respect to any of the foregoing.

(s)    "Subsidiary" shall mean any corporation, association or other business entity of which more than 50% of the shares of stock or other interests entitled to vote in the election of directors, managers or trustees thereof at that time is owned or controlled, directly or indirectly, by the Borrower.

2.    LOAN AND TERMS OF PAYMENT.

(a)    Subject to the terms and conditions of this Loan Agreement, Lender agrees to loan the Borrower $103,725, distributed or distributable to Borrower on or about the Closing Date; Borrower shall execute and deliver to Lender on the date hereof the Note.

(b)    Interest Rates, Payments, and Calculations.

(i)        Interest Rate.  The Note shall bear interest at a rate equal to FIFTEEN percent (15%) per year.

3

(ii)        Loan Fees.  Borrower shall pay a loan fee of THREE THOUSAND DOLLARS ($3,000) due and payable at Closing.

(iii)        Default Rate.  All Obligations shall bear interest, from and after the occurrence and during the continuance of an Event of Default, at the Default Rate.

(iv)        Nothing contained herein shall be deemed to establish or require the payment of a rate of interest or other charges in excess of the maximum permitted by applicable law.  The Borrower does not intend or expect to pay, nor does the Lender or any subsequent holder hereof intend or expect to charge, accept or collect any interest greater than the highest legal rate of interest which may be charged under the laws of the State of Nevada, and if, from any circumstances whatsoever, fulfillment of any provision of the Note or any Loan Document in any manner relating thereto, at the time performance of said provision shall be due, shall involve transcending the limit of validity prescribed by any applicable law governing usury, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity so that in no event shall exaction be possible under this Loan Agreement or any document relating thereto in excess of the limit of such validity, but such obligation shall be fulfilled to the limit of such validity and if, under any circumstances whatsoever, interest in excess of the limit of such validity will have been paid by the Borrower in connection with the indebtedness evidenced by the Note and Loan Documents, such excess shall be applied to the unpaid and outstanding principal due under the Note, and not to the payment of interest.  The provisions of this paragraph shall control every other provision of all other agreements executed by the Borrower or Lender in connection with this transaction.

(v)        No Monthly Payments Required.  The total outstanding principal and all accrued but unpaid interest hereunder shall be due and payable on or before the Maturity Date. Payment of principal and interest shall be made in United States dollars. Borrower may but is not obligated to make payments of accrued and unpaid interest at any time prior to Maturity Date.

(vi)        Computation.  All interest chargeable under the Loan Documents shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed.

(c)        Crediting Payments.  The receipt by Lender of any wire transfer of funds, check, or other item of payment shall be immediately applied to conditionally reduce Obligations, but shall not be considered a payment on account unless such wire transfer is of immediately available federal funds or unless and until such check or other item of payment is honored when presented for payment. Payments received by Lender hereunder, including from any sale or assignment of all or any portion of the Collateral after an Event of Default, will, whether received before or after an Event of Default, be credited on a daily basis first to Interest, second to any other amounts owed to Lender hereunder, then to the outstanding balance of the Note when received in Lender's bank account.

(d)        Fees.  Borrower shall pay to Lender the following fees ("Lender Expenses"): any and all costs of Lender arising out of or in connection with the loan being made hereunder, including without limitation recording fees, documentary stamps, intangible taxes and all

4

reasonable legal fees of Lender for the preparation of the Loan Documents as well as for any future dealings with Borrower following the Closing Date, including without limitation bankruptcy proceedings. On the Closing Date, Borrower will pay Lender Expenses incurred through the Closing Date and, after the Closing Date, all Lender Expenses as they become due, including without limitation Enforcement Costs.

(e)     Term.   This Loan Agreement shall become effective once duly executed and authorized by Borrower and Lender and shall continue in full force and effect for a term ending on the date which all Obligations of Borrower have been discharged and paid in full, or on such earlier date as the parties agree in writing. Notwithstanding the foregoing, Lender shall have the right to terminate this Loan Agreement immediately and without notice upon the occurrence of an Event of Default and Borrower shall have the right to terminate this Loan Agreement immediately upon payment in full of its Obligations then outstanding hereunder. Notwithstanding any termination of this Loan Agreement, all of Lender's security interest in all of the Collateral and all of the terms and provisions of this Loan Agreement shall continue in full force and effect until all Obligations have been paid and performed in full, and no termination shall impair any right or remedy of Lender, nor shall any such termination relieve Borrower of any Obligation to Lender until all of the Obligations have been paid and performed in full.

3.   PREPAYMENT.   Borrower may prepay principal, interest, or both without penalty.

4.   THE COLLATERAL.   As collateral security for the payment and performance of all of the Obligations, the Borrower hereby extends, sells, assigns, conveys, mortgages, pledges, transfers, and grants to the Lender a continuing security interest in the Collateral. Any security interest will be subordinated to all existing security interests in the Collateral, except as provided in any subordination agreement. Prepayment by the Borrower of any portion of the principal and accrued interest pursuant to the terms of this Loan Agreement shall not reduce or otherwise impair the security interest of Lender in the Collateral, except that complete repayment of all Obligations shall release and redeem to the Borrower all interest in the Collateral securing the Obligations. Borrower hereby authorizes Lender to file financing statements, without notice to Borrower, with all appropriate jurisdictions to perfect or protect Lender's interest or rights hereunder, including a notice that any disposition of the Collateral, by either Borrower or any other Person, shall be deemed to violate the rights of Lender. Such financing statements may indicate the Collateral as "all assets of the Debtor" or words of similar effect, or as being of an equal or lesser scope, or with greater detail, all in Lender's discretion.

5.   EVENTS OF DEFAULT.

(a)     The occurrence of any of the following events, in addition to any other Events of Default as defined in any Loan Document, shall constitute an "Event of Default" hereunder:

(i)        Any provision of this Loan Agreement or any Loan Document, and any amendments thereto, is breached or is untrue or misleading in any material respect;

(ii)        Any warranty, representation, or statement made or furnished to Lender by Borrower or Guarantors in connection with any of the Loan Documents, is untrue or misleading in any material respect;

(iii)        Borrower is in default under any provision of any Loan Document and/or any amendments thereto, including without limitation if the Borrower shall fail to pay on the due date any payment of money, whether as principal, interest, late charge, or Enforcement Costs (as defined below), as required under this Loan Agreement or any Loan Document, with any applicable notice having been given and time to cure expired;

(iv)        The Insolvency of the Borrower.  For purposes hereof,  the term "Insolvency" shall mean: (i) the appointment, by the order of a court of competent jurisdiction, of a trustee, receiver, or liquidator of the Borrower, if such order shall not be discharged or dismissed within sixty (60) days after such appointment; (ii) application for, or consent in writing to, the appointment of a receiver, trustee, or liquidator of all or substantially all of the assets of the Borrower; (iii) the filing of a voluntary petition in bankruptcy or the admission in writing of inability to pay debts as they become due; (iv) a general assignment for the benefit of creditors; (v) the filing of a petition or an answer seeking a reorganization (other than a reorganization not involving the liabilities of the Borrower) or an arrangement with creditors or taking advantage of any bankruptcy or insolvency law; (vi) the filing of an answer admitting the material allegations of a petition filed against the Borrower in any bankruptcy, reorganization, or insolvency proceeding; (vii) the insolvency of Borrower; (viii) the Borrower has suffered a Material Adverse Effect in the reasonable discretion of the Lender; or (ix) the entering of an order, judgment, or decree by any court of competent jurisdiction on the application of a creditor adjudicating the Borrower as bankrupt or insolvent, or the appointment of a receiver, trustee, or liquidator of the Borrower, or of all or substantially all of the assets of the Borrower, if such order, judgment or decree continues unstayed and in effect for a period of sixty (60) days from the date entered;

(v)        A Change in Control of Borrower.  If there occurs a Change in Control of Borrower.

(b)        Notwithstanding anything herein to the contrary, Borrower shall have a three (3) calendar day grace period after notice from Lender to cure any non-monetary default hereunder; provided however that such grace period does not cause a Material Adverse Effect.  There shall be no grace period for monetary default and no notice required by Lender for such default to be immediate and material.  Time is of the essence for all Obligations hereunder.

(c)        If an Event of Default shall occur for any reason whatsoever (and whether such occurrences shall be voluntary or involuntary, or come about or be effected by operation of law or pursuant to or in compliance with any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body) then, or at any time thereafter, the Lender may, without written notice, take any or all of the following actions, at the same or different times: (A) accelerate the maturity of the Obligations and demand the immediate payment thereof, and to

charge the Default Rate on such Obligations without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived; (B) require the Borrower to assemble the Collateral and the records pertaining thereto and deliver possession of same to the Lender, as well as to permit Lender to have unrestricted access to the Borrower's premises and the Collateral so as to allow Lender to take control thereof for purposes of disposition of the Collateral and the collection of all Obligations; and (C) take any and all action and pursue any and all remedies as may be permitted under the Loan Documents or by applicable law or otherwise, including exercising all rights of counterclaim or set-off.

(d)    Upon the occurrence of an Event of Default, the Lender may (i) at any time thereafter in its discretion transfer any securities or other property constituting Collateral into its own name or that of its nominee and receive the income thereon and hold the same as security for the Obligations or apply it on any or all amounts due on the Obligations in such order as Lender may elect in its sole discretion, (ii) enter the premises peacefully at the address(es) listed herein, and take control of the Business and (ii) require each Borrower to establish, at Borrower's expense, a lock box account with such bank acceptable to Lender, into which Borrower shall promptly deposit and direct their account debtors to directly  remit all payments on Receivables and, which such payments or deposits shall be the property solely of the Lender.  Insofar as the Collateral shall consist of Receivables, other claims and rights to the payment of money, insurance policies, instruments, choses in action or the like, the Lender may, without notice to or demand on the Borrower, demand, collect, receipt for, settle, compromise, adjust, use, sue for, foreclose or realize upon the Collateral as the Lender may determine, whether or not the obligations or the Collateral are then due and for the purpose of realizing the Lender's rights therein, the Lender may receive, open and dispose of mail addressed to the Borrower and endorse notes, checks, drafts, money orders, documents of title or other evidences of payment, shipment or storage or any form of the Collateral on behalf of and in the name of Borrower. The powers conferred on the Lender by this Section are solely to protect the interest of the Lender and shall not impose any duties on the Lender to exercise any powers.  All acts of said attorney or designee are hereby ratified and approved by the Borrower and the Lender and said attorney or designee shall not be liable for any acts of commission or omission nor for any error of judgment or mistake of fact or law. This power, being coupled with an interest, is irrevocable so long as any of the Obligations remains outstanding.  Borrower hereby irrevocably appoints Lender (and any of Lender's designated officers, or employees) as Borrower's true and lawful attorney to: (a) send requests for verification of Accounts or notify account debtors of Lender's security interest in the Accounts; (b) endorse Borrower's name on any checks or other forms of payment or security that may come into Lender's possession; (c) sign Borrower's name on any invoice or bill of lading relating to any Account, drafts against account debtors, schedules and assignments of Accounts, verifications of Accounts, and notices to account debtors; (d) make, settle, and adjust all claims under and decisions with respect to Borrower's policies of insurance; (e) settle and adjust disputes and claims respecting the accounts directly with account debtors, for amounts and upon terms which Lender determines to be reasonable; (f) to modify, in its sole discretion, any intellectual property security agreement entered into between Borrower and Lender without first obtaining Borrower's approval of or signature to such modification to include reference to any right, title or interest in any copyrights, patents or trademarks acquired by Borrower after the execution hereof or to delete any reference to any right, title or interest in any copyrights, patents or trademarks in which Borrower no longer has or claims any right, title or interest; (g) to file, in its sole discretion, one or more financing or continuation statements and amendments thereto, relative to any of the Collateral without the

7

signature of Borrower where permitted by law. The appointment of Lender as Borrower's attorney in fact, and each and every one of Lender's rights and powers, being coupled with an interest, is irrevocable until all of the Obligations have been fully repaid and performed.

6.  <u>REPRESENTATIONS AND WARRANTIES</u>.  As a material inducement for Lender to enter into this Loan Agreement, Borrower hereby represents and warrants to Lender as follows:

(a)    Borrower is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada and has the power and authority carry on its business as is now being conducted.

(b)    Borrower has all requisite power and authority to enter into this Loan Agreement and the other Loan Documents contemplated hereby and to assume and perform fully its obligations hereunder and thereunder. The execution and delivery by Borrower of this Loan Agreement and the other Loan Documents contemplated hereby and the performance by Borrower of their Obligations hereunder and thereunder have been duly and validly authorized by all necessary corporate action of Borrower.

(c)    The execution and delivery of this Loan Agreement and the other Loan Documents contemplated hereby and the performance by Borrower hereunder and thereunder (i) do not and will not conflict with or violate any provision of the articles of incorporation or bylaws of Borrower and (ii) do not and will not (A) conflict with or result in a breach of the terms, conditions or provisions of, (B) constitute a default under, (C) result in the creation of any encumbrance, lien or other restriction of any nature upon the Borrower's assets pursuant to, (D) give any third party the right to modify, terminate or accelerate any obligation under, (E) result in a violation of, or require any authorization, consent, approval, exemption or other action by or notice to any third party pursuant to, any agreement, instrument, order, judgment, license, permit, decree, law, regulation, ordinance or judgment to which any of Borrower or the Collateral or is a party or is subject or bound.

(d)    No filings with, notices to, or approvals or consents of, any federal, state or local governmental or regulatory agency or body or any other Person are required to be obtained by Borrower in connection with the consummation of the transactions contemplated by the Loan Documents.  "Person" means any individual, sole proprietorship, partnership, limited liability partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, entity or government (whether foreign, federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof), and shall include such Person's successors and assigns.

(e)    There are no charges, complaints, claims, actions, suits, disputes, investigations, arbitrations, demands or other proceedings pending or, to the best knowledge of Borrower, threatened before or by any court, governmental agency or instrumentality, arbitrator, Person to which Borrower is, or are threatened to be, a party or to which, to the best knowledge of Borrower, any employee, independent contractor or affiliate of Borrower is or is threatened to be a party, or which relate to Borrower, the business of Borrower, or any of the assets of Borrower or any other agreement related hereto.  To the best knowledge of Borrower, there is no basis or grounds for any of the foregoing.  Borrower is not subject to or bound by any injunction, order or decree of any court or governmental or administrative agency.

(f)     There are no existing defaults, events of default, breaches or other circumstances, facts or events that with the passage of time or giving of notice, or both, would constitute a default, event of default or breach on the part of Borrower under any agreement of Borrower or otherwise.

(g)     Borrower has obtained and maintained all required local, state and federal licenses and permits necessary to operate Borrower's business and all such licenses and permits are in good standing and Borrower has no knowledge of any actions, claims or violations that are pending that would result in any limitations on or suspension or termination of such licenses.

(h)     All financial statements and reports relating to the Borrower and the Company provided by Borrower and/or Guarantors or made available or disclosed to Lender and its accountants, attorneys and other agents are complete, accurate and fairly present the financial position and performance of Borrower and the Company in all material respects for the periods to which they relate, and there has been no adverse change in the condition, financial or otherwise, of Borrower since the last disclosed statement.

(i)     All of the representations and warranties made by Borrower contained in the Loan Documents contemplated hereby and all information delivered in any schedule, attachment, certificate or exhibit hereto are true, correct and complete on the date of this Loan Agreement, throughout the term of this Loan Agreement.  Borrower has not omitted to state to Lender any fact relating to the Borrower, which (i) is necessary to make the information given by or on behalf of Borrower not misleading, (ii) if disclosed would reasonably affect the decision of a Person considering making a loan to Borrower or (iii) has or which could reasonably be expected to have an adverse effect upon the Borrower or the profits, condition (financial or otherwise) or prospects of the Borrower's business.

(j)     Borrower is the record and beneficial owner of, and has good and marketable title to the Collateral and there are no unrecorded liens or encumbrances on the Collateral.

(k)     Borrower agrees that Borrower will not for any reason change banking institutions or instructions for payment of policies and/or Receivables to any other account without the express written consent of Lender.

(l)     There are no actions or proceedings pending or, to Borrower's knowledge, threatened by or against Borrower or any Subsidiary in which an adverse decision could, with reasonable likelihood, cause a Material Adverse Effect.

(m)     All consolidated financial statements for Borrower delivered to Lender fairly present in all material respects Borrower's consolidated financial condition and Borrower's consolidated results of operations. There has not been any material deterioration in Borrower's consolidated financial condition since the date of the most recent financial statements submitted to Lender.

(n)     This Loan Agreement is entered into by Borrower for the Business Purpose.

7.  <u>AFFIRMATIVE COVENANTS</u>.  From the date hereof and so long as any of the Loan Documents remains in effect or any of the Obligations shall be unpaid, each Borrower will:

(a)     Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its corporate existence, rights, licenses, permits and franchises and comply with all applicable laws, and operate its business in substantially the manner in which it is presently conducted and operated;

(b)     At all times preserve all Property (except for such property as is disposed of in the ordinary course of business) used or useful in the conduct of the Business and keep the same in good repair, working order and condition (subject to normal wear and tear), and from time to time make, or cause to be made, all necessary and proper repairs, whether pursuant to a warranty or otherwise, renewals, replacements, betterments and improvements thereto;

(c)     Execute such other documents and instruments as Lender may reasonably request, duly executed by Borrower, to further implement and effectuate the purposes of this Loan Agreement;

(d)     Keep the insurable Collateral and other properties insured at all times at the replacement value thereof,  by financially sound and reputable insurers, and maintain or cause to be maintained such other insurance to such extent and against such risks, including fire and other risks insured against by extended coverage, as is, the Borrower's best judgment, customary with companies in the same or similar business, and maintain in full force and effect public liability insurance against claims for personal injury, death or property damage occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by it and manufacturer's liability insurance against claims for personal injury or death occurring in connection with the use of any products assembled, manufactured or sold by it in such amount as the Borrower shall in good faith deem necessary, or as may be reasonably required by the Lender and maintain such additional insurance as may be required by law.  In respect of the Collateral, the Lender shall be loss payee under all policies of insurance maintained thereon. The Lender shall be entitled to at least 30 days' prior written notice of the insurer's intention to cancel or reduce any policies of insurance required by this Subsection (d), and, at its election and without any obligation whatsoever, shall have an opportunity to cure any defaults thereunder during such time. In addition, the Borrower shall deliver renewals of all such policies not less than 30 days prior to the expiration date of such policies. The Borrower shall furnish to the Lender full information as to the insurance carried (including a copy or the original, as required hereby, of all insurance policies), as well as proof of payment therefor, and pay for all insurance obtained in accordance herewith upon the terms of invoices therefor.

(e)     Pay all indebtedness and obligations promptly and in accordance with their respective terms if the failure to make such payments would cause a Material Adverse Effect, or affect the rights of the Lender hereunder, and pay and discharge promptly all taxes,  assessments, and governmental charges or levies imposed upon it or in respect of its property, before the same shall become in default, as well as all lawful material claims for labor, materials, and supplies or otherwise which, if unpaid, might become a lien or charge upon such property or any part thereof, and timely comply with all applicable laws and governmental rules and regulations; provided, however that the Borrower shall not be required to pay or discharge or cause to be paid or discharged any such tax, assessment, charge, lien or claim, or timely comply with laws and governmental rules so long as the validity thereof shall be contested by appropriate legal proceedings timely initiated and conducted in good faith, and (i) in the case of an unpaid tax, assessment, governmental charge or levy, lien, encumbrance, charge or claim, such proceedings

10

shall be effective to suspend the collection thereof from the Borrower, and its properties; (ii) neither such properties nor any part thereof, nor any interest therein would be in any danger of being sold, forfeited or lost; (iii) in the case of a law and governmental rule or regulation, neither the Borrower nor the Lender would be in any danger of criminal liability for failure to comply therewith; and (iv) there shall have been established such reserve or other appropriate provision, if any, with respect thereto on the books of the Borrower, as shall be required by generally accepted accounting principles with respect to any such tax, assessment, charge, lien, claim, encumbrance, law, rule or regulation, so contested.

(f)       Furnish to Lender on a monthly basis, balance sheets, statements of income and loss, and statements of cash flow, prepared in accordance with GAAP, and all such other information regarding the operation, business, affairs and financial condition of the Borrower and Company as the Lender may reasonably request, including without limitation the ratio of cash on deposit in the Company and Borrower's operating accounts to outstanding Obligations.

(g)       Give the Lender prompt telephonic or email notice (to be confirmed within 48 hours by written notice as provided below) of any Event of Default or of any event which, with notice or the passage of time, or both, would constitute such an Event of Default, specifying the nature and extent thereof and the action which the party giving such notice proposes to take with respect thereto.

(h)       Keep its place of business and chief executive office and the office where it keeps its records concerning Receivables at its current location.

(i)       Keep its deposit account(s) at the bank(s) presently utilized by Borrower as its operating account(s).

(j)       At all reasonable times during business hours and as often as the Lender may reasonably request, permit any authorized representative of the Lender to visit and inspect any of the properties of the Borrower, including, without limitation, the Collateral, and the books in respect thereof, and to make extracts from such books and to discuss the affairs, finances and accounts with any of their respective chief financial officers or such other person as may be designated by the chief executive officer of the Borrower.

(k)       Promptly, from time to time as the Lender may reasonably request, perform such acts and execute, acknowledge, deliver, file, register, deposit or record any and all further instruments, agreements and documents whether to continue, preserve, renew, record or perfect interests conferred by this Loan Agreement or any of the other Loan Documents, as well as the priority thereof, or otherwise in connection with the Obligations.

(l)       Pay all costs and expenses incurred from time to time by the Lender with respect to any modification, consent or waiver of the provisions of any Loan Document and any enforcement of the Note and the Loan Documents, including, without limitation, reasonable attorneys' fees and expenses,  court costs, transcript costs, fees of experts, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other out-of-pocket disbursements or expenses of the types customarily incurred in connection with modifying terms and/or an action to collect payment, or an appeal from such action (collectively "Enforcement Costs").

DocuSign Envelope ID: B89411B6-E10B-446E-984B-B343A655504F

(m)     Utilize the loan proceeds solely in connection with the Business for the Business Purpose.

8.   <u>NEGATIVE COVENANTS</u>.  Except for the Genext Loan LLC Business Loan and Security Agreement dated November 15, 2019 and any financing authorized by a bankruptcy court under 11 USC § 364, from the date hereof and so long as the Loan Agreement remains in effect and any of the Obligations shall be unpaid, each Borrower will not, without the prior written consent of the Lender:

(a)     Either,  directly or indirectly, incur, create, assume or permit to exist any Lien with respect to any Collateral now owned or hereafter acquired, or be bound by or subject to any agreement or option to do so, except liens granted, incurred or created in favor of the Lender in connection with the Loan Documents;

(b)     Incur, create, assume or permit to exist any indebtedness or liability on account of deposits or advances or progress payments under any contract or any indebtedness or liability for borrowed money, or any other indebtedness or liability evidenced by notes, bonds, debentures or similar obligations, except indebtedness to trade creditors incurred in the ordinary course of business or upon terms and conditions acceptable to Lender in its sole discretion.

9.   <u>BORROWER'S INDEMNITY</u>.  Borrower shall indemnify, defend and hold harmless Lender and its members, agents, partners, employees and independent contractors, at all times from and after the Closing Date, from and against any and all claims, actions, damages, liabilities, losses (including consequential losses), judgments, penalties, interest, fines, expenses, and/or other costs (including attorneys' fees and court costs) arising from or relating to:

(a)     any negligent action or omission of Borrower or any of the Borrower's employees, contractors, agents or any other Person acting under Borrower's supervision or control prior to, as of, or following the Closing Date;

(b)     any inaccuracy or breach of any representation or warranty made by Borrower in this Loan Agreement or any other Loan Document, document or instrument executed or delivered by Borrower in connection with this Loan Agreement or any breach or non-performance of any covenant or agreement made by Borrower in this Loan Agreement or any other Loan Document, document or instrument executed or delivered by Borrower in connection with this Loan Agreement;

(c)     any Loan Document and the payments due thereunder, including without limitation Enforcement Costs;

(d)     the willful misconduct of Borrower, their agents or employees;

(e)     the misapplication or conversion by Borrower of any insurance proceeds paid by reason of any loss, damage or destruction to the Collateral;

(f)     Any state or local documentary stamp taxes, intangible taxes, personal property taxes and sales tax, if any, imposed by virtue of the execution and acceptance of this Loan Agreement, the Loan Documents, Lender's perfection of its security interest in the Collateral,

including without limitation deeds of trust filed with regard to the Receivables, and the transactions contemplated hereby and thereby.

10. <u>WAIVER</u>.  The Borrower hereby waives diligence, presentment, protest, notice of protest, notice of dishonor, and notice of nonpayment of the Note, and specifically consents to and waives notice of any renewal or extension of this Loan Agreement.  The Borrower hereby waives the benefits of the statute of limitations to the maximum extent allowed by law.  No delay by the Lender in exercising any power or privilege hereunder, nor the single or partial exercise of any power or privilege hereunder, shall preclude any other or further exercise thereof, or the exercise of any other power or privilege hereunder.

11. <u>NOTICES</u>.  All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice.  Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by reputable courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur.  The addresses for such communications shall be:

|  |  |
|---|---|
| If to Borrower: | Generation Next Franchise Brands, Inc.<br>ATTN: Ryan Polk<br>2620 Financial Court, Suite 100<br>San Diego, CA 92117<br>T: 858-210-4200<br>F: |
| With a copy sent (which shall not constitute notice) to: | McDonald Hopkins<br>ATTN: Scott Opincar<br>600 Superior Avenue East, Suite 2100<br>Cleveland, OH 44114<br>T: 216-248-5753<br>F: 216-348-5753 |
| If to Lender: | CK Green Partners, LLC<br>Attn:   Kenneth Green<br>5898 Chandler Court, Suite B<br>Westerville, Ohio 43082<br>T: 614.563.3615<br>F: |

|                                          |                                  |
|------------------------------------------|----------------------------------|
| With a copy sent (which shall not        | Stansbury Weaver, Ltd.           |
| constitute notice) to:                   | ATTN: Mark K. Stansbury          |
|                                          | 250 East Broad Street, Suite 250 |
|                                          | Columbus, Ohio 43215             |
|                                          | T: 614-412-1840                  |
|                                          | F:                               |

Any party hereto may from time to time change its address for notices under this Section by giving at least ten (10) days' prior written notice of such changed address or facsimile number to the other party hereto.

12. <u>MISCELLANEOUS</u>.

(a)    THE PARTIES HERETO IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF ANY STATE, DISTRICT OR FEDERAL COURT SITTING IN HENDERSON COUNTY IN THE STATE OF NEVADA OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS LOAN AGREEMENT TO THE EXCLUSION OF ANY OTHER COURT OR TRIBUNAL.  THE PARTIES IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION, OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  The parties agree the substantive law of the State of Nevada shall govern this Loan Agreement exclusive of its Conflict of Laws doctrine. Final judgment in any such suit, action, or proceeding brought in any such court shall be conclusive and binding upon a party hereto and may be enforced in any court in which such party is subject to jurisdiction by a suit upon such judgment provided that service of process is effected upon such party as permitted by applicable law.

(b)    No modification or waiver of any provision of this Loan Agreement or any other Loan Document nor consent to any departure by the Borrower therefrom shall in any event be effective against the Lender unless the same shall be in writing and signed by all parties hereto, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on the Borrower in any case shall entitle such parties to any other or further notice or demand in the same, similar or other circumstances.

(c)    The remedies of the Lender contained in this Loan Agreement are cumulative with one another and with any other remedies which the parties hereto may have at law, in equity, under any agreements of any type or otherwise and no failure or delay on the part of the Lender in exercising any right, power or privilege under the Loan Documents shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise or the exercise of any other right, power or privilege.

(d)    In case any one or more of the provisions contained in the Loan Documents should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

(e)      In the event of any conflict, inconsistency or ambiguity between the provisions of this Loan Agreement and the provisions of any other Loan Document, the provision which best assures the payment and performance of the Obligations or enlarges the security interest of the Lender in and to the Collateral, shall prevail.

(f)      The name of this Loan Agreement, as well as Section headings used herein, are for convenience of reference only and are not to affect the construction of, or be taken into consideration, in interpreting this Loan Agreement.  No language in any Loan Document will be construed against any party as the drafter.

(g)      Any term used herein shall be equally applicable to both the singular and plural forms.

(h)      This Loan Agreement, any schedules or exhibits hereto, constitute the entire understanding and agreement between Borrower and Lender and supersedes any and all prior or contemporaneous oral or written representation, understanding, agreement or communication relating thereto.

(i)      The covenants and agreements contained in this Loan Agreement shall be binding on, and shall inure to the benefit of, the legal and personal representatives, heirs, successors, and permitted assignees of the parties.  This Agreement may be executed in one or more facsimile or emailed PDFs, each of which will be deemed to be an original and all of which together will be deemed to be one and the same document.

*Remainder of page blank; Subsection (j) and signature page follows.*

    (j)    <u>Waiver of Right to Jury Trial</u>.  BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN. FURTHER, THE BORROWER HEREBY CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF THE LENDER NOR THE LENDER'S COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE LENDER WOULD NOT, IN THE EVENT OF SUCH LITIGATION, SEEK TO ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL PROVISION. FINALLY, THE BORROWER ACKNOWLEDGES THAT THE LENDER HAS BEEN INDUCED TO ENTER INTO THIS LOAN AGREEMENT BY, INTER ALIA, THE PROVISIONS OF THIS SECTION.

    IN WITNESS WHEREOF, the Borrower and the Lender have entered into this Loan Agreement as of the date and year first above written.

**LENDER:**

CK Green Partners, LLC

_____

By:    Kenneth Green
Its:    Authorized Representative

**BORROWER:**

Generation Next Franchise Brands, Inc.

*Ryan Polk*
5C3EB19EAA334B9..._____

By:    Ryan Polk
Its:    Chief Executive Officer

Reis & Irvy's, Inc.

*Ryan Polk*
5C3EB19EAA334B9..._____

By:    Ryan Polk
Its:    President

# EXHIBIT A

## PROMISSORY NOTE

$103,725.00                                                                12 November 2019

THIS PROMISSORY NOTE is issued by Generation Next Franchise Brands, Inc., a Nevada corporation (the "Borrower")

FOR VALUE RECEIVED, the Borrower promises to pay to the order of CK Green Partners, LLC ("Lender"), at such place as the holder hereof may designate, in lawful money of the United States of America, the aggregate unpaid principal amount of $103,725, plus interest, at the rates and in accordance with the terms of the Loan and Security Agreement between Borrower and Lender of even date herewith, as amended from time to time (the "Loan Agreement"). The entire principal amount and all accrued interest shall be due and payable on or before the day before the 180-day anniversary of this Note, or on such earlier date, as provided for in the Loan Agreement.

Borrower irrevocably waives the right to direct the application of any and all payments at any time hereafter received by Lender from or on behalf of Borrower, and Borrower irrevocably agrees that Lender shall have the continuing exclusive right to apply any and all such payments against the then due and owing obligations of Borrower as Lender may deem advisable. In the absence of a specific determination by Lender with respect thereto, all payments shall be applied in the following order: (a) then due and payable fees and expenses; (b) then due and payable interest payments and mandatory prepayments; (c) then accrued and unpaid interest; and (d) then due and payable principal payments and optional prepayments.

Borrower promise to pay Lender all Enforcement Costs (as defined in the Loan Agreement), whether or not suit is filed, unless a final court of competent jurisdiction finds in an unappealable ruling that the Lender acted with gross negligence or willful misconduct. Borrower waives presentment, demand, protest, notice of protest, notice of dishonor, notice of nonpayment, and any and all other notices and demands in connection with the delivery, acceptance, performance, default or enforcement of this Note, as well as any applicable statute of limitations. No delay by Lender in exercising any power or right hereunder shall operate as a waiver of any power or right. Time is of the essence as to all obligations hereunder.

This Note is issued pursuant to the Loan Agreement, which shall govern the rights and obligations of Borrower with respect to all obligations hereunder.

Borrower expressly acknowledges that the indebtedness evidenced by this Note is a "business loan" within the meaning of the Nevada Revised Statutes.

This Note shall be binding upon Borrower and Borrower's heirs, personal representatives, successors and assigns. This Note shall inure to the benefit of Lender, its successors and assigns, including any parties to whom this Note may be assigned.

If any provision of this Note is held to be invalid, illegal or unenforceable in any respect, or operates, or would if enforced operate to invalidate this Note, then that provision shall be deemed null and void. Nevertheless, its nullity shall not affect the remaining provisions of this Note, which shall in no way be affected, prejudiced or disturbed.

The law of the State of Nevada shall apply to this Note. BORROWER ACCEPT FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, UNCONDITIONALLY, THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN HENDERSON COUNTY, NEVADA IN ANY ACTION, SUIT, OR PROCEEDING OF ANY KIND, AGAINST IT WHICH ARISES OUT OF OR BY REASON OF THIS NOTE OR THE LOAN AGREEMENT.

BORROWER WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS (AS DEFINED IN THE LOAN AGREEMENT) OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. BORROWER RECOGNIZE AND AGREE THAT THE FOREGOING WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR IT TO ENTER INTO THIS LOAN AGREEMENT. BORROWER REPRESENTS AND WARRANTS THAT BORROWER HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

IN WITNESS WHEREOF, the Borrower has set its hand and seal to this Note as of 19 November 2019.

BORROWER:

Generation Next Franchise Brands, Inc.

DocuSigned by:

*Ryan Polk*

5C3EB19EAA334B9...
_____

By:     Ryan Polk
Its:     Chief Executive Officer

18

# EXHIBIT 12

**STATE OF NEVADA**

*BARBARA K. CEGAVSKE*
*Secretary of State*



*Commercial Recordings & Notary Division*
*202 N. Carson Street*
*Carson City, NV 89701*
*Telephone (775) 684-5708*
*Fax (775) 684-7138*

*North Las Vegas City Hall*
*2250 Las Vegas Blvd North, Suite 400*
*North Las Vegas, NV 89030*
*Telephone (702) 486-2880*
*Fax (702) 486-2888*

*KIMBERLEY PERONDI*
*Deputy Secretary for*
*Commercial Recordings*

**OFFICE OF THE**
**SECRETARY OF STATE**

Andrew Allman
250 East Broad Street Suite 250
Columbus, OH 43215

**Work Order #:** W2019112700132
November 27, 2019
Receipt Version: 1

**Special Handling Instructions:**

**Submitter ID:** 150037

**Charges**

| Description | Filing Number | Filing Date/Time | Filing Status | Qty | Price | Amount |
|---|---|---|---|---|---|---|
| UCC-1 | 2019055802-5 | 11/27/2019 7:05:06 AM | Approved | 1 | $30.00 | $30.00 |
| Total | | | | | | $30.00 |

**Payments**

| Type | Description | Payment Status | Amount |
|---|---|---|---|
| Credit Card | 5748670945236866803024 | Success | $30.00 |
| Total | | | $30.00 |

**Credit Balance:**    $0.00

Andrew Allman
250 East Broad Street Suite 250
Columbus, OH 43215

**STATE OF NEVADA**

*BARBARA K. CEGAVSKE*
*Secretary of State*


*KIMBERLEY PERONDI*
*Deputy Secretary for*
*Commercial Recordings*



*Commercial Recordings Division*
*202 N. Carson Street*
*Carson City, NV 89701*
*Telephone (775) 684-5708*
*Fax (775) 684-7138*

*North Las Vegas City Hall*
*2250 Las Vegas Blvd North, Suite 400*
*North Las Vegas, NV 89030*
*Telephone (702) 486-2880*
*Fax (702) 486-2888*

**OFFICE OF THE**
**SECRETARY OF STATE**

## Filing Acknowledgement

November 27, 2019 07:05 AM

| | |
|---|---|
| **Work Order Number** | **Initial Filing Number** |
| W2019112700132 | 2019055802-5 |
| **Filing Description** | **Document Filing Number** |
| UCC-1 | 2019055802-5 |

**Debtors**

GENERATION NEXT FRANCHISE BRANDS, INC.    2620 FINANCIAL COURT
SUITE 100
SAN DIEGO, CA 92117

**Secured Parties**

CK GREEN PARTNERS, LLC                5898 CHANDLER COURT
SUITE B
WESTERVILLE, OH 43082


The Nevada Secretary of State, Uniform Commercial Code Division has filed the attached documents. The filing number, date, and time are shown on each document. The filing number can be used to reference the document in the future.

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER** (optional) <br> Andrew Allman | Filed in the Office of<br><br>*Barbara K. Cegavske*<br><br>Secretary of State<br>State Of Nevada |
| **B. E-MAIL CONTACT AT FILER** (optional) <br> andrew@stansburyweaver.com | |
| **C. SEND ACKNOWLEDGMENT TO:** (Name and Address) <br> mark@stansburyweaver.com | |

Filed in the Office of

**Initial Filing Number**
**2019055802-5**
Filed On
**November 27, 2019 07:05 AM**
Number of Pages
**2**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **GENERATION NEXT FRANCHISE BRANDS, INC.** | | | |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **2620 FINANCIAL COURT SUITE 100** | **SAN DIEGO** | **CA** | **92117** | **USA** |

**2. DEBTOR'S NAME:** Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only <u>one</u> Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **CK GREEN PARTNERS, LLC** | | | |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **5898 CHANDLER COURT SUITE B** | **WESTERVILLE** | **OH** | **43082** | **USA** |

**4. COLLATERAL:** This financing statement covers the following collateral:

ALL ASSETS AND PROPERTY OF THE DEBTOR AND DEBTOR'S BUSINESS, WHERESOEVER LOCATED AND WHENSOEVER ACQUIRED, CONTRACTED OR ARISING, INCLUDING, WITHOUT LIMITATION, THE FOLLOWING (CAPITALIZED TERMS HAVE THE MEANING ASCRIBED TO THEM IN THE UNIFORM COMMERCIAL CODE AS, FROM TIME TO TIME, IN EFFECT IN THE STATE OF NEVADA):

(A) ALL OF DEBTOR'S AND DEBTOR'S BUSINESS' RIGHTS, TITLE, AND INTERESTS IN, TO, AND UNDER ALL OF THEIR ACCOUNTS, DEPOSIT ACCOUNTS, CHATTEL PAPER, COMMERCIAL TORT CLAIMS, ELECTRONIC CHATTEL PAPER, DOCUMENTS, EQUIPMENT, PROPERTY, INVENTORY, RECEIVABLES, GOODS, INSTRUMENTS, INVENTORY, INVESTMENT PROPERTY, LETTER OF CREDIT RIGHTS, PAYMENT INTANGIBLES, INCLUDING, WITHOUT LIMITATION, ALL PROCEEDS, AND ALL SOFTWARE, LICENSES, AND PERMITS RELATED THERETO, WHETHER DESIGNED OR ISSUED BY THE DEBTOR, OR OTHERWISE;

(B) ALL OF DEBTOR'S AND DEBTOR'S BUSINESS' RIGHTS TO THE PAYMENT OF MONEY NOW OR HEREAFTER ARISING OUT OF OR IN CONNECTION WITH THE SALE, LEASE, OR OTHER DISPOSITION OF THE FOREGOING PROPERTY, INCLUDING, WITHOUT LIMITATION, AMOUNTS DUE FROM AFFILIATES, TAX REFUNDS, OR INSURANCE PROC

**5.** Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

| 6a. Check <u>only</u> if applicable and check <u>only</u> one box: | | | 6b. Check <u>only</u> if applicable and check <u>only</u> one box: | |
|---|---|---|---|---|
| ☐ Public-Finance Transaction | ☐ Manufactured-Home Transaction | ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien | ☐ Non-UCC Filing |

**7.** ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8.** OPTIONAL FILER REFERENCE DATA:

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

## UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank
because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME | | |
|---|---|---|

OR

| 9b. INDIVIDUAL'S SURNAME | | |
|---|---|---|
| FIRST PERSONAL NAME | | |
| ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name;
do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|

OR

| 10b. INDIVIDUAL'S SURNAME | | | | | |
|---|---|---|---|---|---|
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | | SUFFIX |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

11. ☐ ADDITIONAL SECURED PARTY'S NAME   or   ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

**EEDS;**

**(C) ALL FILES, RECORDS (INLCUDING, BUT NOT LIMITED TO, COMPUTER PROGRAMS, TAPES, AND RELATED ELECTRONIC DATE PROCESSING SOFTWARE), AND WRITINGS OF DEBTOR AND DEBTOR'S BUSINESS OR IN WHICH THE DEBTOR HAS AN INTEREST RELATING IN ANYWAY TO THE FOREGOING PROPERTY; AND**

**(D) AS TO EACH OF THE FOREGOING, ALL PRODUCTS AND PROCEEDS THEREOF, SUBSTITUTIONS THEREFORE, AND ACCESSIONS THERETO.**

| 13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT:<br>☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing |
|---|---|
| 15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | 16. Description of real estate: |

17. MISCELLANEOUS:

# EXHIBIT 13

## BUSINESSS LOAN AND SECURITY AGREEMENT

This Business Loan and Security Loan Agreement (this "Loan Agreement"), is made effective as of 12 November 2019 (the "Effective Date"), by and between Generation Next Franchise Brands, Inc., a Nevada corporation and Reis & Irvy's, Inc., a Nevada corporation (collectively, jointly and severally, the "Borrower") and Kenneth D. Cascarella, an Individual ("Lender").

### BACKGROUND:

A.  Borrower and Lender desire in the Loan Agreement to set forth their agreement with respect to a business loan as documented herein and by that certain "Note" attached hereto as Exhibit A. Exhibit A, along with this Loan Agreement, that certain "Subordination Agreement" dated of even date herewith by and between Lender and Socially Responsible Brands, Inc. ("Creditor") and all other agreements, documents and instruments evidencing or securing said Note and/or entered into in connection herewith, now or in the future, are referred to collectively herein and therein as the "Loan Documents."

B.  As an inducement to Lender to enter into this Loan Agreement and the Loan Documents and issue the loan amount to the Borrower and accept the Note, Borrower wishes to, among other things, grant a lien upon and security interest in and to the Collateral (as defined below).

### TERMS AND CONDITIONS:

For the reasons described above, in consideration of the mutual promises and covenants set forth in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Lender and Borrower hereby agree as follows:

1.  CERTAIN DEFINED TERMS.  Unless the context otherwise requires, as used in this Loan Agreement the following terms shall have the following meanings:

(a)    "Business" shall mean the business of the Borrower and any and all additions, successions, and appreciation thereof.

(b)    "Change in Control" shall mean:

(i)    any sale, lease, exchange, or other transfer (in one transaction or series of related transactions during the twelve month period ending on the date of the most recent sale, lease, exchange or other transfer) of all or substantially all of the assets of the Borrower to any person or persons acting as a group (as determined pursuant to Treasury Regulations Section 1.409A-3(i)(5)(v)(B) and Internal Revenue Service interpretations thereunder (a "Group")), other than to a person or Group holding, directly or indirectly, at least fifty percent (50%) of the total fair market value of the outstanding and issued equity interests of the Seller, as constituted immediately preceding such event; or

(ii)    the acquisition by any person or Group of more than fifty percent (50%) of the total fair market value of the outstanding and issued equity interests in the Borrower, other than any event as a result of which partners or owners (or their affiliates) of the Borrower, as constituted immediately preceding such event, hold greater than one-half

(50%) of the total fair market value of the outstanding and issued equity interests of the Borrower.

(c)     "Closing Date" shall mean the date of this Loan Agreement.

(d)     "Code" shall mean the Uniform Commercial Code as, from time to time, in effect in the State of Nevada.

(e)     "Collateral" shall mean all of the assets and property of the Borrower and the Business, wheresoever located and whensoever acquired, contracted or arising, including without limitation the following (capitalized terms in this section have the meaning ascribed to them in the Code):

(i)     all of the Business and Borrower's rights, title and interests in, to and under all of their Accounts, Deposit Accounts, Chattel Paper, Commercial Tort Claims, Electronic Chattel Paper, Documents, Equipment, Property, Inventory, Receivables, Goods, Instruments, Inventory, Investment Property, Letter of Credit Rights, Payment Intangibles, including, without limitation, all Proceeds, and all software, licenses, and permits related thereto, whether designed or issued by the Borrower, or otherwise;

(ii)     all rights of the Business and Borrower to the payment of money now or hereafter arising out of / in connection with the sale, lease or other disposition of the foregoing property, including, without limitation, amounts due from affiliates, tax refunds, and insurance proceeds;

(iii)     all files, records (including, without limitation, computer programs, tapes and related electronic data processing software) and writings of the Business and Borrower or in which the Borrower has an interest in any way relating to the foregoing property; and

(iv)     as to each of the foregoing, all products and proceeds thereof, substitutions therefore and Accessions thereto.

(f)     "Default Rate" shall mean Eighteen Percent (18%) per annum.

(g)     "Enforcement Costs" shall have the meaning ascribed to it in Section 7(l).

(h)     "Event of Default" shall have the meaning ascribed to it in Article V.

(i)     "General Intangibles" shall mean all general intangibles (within the meaning of the Code), whether now existing or hereafter created, arising or acquired.

(j)     "Inventory" shall mean all of the Borrower's inventory (within the meaning of the Code).

(k)     "Lender Expenses" has the meaning ascribed to it in 2(d).

(l)     "Loan Documents" shall have the meaning ascribed to it in the Recitals.

2

(m)    "Material Adverse Effect" means, in the reasonable discretion of Lender, a material adverse effect on (i) the business operations or condition (financial or otherwise) of Borrower and its Subsidiaries taken as a whole or (ii) the ability of Borrower to repay the Obligations or otherwise perform its obligations under the Loan Documents.

(n)    "Maturity Date" means the day before 180-day anniversary of the Closing Date.

(o)    "Obligations" shall mean, collectively, all obligations and liabilities (primary, secondary, direct, indirect, contingent, sole, joint or several, whether similar or dissimilar or related or unrelated) of any and all of the Borrower in favor of the Lender, due or to become due, now existing or hereafter incurred, contracted or acquired, whether arising under, out of or in connection with the Loan Documents or otherwise.

(p)    "Proceeds" has the meaning ascribed to that term under the Uniform Commercial Code as in effect in the State of Nevada on the date hereof. For purposes of this Agreement, the term "Proceeds" includes whatever is receivable or received when Collateral or proceeds of the Collateral are sold, collected, exchanged, or otherwise disposed of, whether the disposition is voluntary or involuntary, and includes, without limitation, all rights to payment in whatever form and however arising.

(q)    "Property" shall mean any and all interests in real and/or personal property of the Borrower.

(r)    "Receivables" shall mean all accounts (within the meaning of the Code), Accounts, accounts receivable, book debts, notes, drafts, acceptances and other forms of obligations, now or hereafter owing to the Borrower, arising from the sale or lease of the Inventory by Borrower any obligation that might be characterized as an account, contract right, general intangible or chattel paper under the Code, all of the Borrower's rights in, to and under all purchase orders, now or hereafter received by the Borrower for such Inventory, and all monies due or to become due to the Borrower under all contracts for the sale, lease, or other disposition of the Inventory (whether or not yet earned by performance) or in connection with any other transaction (including, without limitation, the right to receive the proceeds of said purchase orders and contracts), and all collateral security and guarantees of any kind given by any obligor, with respect to any of the foregoing.

(s)    "Subsidiary" shall mean any corporation, association or other business entity of which more than 50% of the shares of stock or other interests entitled to vote in the election of directors, managers or trustees thereof at that time is owned or controlled, directly or indirectly, by the Borrower.

2.    LOAN AND TERMS OF PAYMENT.

(a)    Subject to the terms and conditions of this Loan Agreement, Lender agrees to loan the Borrower $100,000, distributed or distributable to Borrower on or about the Closing Date; Borrower shall execute and deliver to Lender on the date hereof the Note.

(b)    Interest Rates, Payments, and Calculations.

(i)    Interest Rate. The Note shall bear interest at a rate equal to FIFTEEN percent (15%) per year.

3

(ii)       Loan Fees.  N/A

(iii)      Default Rate.  All Obligations shall bear interest, from and after the occurrence and during the continuance of an Event of Default, at the Default Rate.

(iv)      Nothing contained herein shall be deemed to establish or require the payment of a rate of interest or other charges in excess of the maximum permitted by applicable law.  The Borrower does not intend or expect to pay, nor does the Lender or any subsequent holder hereof intend or expect to charge, accept or collect any interest greater than the highest legal rate of interest which may be charged under the laws of the State of Nevada, and if, from any circumstances whatsoever, fulfillment of any provision of the Note or any Loan Document in any manner relating thereto, at the time performance of said provision shall be due, shall involve transcending the limit of validity prescribed by any applicable law governing usury, then, **ipso facto**, the obligation to be fulfilled shall be reduced to the limit of such validity so that in no event shall exaction be possible under this Loan Agreement or any document relating thereto in excess of the limit of such validity, but such obligation shall be fulfilled to the limit of such validity and if, under any circumstances whatsoever, interest in excess of the limit of such validity will have been paid by the Borrower in connection with the indebtedness evidenced by the Note and Loan Documents, such excess shall be applied to the unpaid and outstanding principal due under the Note, and not to the payment of interest.  The provisions of this paragraph shall control every other provision of all other agreements executed by the Borrower or Lender in connection with this transaction.

(v)      No Monthly Payments Required.  The total outstanding principal and all accrued but unpaid interest hereunder shall be due and payable on or before the Maturity Date. Payment of principal and interest shall be made in United States dollars. Borrower may but is not obligated to make payments of accrued and unpaid interest at any time prior to Maturity Date.

(vi)      Computation.  All interest chargeable under the Loan Documents shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed.

(c)      Crediting Payments.  The receipt by Lender of any wire transfer of funds, check, or other item of payment shall be immediately applied to conditionally reduce Obligations, but shall not be considered a payment on account unless such wire transfer is of immediately available federal funds or unless and until such check or other item of payment is honored when presented for payment. Payments received by Lender hereunder, including from any sale or assignment of all or any portion of the Collateral after an Event of Default, will, whether received before or after an Event of Default, be credited on a daily basis first to Interest, second to any other amounts owed to Lender hereunder, then to the outstanding balance of the Note when received in Lender's bank account.

(d)      Fees.  Borrower shall pay to Lender the following fees ("Lender Expenses"): any and all costs of Lender arising out of or in connection with the loan being made hereunder, including without limitation recording fees, documentary stamps, intangible taxes and all reasonable legal fees of Lender for the preparation of the Loan Documents as well as for any future

dealings with Borrower following the Closing Date, including without limitation bankruptcy proceedings. On the Closing Date, Borrower will pay Lender Expenses incurred through the Closing Date and, after the Closing Date, all Lender Expenses as they become due, including without limitation Enforcement Costs.

(c)    Term. This Loan Agreement shall become effective once duly executed and authorized by Borrower and Lender and shall continue in full force and effect for a term ending on the date which all Obligations of Borrower have been discharged and paid in full, or on such earlier date as the parties agree in writing. Notwithstanding the foregoing, Lender shall have the right to terminate this Loan Agreement immediately and without notice upon the occurrence of an Event of Default and Borrower shall have the right to terminate this Loan Agreement immediately upon payment in full of its Obligations then outstanding hereunder. Notwithstanding any termination of this Loan Agreement, all of Lender's security interest in all of the Collateral and all of the terms and provisions of this Loan Agreement shall continue in full force and effect until all Obligations have been paid and performed in full, and no termination shall impair any right or remedy of Lender, nor shall any such termination relieve Borrower of any Obligation to Lender until all of the Obligations have been paid and performed in full.

3.    PREPAYMENT. Borrower may prepay principal, interest, or both without penalty.

4.    THE COLLATERAL. As collateral security for the payment and performance of all of the Obligations, the Borrower hereby extends, sells, assigns, conveys, mortgages, pledges, transfers, and grants to the Lender a continuing security interest in the Collateral. Any security interest will be subordinated to all existing security interests in the Collateral, except as provided in any subordination agreement. Prepayment by the Borrower of any portion of the principal and accrued interest pursuant to the terms of this Loan Agreement shall not reduce or otherwise impair the security interest of Lender in the Collateral, except that complete repayment of all Obligations shall release and redeem to the Borrower all interest in the Collateral securing the Obligations. Borrower hereby authorizes Lender to file financing statements, without notice to Borrower, with all appropriate jurisdictions to perfect or protect Lender's interest or rights hereunder, including a notice that any disposition of the Collateral, by either Borrower or any other Person, shall be deemed to violate the rights of Lender. Such financing statements may indicate the Collateral as "all assets of the Debtor" or words of similar effect, or as being of an equal or lesser scope, or with greater detail, all in Lender's discretion.

5.    EVENTS OF DEFAULT.

(a)    The occurrence of any of the following events, in addition to any other Events of Default as defined in any Loan Document, shall constitute an "Event of Default" hereunder:

(i)        Any provision of this Loan Agreement or any Loan Document, and any amendments thereto, is breached or is untrue or misleading in any material respect;

(ii)       Any warranty, representation, or statement made or furnished to Lender by Borrower or Guarantors in connection with any of the Loan Documents, is untrue or misleading in any material respect;

(iii)      Borrower is in default under any provision of any Loan Document and/or any amendments thereto, including without limitation if the Borrower shall fail to pay on the due date any payment of money, whether as principal, interest, late charge, or Enforcement Costs (as defined below), as required under this Loan Agreement or any Loan Document, with any applicable notice having been given and time to cure expired;

(iv)      The Insolvency of the Borrower.  For purposes hereof,  the term "Insolvency" shall mean: (i) the appointment, by the order of a court of competent jurisdiction, of a trustee, receiver, or liquidator of the Borrower, if such order shall not be discharged or dismissed within sixty (60) days after such appointment; (ii) application for, or consent in writing to, the appointment of a receiver, trustee, or liquidator of all or substantially all of the assets of the Borrower; (iii) the filing of a voluntary petition in bankruptcy or the admission in writing of inability to pay debts as they become due; (iv) a general assignment for the benefit of creditors; (v) the filing of a petition or an answer seeking a reorganization (other than a reorganization not involving the liabilities of the Borrower) or an arrangement with creditors or taking advantage of any bankruptcy or insolvency law; (vi) the filing of an answer admitting the material allegations of a petition filed against the Borrower in any bankruptcy, reorganization, or insolvency proceeding; (vii) the insolvency of Borrower; (viii) the Borrower has suffered a Material Adverse Effect in the reasonable discretion of the Lender; or (ix) the entering of an order, judgment, or decree by any court of competent jurisdiction on the application of a creditor adjudicating the Borrower as bankrupt or insolvent, or the appointment of a receiver, trustee, or liquidator of the Borrower, or of all or substantially all of the assets of the Borrower, if such order, judgment or decree continues unstayed and in effect **for** a period of sixty (60) **days** from the date entered;

(v)       A Change in Control of Borrower.  If there occurs a Change in Control of Borrower.

(b)      Notwithstanding anything herein to the contrary, Borrower shall have a three (3) calendar day grace period after notice from Lender to cure any non-monetary default hereunder; provided however that such grace period does not cause a Material Adverse Effect.  There shall be no grace period for monetary default and no notice required by Lender for such default to be immediate and material.  Time is of the essence for all Obligations hereunder.

(c)      If an Event of Default shall occur for any reason whatsoever (and whether such occurrences shall be voluntary or involuntary, or come about or be effected by operation of law or pursuant to or in compliance with any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body) then, or at any time thereafter, the Lender may, without written notice, take any or all of the following actions, at the same or different times: (A) accelerate the maturity of the Obligations and demand the immediate payment thereof, and to

6

charge the Default Rate on such Obligations without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived; (B) require the Borrower to assemble the Collateral and the records pertaining thereto and deliver possession of same to the Lender, as well as to permit Lender to have unrestricted access to the Borrower's premises and the Collateral so as to allow Lender to take control thereof for purposes of disposition of the Collateral and the collection of all Obligations; and (C) take any and all action and pursue any and all remedies as may be permitted under the Loan Documents or by applicable law or otherwise, including exercising all rights of counterclaim or set-off.

(d)    Upon the occurrence of an Event of Default, the Lender may (i) at any time thereafter in its discretion transfer any securities or other property constituting Collateral into its own name or that of its nominee and receive the income thereon and hold the same as security for the Obligations or apply it on any or all amounts due on the Obligations in such order as Lender may elect in its sole discretion, (ii) enter the premises peacefully at the address(es) listed herein, and take control of the Business and (ii) require each Borrower to establish, at Borrower's expense, a lock box account with such bank acceptable to Lender, into which Borrower shall promptly deposit and direct their account debtors to directly remit all payments on Receivables and, which such payments or deposits shall be the property solely of the Lender. Insofar as the Collateral shall consist of Receivables, other claims and rights to the payment of money, insurance policies, instruments, choses in action or the like, the Lender may, without notice to or demand on the Borrower, demand, collect, receipt for, settle, compromise, adjust, use, sue for, foreclose or realize upon the Collateral as the Lender may determine, whether or not the obligations or the Collateral are then due and for the purpose of realizing the Lender's rights therein, the Lender may receive, open and dispose of mail addressed to the Borrower and endorse notes, checks, drafts, money orders, documents of title or other evidences of payment, shipment or storage or any form of the Collateral on behalf of and in the name of Borrower. The powers conferred on the Lender by this Section are solely to protect the interest of the Lender and shall not impose any duties on the Lender to exercise any powers. All acts of said attorney or designee are hereby ratified and approved by the Borrower and the Lender and said attorney or designee shall not be liable for any acts of commission or omission nor for any error of judgment or mistake of fact or law. This power, being coupled with an interest, is irrevocable so long as any of the Obligations remains outstanding. Borrower hereby irrevocably appoints Lender (and any of Lender's designated officers, or employees) as Borrower's true and lawful attorney to: (a) send requests for verification of Accounts or notify account debtors of Lender's security interest in the Accounts; (b) endorse Borrower's name on any checks or other forms of payment or security that may come into Lender's possession; (c) sign Borrower's name on any invoice or bill of lading relating to any Account, drafts against account debtors, schedules and assignments of Accounts, verifications of Accounts, and notices to account debtors; (d) make, settle, and adjust all claims under and decisions with respect to Borrower's policies of insurance; (e) settle and adjust disputes and claims respecting the accounts directly with account debtors, for amounts and upon terms which Lender determines to be reasonable; (f) to modify, in its sole discretion, any intellectual property security agreement entered into between Borrower and Lender without first obtaining Borrower's approval of or signature to such modification to include reference to any right, title or interest in any copyrights, patents or trademarks acquired by Borrower after the execution hereof or to delete any reference to any right, title or interest in any copyrights, patents or trademarks in which Borrower no longer has or claims any right, title or interest; (g) to file, in its sole discretion, one or more financing or continuation statements and amendments thereto, relative to any of the Collateral without the

signature of Borrower where permitted by law. The appointment of Lender as Borrower's attorney in fact, and each and every one of Lender's rights and powers, being coupled with an interest, is irrevocable until all of the Obligations have been fully repaid and performed.

6.  REPRESENTATIONS AND WARRANTIES.  As a material inducement for Lender to enter into this Loan Agreement, Borrower hereby represents and warrants to Lender as follows:

(a)    Borrower is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada and has the power and authority carry on its business as is now being conducted.

(b)    Borrower has all requisite power and authority to enter into this Loan Agreement and the other Loan Documents contemplated hereby and to assume and perform fully its obligations hereunder and thereunder. The execution and delivery by Borrower of this Loan Agreement and the other Loan Documents contemplated hereby and the performance by Borrower of their Obligations hereunder and thereunder have been duly and validly authorized by all necessary corporate action of Borrower.

(c)    The execution and delivery of this Loan Agreement and the other Loan Documents contemplated hereby and the performance by Borrower hereunder and thereunder (i) do not and will not conflict with or violate any provision of the articles of incorporation or bylaws of Borrower and (ii) do not and will not (A) conflict with or result in a breach of the terms, conditions or provisions of, (B) constitute a default under, (C) result in the creation of any encumbrance, lien or other restriction of any nature upon the Borrower's assets pursuant to, (D) give any third party the right to modify, terminate or accelerate any obligation under, (E) result in a violation of, or require any authorization, consent, approval, exemption or other action by or notice to any third party pursuant to, any agreement, instrument, order, judgment, license, permit, decree, law, regulation, ordinance or judgment to which any of Borrower or the Collateral or is a party or is subject or bound.

(d)    No filings with, notices to, or approvals or consents of, any federal, state or local governmental or regulatory agency or body or any other Person are required to be obtained by Borrower in connection with the consummation of the transactions contemplated by the Loan Documents. "Person" means any individual, sole proprietorship, partnership, limited liability partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, entity or government (whether foreign, federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof), and shall include such Person's successors and assigns.

(e)    There are no charges, complaints, claims, actions, suits, disputes, investigations, arbitrations, demands or other proceedings pending or, to the best knowledge of Borrower, threatened before or by any court, governmental agency or instrumentality, arbitrator, Person to which Borrower is, or are threatened to be, a party or to which, to the best knowledge of Borrower, any employee, independent contractor or affiliate of Borrower is or is threatened to be a party, or which relate to Borrower, the business of Borrower, or any of the assets of Borrower or any other agreement related hereto. To the best knowledge of Borrower, there is no basis or grounds for any of the foregoing. Borrower is not subject to or bound by any injunction, order or decree of any court or governmental or administrative agency.

8

(f)    There are no existing defaults, events of default, breaches or other circumstances, facts or events that with the passage of time or giving of notice, or both, would constitute a default, event of default or breach on the part of Borrower under any agreement of Borrower or otherwise.

(g)    Borrower has obtained and maintained all required local, state and federal licenses and permits necessary to operate Borrower's business and all such licenses and permits are in good standing and Borrower has no knowledge of any actions, claims or violations that are pending that would result in any limitations on or suspension or termination of such licenses.

(h)    All financial statements and reports relating to the Borrower and the Company provided by Borrower and/or Guarantors or made available or disclosed to Lender and its accountants, attorneys and other agents are complete, accurate and fairly present the financial position and performance of Borrower and the Company in all material respects for the periods to which they relate, and there has been no adverse change in the condition, financial or otherwise, of Borrower since the last disclosed statement.

(i)    All of the representations and warranties made by Borrower contained in the Loan Documents contemplated hereby and all information delivered in any schedule, attachment, certificate or exhibit hereto are true, correct and complete on the date of this Loan Agreement, throughout the term of this Loan Agreement. Borrower has not omitted to state to Lender any fact relating to the Borrower, which (i) is necessary to make the information given by or on behalf of Borrower not misleading, (ii) if disclosed would reasonably affect the decision of a Person considering making a loan to Borrower or (iii) has or which could reasonably be expected to have an adverse effect upon the Borrower or the profits, condition (financial or otherwise) or prospects of the Borrower's business.

(j)    Borrower is the record and beneficial owner of, and has good and marketable title to the Collateral and there are no unrecorded liens or encumbrances on the Collateral.

(k)    Borrower agrees that Borrower will not for any reason change banking institutions or instructions for payment of policies and/or Receivables to any other account without the express written consent of Lender.

(l)    There are no actions or proceedings pending or, to Borrower's knowledge, threatened by or against Borrower or any Subsidiary in which an adverse decision could, with reasonable likelihood, cause a Material Adverse Effect.

(m)    All consolidated financial statements for Borrower delivered to Lender fairly present in all material respects Borrower's consolidated financial condition and Borrower's consolidated results of operations. There has not been any material deterioration in Borrower's consolidated financial condition since the date of the most recent financial statements submitted to Lender.

(n)    This Loan Agreement is entered into by Borrower for the Business Purpose.

7.    **AFFIRMATIVE COVENANTS.** From the date hereof and so long as any of the Loan Documents remains in effect or any of the Obligations shall be unpaid, each Borrower will:

9

(a)    Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its corporate existence, rights, licenses, permits and franchises and comply with all applicable laws, and operate its business in substantially the manner in which it is presently conducted and operated;

(b)    At all times preserve all Property (except for such property as is disposed of in the ordinary course of business) used or useful in the conduct of the Business and keep the same in good repair, working order and condition (subject to normal wear and tear), and from time to time make, or cause to be made, all necessary and proper repairs, whether pursuant to a warranty or otherwise, renewals, replacements, betterments and improvements thereto;

(c)    Execute such other documents and instruments as Lender may reasonably request, duly executed by Borrower, to further implement and effectuate the purposes of this Loan Agreement;

(d)    Keep the insurable Collateral and other properties insured at all times at the replacement value thereof, by financially sound and reputable insurers, and maintain or cause to be maintained such other insurance to such extent and against such risks, including fire and other risks insured against by extended coverage, as is, the Borrower's best judgment, customary with companies in the same or similar business, and maintain in full force and effect public liability insurance against claims for personal injury, death or property damage occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by it and manufacturer's liability insurance against claims for personal injury or death occurring in connection with the use of any products assembled, manufactured or sold by it in such amount as the Borrower shall in good faith deem necessary, or as may be reasonably required by the Lender and maintain such additional insurance as may be required by law. In respect of the Collateral, the Lender shall be loss payee under all policies of insurance maintained thereon. The Lender shall be entitled to at least 30 days' prior written notice of the insurer's intention to cancel or reduce any policies of insurance required by this Subsection (d), and, at its election and without any obligation whatsoever, shall have an opportunity to cure any defaults thereunder during such time. In addition, the Borrower shall deliver renewals of all such policies not less than 30 days prior to the expiration date of such policies. The Borrower shall furnish to the Lender full information as to the insurance carried (including a copy or the original, as required hereby, of all insurance policies), as well as proof of payment therefor, and pay for all insurance obtained in accordance herewith upon the terms of invoices therefor.

(e)    Pay all indebtedness and obligations promptly and in accordance with their respective terms if the failure to make such payments would cause a Material Adverse Effect, or affect the rights of the Lender hereunder, and pay and discharge promptly all taxes, assessments, and governmental charges or levies imposed upon it or in respect of its property, before the same shall become in default, as well as all lawful material claims for labor, materials, and supplies or otherwise which, if unpaid, might become a lien or charge upon such property or any part thereof, and timely comply with all applicable laws and governmental rules and regulations; provided, however that the Borrower shall not be required to pay or discharge or cause to be paid or discharged any such tax, assessment, charge, lien or claim, or timely comply with laws and governmental rules so long as the validity thereof shall be contested by appropriate legal proceedings timely initiated and conducted in good faith, and (i) in the case of an unpaid tax, assessment, governmental charge or levy, lien, encumbrance, charge or claim, such proceedings

shall be effective to suspend the collection thereof from the Borrower, and its properties; (ii) neither such properties nor any part thereof, nor any interest therein would be in any danger of being sold, forfeited or lost; (iii) in the case of a law and governmental rule or regulation, neither the Borrower nor the Lender would be in any danger of criminal liability for failure to comply therewith; and (iv) there shall have been established such reserve or other appropriate provision, if any, with respect thereto on the books of the Borrower, as shall be required by generally accepted accounting principles with respect to any such tax, assessment, charge, lien, claim, encumbrance, law, rule or regulation, so contested.

(f)    Furnish to Lender on a monthly basis, balance sheets, statements of income and loss, and statements of cash flow, prepared in accordance with GAAP, and all such other information regarding the operation, business, affairs and financial condition of the Borrower and Company as the Lender may reasonably request, including without limitation the ratio of cash on deposit in the Company and Borrower's operating accounts to outstanding Obligations.

(g)    Give the Lender prompt telephonic or email notice (to be confirmed within 48 hours by written notice as provided below) of any Event of Default or of any event which, with notice or the passage of time, or both, would constitute such an Event of Default, specifying the nature and extent thereof and the action which the party giving such notice proposes to take with respect thereto.

(h)    Keep its place of business and chief executive office and the office where it keeps its records concerning Receivables at its current location.

(i)    Keep its deposit account(s) at the bank(s) presently utilized by Borrower as its operating account(s).

(j)    At all reasonable times during business hours and as often as the Lender may reasonably request, permit any authorized representative of the Lender to visit and inspect any of the properties of the Borrower, including, without limitation, the Collateral, and the books in respect thereof, and to make extracts from such books and to discuss the affairs, finances and accounts with any of their respective chief financial officers or such other person as may be designated by the chief executive officer of the Borrower.

(k)    Promptly, from time to time as the Lender may reasonably request, perform such acts and execute, acknowledge, deliver, file, register, deposit or record any and all further instruments, agreements and documents whether to continue, preserve, renew, record or perfect interests conferred by this Loan Agreement or any of the other Loan Documents, as well as the priority thereof, or otherwise in connection with the Obligations.

(l)    Pay all costs and expenses incurred from time to time by the Lender with respect to any modification, consent or waiver of the provisions of any Loan Document and any enforcement of the Note and the Loan Documents, including, without limitation, reasonable attorneys' fees and expenses, court costs, transcript costs, fees of experts, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other out-of-pocket disbursements or expenses of the types customarily incurred in connection with modifying terms and/or an action to collect payment, or an appeal from such action (collectively "Enforcement Costs").

(m)    Utilize the loan proceeds solely in connection with the Business for the Business Purpose.

8.   **NEGATIVE COVENANTS.**  Except for the Genext Loan LLC Business Loan and Security Agreement dated November 15, 2019 and any financing authorized by a bankruptcy court under 11 USC § 364, from the date hereof and so long as the Loan Agreement remains in effect and any of the Obligations shall be unpaid, each Borrower will not, without the prior written consent of the Lender:

(a)    Either, directly or indirectly, incur, create, assume or permit to exist any Lien with respect to any Collateral now owned or hereafter acquired, or be bound by or subject to any agreement or option to do so, except liens granted, incurred or created in favor of the Lender in connection with the Loan Documents;

(b)    Incur, create, assume or permit to exist any indebtedness or liability on account of deposits or advances or progress payments under any contract or any indebtedness or liability for borrowed money, or any other indebtedness or liability evidenced by notes, bonds, debentures or similar obligations, except indebtedness to trade creditors incurred in the ordinary course of business or upon terms and conditions acceptable to Lender in its sole discretion.

9.   **BORROWER'S INDEMNITY.**  Borrower shall indemnify, defend and hold harmless Lender and its members, agents, partners, employees and independent contractors, at all times from and after the Closing Date, from and against any and all claims, actions, damages, liabilities, losses (including consequential losses), judgments, penalties, interest, fines, expenses, and/or other costs (including attorneys' fees and court costs) arising from or relating to:

(a)    any negligent action or omission of Borrower or any of the Borrower's employees, contractors, agents or any other Person acting under Borrower's supervision or control prior to, as of, or following the Closing Date;

(b)    any inaccuracy or breach of any representation or warranty made by Borrower in this Loan Agreement or any other Loan Document, document or instrument executed or delivered by Borrower in connection with this Loan Agreement or any breach or non-performance of any covenant or agreement made by Borrower in this Loan Agreement or any other Loan Document, document or instrument executed or delivered by Borrower in connection with this Loan Agreement;

(c)    any Loan Document and the payments due thereunder, including without limitation Enforcement Costs;

(d)    the willful misconduct of Borrower, their agents or employees;

(e)    the misapplication or conversion by Borrower of any insurance proceeds paid by reason of any loss, damage or destruction to the Collateral;

(f)    Any state or local documentary stamp taxes, intangible taxes, personal property taxes and sales tax, if any, imposed by virtue of the execution and acceptance of this Loan Agreement, the Loan Documents, Lender's perfection of its security interest in the Collateral,

12

including without limitation deeds of trust filed with regard to the Receivables, and the transactions contemplated hereby and thereby.

10. **WAIVER**.  The Borrower hereby waives diligence, presentment, protest, notice of protest, notice of dishonor, and notice of nonpayment of the Note, and specifically consents to and waives notice of any renewal or extension of this Loan Agreement.  The Borrower hereby waives the benefits of the statute of limitations to the maximum extent allowed by law.  No delay by the Lender in exercising any power or privilege hereunder, nor the single or partial exercise of any power or privilege hereunder, shall preclude any other or further exercise thereof, or the exercise of any other power or privilege hereunder.

11. **NOTICES**.  All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice.  Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by reputable courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur.  The addresses for such communications shall be:

| | |
|---|---|
| If to Borrower: | Generation Next Franchise Brands, Inc.<br>ATTN: Ryan Polk<br>2620 Financial Court, Suite 100<br>San Diego, CA 92117<br>T: 858-210-4200<br>F: |
| With a copy sent (which shall not constitute notice) to: | McDonald Hopkins<br>ATTN: Scott Opincar<br>600 Superior Avenue East, Suite 2100<br>Cleveland, OH 44114<br>T: 216-248-5753<br>F: 216-348-5753 |
| If to Lender: | Kenneth D. Cascarella<br>3157 Seward Drive<br>Eads, TN 38028<br>901-937-9404 |
| With a copy sent (which shall not constitute notice) to: | Tom Minor PLLC<br>124 Market Street<br>Somerville, TN 38068 |

901-465-3117

Any party hereto may from time to time change its address for notices under this Section by giving at least ten (10) days' prior written notice of such changed address or facsimile number to the other party hereto.

12. <u>MISCELLANEOUS</u>.

    (a)    THE PARTIES HERETO IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF ANY STATE, DISTRICT OR FEDERAL COURT SITTING IN HENDERSON COUNTY IN THE STATE OF NEVADA OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS LOAN AGREEMENT TO THE EXCLUSION OF ANY OTHER COURT OR TRIBUNAL. THE PARTIES IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION, OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. The parties agree the substantive law of the State of Nevada shall govern this Loan Agreement exclusive of its Conflict of Laws doctrine. Final judgment in any such suit, action, or proceeding brought in any such court shall be conclusive and binding upon a party hereto and may be enforced in any court in which such party is subject to jurisdiction by a suit upon such judgment provided that service of process is effected upon such party as permitted by applicable law.

    (b)    No modification or waiver of any provision of this Loan Agreement or any other Loan Document nor consent to any departure by the Borrower therefrom shall in any event be effective against the Lender unless the same shall be in writing and signed by all parties hereto, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on the Borrower in any case shall entitle such parties to any other or further notice or demand in the same, similar or other circumstances.

    (c)    The remedies of the Lender contained in this Loan Agreement are cumulative with one another and with any other remedies which the parties hereto may have at law, in equity, under any agreements of any type or otherwise and no failure or delay on the part of the Lender in exercising any right, power or privilege under the Loan Documents shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise or the exercise of any other right, power or privilege.

    (d)    In case any one or more of the provisions contained in the Loan Documents should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

    (e)    In the event of any conflict, inconsistency or ambiguity between the provisions of this Loan Agreement and the provisions of any other Loan Document, the provision which best assures the payment and performance of the Obligations or enlarges the security interest of the Lender in and to the Collateral, shall prevail.

14

(f)    The name of this Loan Agreement, as well as Section headings used herein, are for convenience of reference only and are not to affect the construction of, or be taken into consideration, in interpreting this Loan Agreement.  No language in any Loan Document will be construed against any party as the drafter.

(g)    Any term used herein shall be equally applicable to both the singular and plural forms.

(h)    This Loan Agreement, any schedules or exhibits hereto, constitute the entire understanding and agreement between Borrower and Lender and supersedes any and all prior or contemporaneous oral or written representation, understanding, agreement or communication relating thereto.

(i)    The covenants and agreements contained in this Loan Agreement shall be binding on, and shall inure to the benefit of, the legal and personal representatives, heirs, successors, and permitted assignees of the parties.  This Agreement may be executed in one or more facsimile or emailed PDFs, each of which will be deemed to be an original and all of which together will be deemed to be one and the same document.

*Remainder of page blank; Subsection (j) and signature page follows.*

15

(j)    Waiver of Right to Jury Trial.    BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN. FURTHER, THE BORROWER HEREBY CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF THE LENDER NOR THE LENDER'S COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE LENDER WOULD NOT, IN THE EVENT OF SUCH LITIGATION, SEEK TO ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL PROVISION. FINALLY, THE BORROWER ACKNOWLEDGES THAT THE LENDER HAS BEEN INDUCED TO ENTER INTO THIS LOAN AGREEMENT BY, INTER ALIA, THE PROVISIONS OF THIS SECTION.

IN WITNESS WHEREOF, the Borrower and the Lender have entered into this Loan Agreement as of the date and year first above written.

**LENDER:**

By: Kenneth D. Cascarella

**BORROWER:**

Generation Next Franchise Brands, Inc.

By:    Ryan Polk
Its:    Chief Executive Officer

Reis & Irvy's, Inc.

By:    Ryan Polk
Its:    President

EXHIBIT A

PROMISSORY NOTE

$100,000

12 November 2019

THIS PROMISSORY NOTE is issued by Generation Next Franchise Brands, Inc., a Nevada corporation (the "Borrower")

FOR VALUE RECEIVED, the Borrower promises to pay to the order of Kenneth D. Cascarella ("Lender"), at such place as the holder hereof may designate, in lawful money of the United States of America, the aggregate unpaid principal amount of $100,000, plus interest, at the rates and in accordance with the terms of the Loan and Security Agreement between Borrower and Lender of even date herewith, as amended from time to time (the "Loan Agreement"). The entire principal amount and all accrued interest shall be due and payable on or before the day before the 180-day anniversary of this Note, or on such earlier date, as provided for in the Loan Agreement.

Borrower irrevocably waives the right to direct the application of any and all payments at any time hereafter received by Lender from or on behalf of Borrower, and Borrower irrevocably agrees that Lender shall have the continuing exclusive right to apply any and all such payments against the then due and owing obligations of Borrower as Lender may deem advisable. In the absence of a specific determination by Lender with respect thereto, all payments shall be applied in the following order: (a) then due and payable fees and expenses; (b) then due and payable interest payments and mandatory prepayments; (c) then accrued and unpaid interest; and (d) then due and payable principal payments and optional prepayments.

Borrower promise to pay Lender all Enforcement Costs (as defined in the Loan Agreement), whether or not suit is filed, unless a final court of competent jurisdiction finds in an unappealable ruling that the Lender acted with gross negligence or willful misconduct. Borrower waives presentment, demand, protest, notice of protest, notice of dishonor, notice of nonpayment, and any and all other notices and demands in connection with the delivery, acceptance, performance, default or enforcement of this Note, as well as any applicable statute of limitations. No delay by Lender in exercising any power or right hereunder shall operate as a waiver of any power or right. Time is of the essence as to all obligations hereunder.

This Note is issued pursuant to the Loan Agreement, which shall govern the rights and obligations of Borrower with respect to all obligations hereunder.

Borrower expressly acknowledges that the indebtedness evidenced by this Note is a "business loan" within the meaning of the Nevada Revised Statutes.

This Note shall be binding upon Borrower and Borrower's heirs, personal representatives, successors and assigns. This Note shall inure to the benefit of Lender, its successors and assigns, including any parties to whom this Note may be assigned.

If any provision of this Note is held to be invalid, illegal or unenforceable in any respect, or operates, or would if enforced operate to invalidate this Note, then that provision shall be

17

deemed null and void. Nevertheless, its nullity shall not affect the remaining provisions of this Note, which shall in no way be affected, prejudiced or disturbed.

The law of the State of Nevada shall apply to this Note. BORROWER ACCEPT FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, UNCONDITIONALLY, THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN HENDERSON COUNTY, NEVADA IN ANY ACTION, SUIT, OR PROCEEDING OF ANY KIND, AGAINST IT WHICH ARISES OUT OF OR BY REASON OF THIS NOTE OR THE LOAN AGREEMENT.

BORROWER WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS (AS DEFINED IN THE LOAN AGREEMENT) OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. BORROWER RECOGNIZE AND AGREE THAT THE FOREGOING WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR IT TO ENTER INTO THIS LOAN AGREEMENT. BORROWER REPRESENTS AND WARRANTS THAT BORROWER HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

IN WITNESS WHEREOF, the Borrower has set its hand and seal to this Note as of 19 November, 2019

BORROWER:

Generation Next Franchise Brands, Inc.

By:    Ryan Polk
Its:    Chief Executive Officer

# EXHIBIT 14



*BARBARA K. CEGAVSKE*
*Secretary of State*

**STATE OF NEVADA**

*Commercial Recordings & Notary Division*
*202 N. Carson Street*
*Carson City, NV 89701*
*Telephone (775) 684-5708*
*Fax (775) 684-7138*

**KIMBERLEY PERONDI**
*Deputy Secretary for*
*Commercial Recordings*

*North Las Vegas City Hall*
*2250 Las Vegas Blvd North, Suite 400*
*North Las Vegas, NV 89030*
*Telephone (702) 486-2880*
*Fax (702) 486-2888*

**OFFICE OF THE**
**SECRETARY OF STATE**

Andrew Allman
250 East Broad Street Suite 250
Columbus, OH 43215

**Work Order #:** W2019120601443
December 6, 2019
Receipt Version: 1

**Special Handling Instructions:**

**Submitter ID:** 150037

**Charges**

| Description | Filing Number | Filing Date/Time | Filing Status | Qty | Price | Amount |
|---|---|---|---|---|---|---|
| UCC-1 | 2019056995-9 | 12/6/2019 2:58:20 PM | Approved | 1 | $30.00 | $30.00 |
| Total | | | | | | $30.00 |

**Payments**

| Type | Description | Payment Status | Amount |
|---|---|---|---|
| Credit Card | 5756730839056716903066 | Success | $30.00 |
| Total | | | $30.00 |

**Credit Balance:** $0.00

Andrew Allman
250 East Broad Street Suite 250
Columbus, OH 43215

**STATE OF NEVADA**

*BARBARA K. CEGAVSKE*
*Secretary of State*

*KIMBERLEY PERONDI*
*Deputy Secretary for*
*Commercial Recordings*



**OFFICE OF THE**
**SECRETARY OF STATE**

*Commercial Recordings Division*
*202 N. Carson Street*
*Carson City, NV 89701*
*Telephone (775) 684-5708*
*Fax (775) 684-7138*

*North Las Vegas City Hall*
*2250 Las Vegas Blvd North, Suite 400*
*North Las Vegas, NV 89030*
*Telephone (702) 486-2880*
*Fax (702) 486-2888*

## Filing Acknowledgement

December 6, 2019 02:58 PM

| | |
|---|---|
| **Work Order Number** | **Initial Filing Number** |
| W2019120601443 | 2019056995-9 |
| **Filing Description** | **Document Filing Number** |
| UCC-1 | 2019056995-9 |
| **Debtors** | |
| GENERATION NEXT FRANCHISE BRANDS, INC. | 2620 FINANCIAL COURT SUITE 100 SAN DIEGO, CA 92117 |
| **Secured Parties** | |
| CASCARELLA KENNETH | 3170 SEWARD DRIVE EADS, TN 38028 |

The Nevada Secretary of State, Uniform Commercial Code Division has filed the attached documents. The filing number, date, and time are shown on each document. The filing number can be used to reference the document in the future.

**http://www.nvsos.gov/**

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER** (optional)<br>Andrew Allman | |
| **B. E-MAIL CONTACT AT FILER** (optional)<br>andrew@stansburyweaver.com | |
| **C. SEND ACKNOWLEDGMENT TO:** (Name and Address)<br>Mark@stansburyweaver.com | |

| Filed in the Office of<br><br>*Barbara K. Cegavske*<br><br>Secretary of State<br>State Of Nevada | Initial Filing Number<br>**2019056995-9**<br>Filed On<br>**December 6, 2019 02:58 PM**<br>Number of Pages<br>**2** |
|---|---|

---

1. **DEBTOR'S NAME:** Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| **1a. ORGANIZATION'S NAME**<br>**GENERATION NEXT FRANCHISE BRANDS, INC.** | | | | |
| **1b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| **1c. MAILING ADDRESS**<br>**2620 FINANCIAL COURT SUITE 100** | CITY<br>**SAN DIEGO** | STATE<br>**CA** | POSTAL CODE<br>**92117** | COUNTRY<br>**USA** |

2. **DEBTOR'S NAME:** Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| **2a. ORGANIZATION'S NAME** | | | | |
| **2b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| **2c. MAILING ADDRESS** | CITY | STATE | POSTAL CODE | COUNTRY |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only <u>one</u> Secured Party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| **3a. ORGANIZATION'S NAME** | | | | |
| **3b. INDIVIDUAL'S SURNAME**<br>**CASCARELLA** | FIRST PERSONAL NAME<br>**KENNETH** | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| **3c. MAILING ADDRESS**<br>**3170 SEWARD DRIVE** | CITY<br>**EADS** | STATE<br>**TN** | POSTAL CODE<br>**38028** | COUNTRY<br>**USA** |

4. **COLLATERAL:** This financing statement covers the following collateral:

ALL ASSETS AND PROPERTY OF THE DEBTOR AND DEBTOR'S BUSINESS, WHERESOEVER LOCATED AND WHENSOEVER ACQUIRED, CONTRACTED OR ARISING, INCLUDING, WITHOUT LIMITATION, THE FOLLOWING (CAPITALIZED TERMS HAVE THE MEANING ASCRIBED TO THEM IN THE UNIFORM COMMERCIAL CODE AS, FROM TIME TO TIME, IN EFFECT IN THE STATE OF NEVADA):

(A) ALL OF DEBTOR'S AND DEBTOR'S BUSINESS' RIGHTS, TITLE, AND INTERESTS IN, TO, AND UNDER ALL OF THEIR ACCOUNTS, DEPOSIT ACCOUNTS, CHATTEL PAPER, COMMERCIAL TORT CLAIMS, ELECTRONIC CHATTEL PAPER, DOCUMENTS, EQUIPMENT, PROPERTY, INVENTORY, RECEIVABLES, GOODS, INSTRUMENTS, INVENTORY, INVESTMENT PROPERTY, LETTER OF CREDIT RIGHTS, PAYMENT INTANGIBLES, INCLUDING, WITHOUT LIMITATION, ALL PROCEEDS, AND ALL SOFTWARE, LICENSES, AND PERMITS RELATED THERETO, WHETHER DESIGNED OR ISSUED BY THE DEBTOR, OR OTHERWISE;

(B) ALL OF DEBTOR'S AND DEBTOR'S BUSINESS' RIGHTS TO THE PAYMENT OF MONEY NOW OR HEREAFTER ARISING OUT OF OR IN CONNECTION WITH THE SALE, LEASE, OR OTHER DISPOSITION OF THE FOREGOING PROPERTY, INCLUDING, WITHOUT LIMITATION, AMOUNTS DUE FROM AFFILIATES, TAX REFUNDS, OR INSURANCE PROC

---

5. Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

| 6a. Check <u>only</u> if applicable and check <u>only</u> one box:<br>☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | 6b. Check <u>only</u> if applicable and check <u>only</u> one box:<br>☐ Agricultural Lien ☐ Non-UCC Filing |
|---|---|

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

---

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

## UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank
because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |  |
|---|---|
| OR 9b. INDIVIDUAL'S SURNAME |  |
| FIRST PERSONAL NAME |  |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name;
do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME |  |  |  |  |
|---|---|---|---|---|
| OR 10b. INDIVIDUAL'S SURNAME |  |  |  |  |
| INDIVIDUAL'S FIRST PERSONAL NAME |  |  |  |  |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) |  |  |  | SUFFIX |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
|  |  |  |  |  |

11. ☐ ADDITIONAL SECURED PARTY'S NAME   or   ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME |  |  |  |
|---|---|---|---|
| OR 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
|  |  |  |  |  |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
    EEDS;

(C) ALL FILES, RECORDS (INLCUDING, BUT NOT LIMITED TO, COMPUTER PROGRAMS, TAPES, AND RELATED ELECTRONIC DATA-
PROCESSING SOFTWARE), AND WRITINGS OF DEBTOR AND DEBTOR'S BUSINESS OR IN WHICH THE DEBTOR HAS AN INTEREST
RELATING IN ANYWAY TO THE FOREGOING PROPERTY; AND

(D) AS TO EACH OF THE FOREGOING, ALL PRODUCTS AND PROCEEDS THEREOF, SUBSTITUTIONS THEREFORE, AND ACCESSIONS
THERETO.

| 13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT: ☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing |
|---|---|
| 15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | 16. Description of real estate: |

17. MISCELLANEOUS:

# EXHIBIT 15

## BUSINESSS LOAN AND SECURITY AGREEMENT

This Business Loan and Security Loan Agreement (this "Loan Agreement"), is made effective as of 15 November 2019 (the "Effective Date"), by and between Generation Next Franchise Brands, Inc., a Nevada corporation, Reis & Irvy's, Inc., a Nevada corporation, 19 Degrees, Inc., a Nevada corporation and Generation Next Vending Robots, Inc., a Nevada corporation (collectively, jointly and severally, the "Borrower") and Genext Loan LLC, a Wyoming limited liability company ("Lender").

## BACKGROUND:

A.  Borrower and Lender desire in the Loan Agreement to set forth their agreement with respect to a business loan as documented herein and by that certain "Note" attached hereto as Exhibit A. Exhibit A, along with this Loan Agreement, that certain "Subordination Agreement" dated of even date herewith by and between Lender and Socially Responsible Brands, Inc. ("Creditor") and all other agreements, documents and instruments evidencing or securing said Note and/or entered into in connection herewith, now or in the future, are referred to collectively herein and therein as the "Loan Documents."

B.  As an inducement to Lender to enter into this Loan Agreement and the Loan Documents and issue the loan amount to the Borrower and accept the Note, Borrower wishes to, among other things, grant a first priority lien upon and security interest in and to the Collateral (as defined below).

## TERMS AND CONDITIONS:

For the reasons described above, in consideration of the mutual promises and covenants set forth in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Lender and Borrower hereby agree as follows:

1.  CERTAIN DEFINED TERMS.  Unless the context otherwise requires, as used in this Loan Agreement the following terms shall have the following meanings:

(a)  "Business" shall mean the business of the Borrower and any and all additions, successions, and appreciation thereof.

(b)  "Change in Control" shall mean:

(i)  any sale, lease, exchange, or other transfer (in one transaction or series of related transactions during the twelve month period ending on the date of the most recent sale, lease, exchange or other transfer) of all or substantially all of the assets of the Borrower to any person or persons acting as a group (as determined pursuant to Treasury Regulations Section 1.409A-3(i)(5)(v)(B) and Internal Revenue Service interpretations thereunder (a "Group")), other than to a person or Group holding, directly or indirectly, at least fifty percent (50%) of the total fair market value of the outstanding and issued equity interests of the Borrower, as constituted immediately preceding such event; or

(ii)  the acquisition by any person or Group of more than fifty percent (50%) of the total fair market value of the outstanding and issued equity interests in the Borrower,

DocuSign Envelope ID: E2665BEE-4CC2-48E1-BAD4-5881F43DB2EB

other than any event as a result of which partners or owners (or their affiliates) of the Borrower, as constituted immediately preceding such event, hold greater than one-half (50%) of the total fair market value of the outstanding and issued equity interests of the Borrower.

(c)　　"Closing Date" shall mean the date of this Loan Agreement.

(d)　　"Code" shall mean the Uniform Commercial Code as, from time to time, in effect in the State of Nevada.

(e)　　"Collateral" shall mean all of the assets and property of the Borrower and the Business, wheresoever located and whensoever acquired, contracted or arising, including without limitation the following (capitalized terms in this section have the meaning ascribed to them in the Code):

　　　　(i)　　all of the Business and Borrower's rights, title and interests in, to and under all of their Accounts, Deposit Accounts, Chattel Paper, Commercial Tort Claims, Electronic Chattel Paper, Documents, Equipment, Property, Inventory, Receivables, Goods, Instruments, Inventory, Investment Property, Letter of Credit Rights, Payment Intangibles, including, without limitation, all Proceeds, and all software, licenses, and permits related thereto, whether designed or issued by the Borrower, or otherwise;

　　　　(ii)　　all rights of the Business and Borrower to the payment of money now or hereafter arising out of / in connection with the sale, lease or other disposition of the foregoing property, including, without limitation, amounts due from affiliates, tax refunds, and insurance proceeds;

　　　　(iii)　　all files, records (including, without limitation, computer programs, tapes and related electronic data processing software) and writings of the Business and Borrower or in which the Borrower has an interest in any way relating to the foregoing property; and

　　　　(iv)　　as to each of the foregoing, all products and proceeds thereof, substitutions therefore and Accessions thereto.

(f)　　"Default Rate" shall mean Twenty Five Percent (25%) per annum.

(g)　　"Enforcement Costs" shall have the meaning ascribed to it in Section 7(l).

(h)　　"Event of Default" shall have the meaning ascribed to it in Article V.

(i)　　"General Intangibles" shall mean all general intangibles (within the meaning of the Code), whether now existing or hereafter created, arising or acquired.

(j)　　"Inventory" shall mean all of the Borrower's inventory (within the meaning of the Code).

(k)　　"Lender Expenses" has the meaning ascribed to it in 2(d).

(l)      "Loan Documents" shall have the meaning ascribed to it in the Recitals.

(m)      "Material Adverse Effect" means, in the reasonable discretion of Lender, a material adverse effect on (i) the business operations or condition (financial or otherwise) of Borrower and its Subsidiaries taken as a whole or (ii) the ability of Borrower to repay the Obligations or otherwise perform its obligations under the Loan Documents; provided however, such effect shall be measured against facts and circumstances as they exist on the Effective Date.

(n)      "Maturity Date" means the day before 30-day anniversary of the Closing Date.

(o)      "Obligations" shall mean, collectively, all obligations and liabilities (primary, secondary, direct, indirect, contingent, sole, joint or several, whether similar or dissimilar or related or unrelated) of any and all of the Borrower in favor of the Lender, due or to become due, now existing or hereafter incurred, contracted or acquired, whether arising under, out of or in connection with the Loan Documents or otherwise.

(p)      "Proceeds" has the meaning ascribed to that term under the Uniform Commercial Code as in effect in the State of Nevada on the date hereof.  For purposes of this Agreement, the term "Proceeds" includes whatever is receivable or received when Collateral or proceeds of the Collateral are sold, collected, exchanged, or otherwise disposed of, whether the disposition is voluntary or involuntary, and includes, without limitation, all rights to payment in whatever form and however arising.

(q)      "Property" shall mean any and all interests in real and/or personal property of the Borrower.

(r)      "Receivables" shall mean all accounts (within the meaning of the Code), Accounts, accounts receivable, book debts, notes, drafts, acceptances and other forms of obligations, now or hereafter owing to the Borrower, arising from the sale or lease of the Inventory by Borrower any obligation that might be characterized as an account, contract right, general intangible or chattel paper under the Code, all of the Borrower's rights in, to and under all purchase orders, now or hereafter received by the Borrower for such Inventory, and all monies due or to become due to the Borrower under all contracts for the sale, lease, or other disposition of the Inventory (whether or not yet earned by performance) or in connection with any other transaction (including, without limitation, the right to receive the proceeds of said purchase orders and contracts), and all collateral security and guarantees of any kind given by any obligor, with respect to any of the foregoing.

(s)      "Subsidiary" shall mean any corporation, association or other business entity of which more than 50% of the shares of stock or other interests entitled to vote in the election of directors, managers or trustees thereof at that time is owned or controlled, directly or indirectly, by the Borrower.

2.  <u>LOAN AND TERMS OF PAYMENT</u>.

(a)      Subject to the terms and conditions of this Loan Agreement, Lender agrees to loan the Borrower THREE HUNDRED THOUSAND DOLLARS ($300,000), FIFTY THOUSAND ($50,000) distributable to Borrower on the Closing Date; Borrower shall execute and deliver to

Lender on the date hereof the Note. The balance to be distributable upon completion of Lender's due diligence in its sole discretion.

(b)        Interest Rates, PIK Notes, Payments, and Calculations.

(i)        Interest Rate.  Subject to Sections 5(c) and 12(c), interest payable on the outstanding principal amount of the Note (including all PIK Interest (as defined below) added thereto, the "Principal Amount") shall be calculated on the basis of a 360 day year, shall accrue at a rate per annum equal to twenty percent (20%) ("PIK Interest") and shall be payable on the last day of each calendar month, in arrears, commencing on the last day of the first full calendar month after the date hereof, in kind by an automatic increase to the Principal Amount of the Note by the amount of such interest due.

(ii)       Notwithstanding anything to the contrary contained in the Note:

(A) all accrued and unpaid interest shall be due in payable in cash on the Maturity Date and on the date of any acceleration hereof;

(B) on the date of any repayment of Principal Amount of the Note, accrued and unpaid interest on the Principal Amount so repaid shall be due and payable in cash; and

(C) The Lender may by prior written notice to Borrower delivered at least three (3) Business Days prior to an interest payment date elect that any PIK Interest be paid by the issuance by Borrower  to the Holder of an additional secured term note, containing substantially the same terms and conditions as the Note (each a "PIK Note"), in which case such interest shall be payable by delivery to such Holder of a PIK Note in an original principal amount equal to the PIK Interest so due.  Such election shall be effective for the period specified in such notice (or if no period is specified for the immediately succeeding interest payment date only) and may be withdrawn at any time by the Lender by written notice delivered at least three (3) Business Days prior to any interest payment date.

(iii)      Loan Fees.  Borrower shall pay a loan fee of SEVEN THOUSAND FIVE HUNDRED DOLLARS ($7,500) due and payable at Closing.

(iv)      Default Rate.  All Obligations shall bear interest, from and after the occurrence and during the continuance of an Event of Default, at the Default Rate.

(v)       Nothing contained herein shall be deemed to establish or require the payment of a rate of interest or other charges in excess of the maximum permitted by applicable law.  The Borrower does not intend or expect to pay, nor does the Lender or any subsequent holder hereof intend or expect to charge, accept or collect any interest greater than the highest legal rate of interest which may be charged under the laws of the State of Nevada, and if, from any circumstances whatsoever, fulfillment of any provision of the Note or any Loan Document in any manner relating thereto, at the time performance of said provision shall be due, shall involve transcending the limit of

validity prescribed by any applicable law governing usury, then, *ipso facto*, the obligation to be fulfilled shall be reduced to the limit of such validity so that in no event shall exaction be possible under this Loan Agreement or any document relating thereto in excess of the limit of such validity, but such obligation shall be fulfilled to the limit of such validity and if, under any circumstances whatsoever, interest in excess of the limit of such validity will have been paid by the Borrower in connection with the indebtedness evidenced by the Note and Loan Documents, such excess shall be applied to the unpaid and outstanding principal due under the Note, and not to the payment of interest. The provisions of this paragraph shall control every other provision of all other agreements executed by the Borrower or Lender in connection with this transaction.

(c)    Crediting Payments. The receipt by Lender of any wire transfer of funds, check, or other item of payment shall be immediately applied to conditionally reduce Obligations, but shall not be considered a payment on account unless such wire transfer is of immediately available federal funds or unless and until such check or other item of payment is honored when presented for payment. Payments received by Lender hereunder, including from any sale or assignment of all or any portion of the Collateral after an Event of Default, will, whether received before or after an Event of Default, be credited on a daily basis first to Interest, second to any other amounts owed to Lender hereunder, then to the outstanding balance of the Note when received in Lender's bank account.

(d)    Fees. Borrower shall pay to Lender the following fees ("Lender Expenses"): any and all costs of Lender arising out of or in connection with the loan being made hereunder, including without limitation recording fees, documentary stamps, intangible taxes and all reasonable legal fees of Lender for the preparation of the Loan Documents as well as for any future dealings with Borrower following the Closing Date, including without limitation bankruptcy proceedings. On the Closing Date, Borrower will pay Lender Expenses incurred through the Closing Date and, after the Closing Date, all Lender Expenses as they become due, including without limitation Enforcement Costs.

(e)    Term. This Loan Agreement shall become effective once duly executed and authorized by Borrower and Lender and shall continue in full force and effect for a term ending on the date which all Obligations of Borrower have been discharged and paid in full, or on such earlier date as the parties agree in writing. Notwithstanding the foregoing, Lender shall have the right to terminate this Loan Agreement immediately and without notice upon the occurrence of an Event of Default and Borrower shall have the right to terminate this Loan Agreement immediately upon payment in full of its Obligations then outstanding hereunder. Notwithstanding any termination of this Loan Agreement, all of Lender's security interest in all of the Collateral and all of the terms and provisions of this Loan Agreement shall continue in full force and effect until all Obligations have been paid and performed in full, and no termination shall impair any right or remedy of Lender, nor shall any such termination relieve Borrower of any Obligation to Lender until all of the Obligations have been paid and performed in full.

3.    PREPAYMENT. Borrower may prepay principal without penalty.

4.    THE COLLATERAL. As collateral security for the payment and performance of all of the Obligations, the Borrower hereby extends, sells, assigns, conveys, mortgages, pledges, transfers, and grants to the Lender a first priority continuing security interest in the Collateral. Any

security interest will be a first priority security interest in the Collateral. Prepayment by the Borrower of any portion of the principal and accrued interest pursuant to the terms of this Loan Agreement shall not reduce or otherwise impair the security interest of Lender in the Collateral, except that complete repayment of all Obligations shall release and redeem to the Borrower all interest in the Collateral securing the Obligations.

5.    <u>EVENTS OF DEFAULT</u>.

(a)    The occurrence of any of the following events, in addition to any other Events of Default as defined in any Loan Document, shall constitute an "Event of Default" hereunder:

(i)    Any provision of this Loan Agreement or any Loan Document, and any amendments thereto, is breached or is untrue or misleading in any material respect;

(ii)    Any warranty, representation, or statement made or furnished to Lender by Borrower in connection with any of the Loan Documents, is untrue or misleading in any material respect;

(iii)    Borrower is in default under any provision of any Loan Document and/or any amendments thereto, including without limitation if the Borrower shall fail to pay on the due date any payment of money, whether as principal, interest, late charge, or Enforcement Costs (as defined below), as required under this Loan Agreement or any Loan Document, with any applicable notice having been given and time to cure expired;

(iv)    The Insolvency of the Borrower.  For purposes hereof,  the term "Insolvency" shall mean: (i) the appointment, by the order of a court of competent jurisdiction, of a trustee, receiver, or liquidator of the Borrower, if such order shall not be discharged or dismissed within sixty (60) days after such appointment; (ii) application for, or consent in writing to, the appointment of a receiver, trustee, or liquidator of all or substantially all of the assets of the Borrower; (iii) the filing of a voluntary petition in bankruptcy; (iv) a general assignment for the benefit of creditors; (v) the filing of a petition or an answer seeking a reorganization (other than a reorganization not involving the liabilities of the Borrower) or an arrangement with creditors or taking advantage of any bankruptcy or insolvency law; (vi) the filing of an answer admitting the material allegations of a petition filed against the Borrower in any bankruptcy, reorganization, or insolvency proceeding; (vii) the Borrower has suffered a Material Adverse Effect in the reasonable discretion of the Lender; or (viii) the entering of an order, judgment, or decree by any court of competent jurisdiction on the application of a creditor adjudicating the Borrower as bankrupt or insolvent, or the appointment of a receiver, trustee, or liquidator of the Borrower, or of all or substantially all of the assets of the Borrower, if such order, judgment or decree continues unstayed and in effect for a period of sixty (60) days from the date entered;

(v)    A Change in Control of Borrower.  If there occurs a Change in Control of Borrower.

(b)    Notwithstanding anything herein to the contrary, Borrower shall have a three (3) calendar day grace period after written notice from Lender to cure any non-monetary default

hereunder; provided however that such grace period does not cause a Material Adverse Effect. There shall be no grace period for monetary default and no notice required by Lender for such default to be immediate and material.  Time is of the essence for all Obligations hereunder.

(c)    If an Event of Default shall occur for any reason whatsoever (and whether such occurrences shall be voluntary or involuntary, or come about or be effected by operation of law or pursuant to or in compliance with any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body) then, or at any time thereafter, the Lender may, without written notice, take any or all of the following actions, at the same or different times: (A) accelerate the maturity of the Obligations and demand the immediate payment thereof, and to charge the Default Rate on such Obligations without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived; (B) require the Borrower to assemble the Collateral and the records pertaining thereto and deliver possession of same to the Lender, as well as to permit Lender to have unrestricted access to the Borrower's premises and the Collateral so as to allow Lender to take control thereof for purposes of disposition of the Collateral and the collection of all Obligations; and (C) take any and all action and pursue any and all remedies as may be permitted under the Loan Documents or by applicable law or otherwise, including exercising all rights of counterclaim or set-off.

(d)    Upon the occurrence of an Event of Default, the Lender may (i) at any time thereafter, in its discretion and in accordance with Article 9 of the Code, transfer any securities or other property constituting Collateral into its own name or that of its nominee and receive the income thereon and hold the same as security for the Obligations or apply it on any or all amounts due on the Obligations in such order as Lender may elect in its sole discretion, (ii) enter the premises peacefully at the address(es) listed herein, and take control of the Business and (ii) require each Borrower to establish, at Borrower's expense, a lock box account with such bank acceptable to Lender, into which Borrower shall promptly deposit and direct their account debtors to directly  remit all payments on Receivables and, which such payments or deposits shall be the property solely of the Lender.  Insofar as the Collateral shall consist of Receivables, other claims and rights to the payment of money, insurance policies, instruments, choses in action or the like, the Lender may, without notice to or demand on the Borrower, demand, collect, receipt for, settle, compromise, adjust, use, sue for, foreclose or realize upon the Collateral as the Lender may determine, whether or not the obligations or the Collateral are then due and for the purpose of realizing the Lender's rights therein, the Lender may receive, open and dispose of mail addressed to the Borrower and endorse notes, checks, drafts, money orders, documents of title or other evidences of payment, shipment or storage or any form of the Collateral on behalf of and in the name of Borrower. The powers conferred on the Lender by this Section are solely to protect the interest of the Lender and shall not impose any duties on the Lender to exercise any powers.  All acts of said attorney or designee are hereby ratified and approved by the Borrower and the Lender and said attorney or designee shall not be liable for any acts of commission or omission nor for any error of judgment or mistake of fact or law. This power, being coupled with an interest, is irrevocable so long as any of the Obligations remains outstanding.  Borrower hereby irrevocably appoints Lender (and any of Lender's designated officers, or employees) as Borrower's true and lawful attorney to: (a) send requests for verification of Accounts or notify account debtors of Lender's security interest in the Accounts; (b) endorse Borrower's name on any checks or other forms of payment or security that may come into Lender's possession; (c) sign Borrower's name on any invoice or bill of lading relating

to any Account, drafts against account debtors, schedules and assignments of Accounts, verifications of Accounts, and notices to account debtors; (d) make, settle, and adjust all claims under and decisions with respect to Borrower's policies of insurance; (e) settle and adjust disputes and claims respecting the accounts directly with account debtors, for amounts and upon terms which Lender determines to be reasonable; (f) to modify, in its sole discretion, any intellectual property security agreement entered into between Borrower and Lender without first obtaining Borrower's approval of or signature to such modification to include reference to any right, title or interest in any copyrights, patents or trademarks acquired by Borrower after the execution hereof or to delete any reference to any right, title or interest in any copyrights, patents or trademarks in which Borrower no longer has or claims any right, title or interest; (g) to file, in its sole discretion, one or more financing or continuation statements and amendments thereto, relative to any of the Collateral without the signature of Borrower where permitted by law.  The appointment of Lender as Borrower's attorney in fact, and each and every one of Lender's rights and powers, being coupled with an interest, is irrevocable until all of the Obligations have been fully repaid and performed.

6.  <u>REPRESENTATIONS AND WARRANTIES</u>.  As a material inducement for Lender to enter into this Loan Agreement, Borrower hereby represents and warrants to Lender as follows:

(a)    Borrower is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada and has the power and authority carry on its business as is now being conducted.

(b)    Borrower has all requisite power and authority to enter into this Loan Agreement and the other Loan Documents contemplated hereby and to assume and perform fully its obligations hereunder and thereunder. The execution and delivery by Borrower of this Loan Agreement and the other Loan Documents contemplated hereby and the performance by Borrower of their Obligations hereunder and thereunder have been duly and validly authorized by all necessary corporate action of Borrower.

(c)    The execution and delivery of this Loan Agreement and the other Loan Documents contemplated hereby and the performance by Borrower hereunder and thereunder (i) do not and will not conflict with or violate any provision of the operating agreement of Borrower and (ii) do not and will not (A) conflict with or result in a breach of the terms, conditions or provisions of, (B) constitute a default under, (C) result in the creation of any encumbrance, lien or other restriction of any nature upon the Borrower's assets pursuant to, (D) give any third party the right to modify, terminate or accelerate any obligation under, (E) result in a violation of, or require any authorization, consent, approval, exemption or other action by or notice to any third party pursuant to, any agreement, instrument, order, judgment, license, permit, decree, law, regulation, ordinance or judgment to which any of Borrower or the Collateral or is a party or is subject or bound.

(d)    No filings with, notices to, or approvals or consents of, any federal, state or local governmental or regulatory agency or body or any other Person are required to be obtained by Borrower in connection with the consummation of the transactions contemplated by the Loan Documents.  "Person" means any individual, sole proprietorship, partnership, limited liability partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, entity or government (whether foreign,

federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof), and shall include such Person's successors and assigns.

(e)    Other than the Subordinated Security Interest (as defined in the Subordination Agreement) Borrower has no material liability or obligation of any nature relating directly or indirectly to the assets of Borrower (whether accrued or unaccrued, absolute or contingent, known or unknown, due or to become due, liquidated or unliquidated or secured or unsecured or otherwise). Borrower is not aware of any basis upon which any such liability or obligation may be asserted against Borrower or their employees, contractors or affiliates or otherwise adversely affect the transactions contemplated by the Loan Documents.

(f)    [Omitted].

(g)    [Omitted].

(h)    Borrower has obtained and maintained all required local, state and federal licenses and permits necessary to operate Borrower's business and all such licenses and permits are in good standing and Borrower has no knowledge of any actions, claims or violations that are pending that would result in any limitations on or suspension or termination of such licenses.

(i)    All financial statements and reports relating to the Borrower provided by Borrower or made available or disclosed to Lender and its accountants, attorneys and other agents are complete, accurate and fairly present the financial position and performance of Borrower in all material respects for the periods to which they relate, and there has been no adverse change in the condition, financial or otherwise, of Borrower since the last disclosed statement.

(j)    All of the representations and warranties made by Borrower contained in the Loan Documents contemplated hereby and all information delivered in any schedule, attachment, certificate or exhibit hereto are true, correct and complete on the date of this Loan Agreement, throughout the term of this Loan Agreement. Borrower has not omitted to state to Lender any fact relating to the Borrower, which (i) is necessary to make the information given by or on behalf of Borrower not misleading, (ii) if disclosed would reasonably affect the decision of a Person considering making a loan to Borrower or (iii) has or which could reasonably be expected to have an adverse effect upon the Borrower or the profits, condition (financial or otherwise) or prospects of the Borrower's business.

(k)    Borrower is the record and beneficial owner of, and has good and marketable title to the Collateral free of any and all liens or options in favor of, or claims of, any other Person and Lender's security interest in the Collateral is a first priority lien in such Collateral, senior to any other lien or encumbrance, and there are no unrecorded liens or encumbrances on the Collateral.

(l)    Borrower agrees that Borrower will not for any reason change banking institutions or instructions for payment of policies and/or Receivables to any other account without the express written consent of Lender.

(m)    [Omitted.]

{8467188: }                                                                    9

(n)    All consolidated financial statements for Borrower delivered to Lender fairly present in all material respects Borrower's consolidated financial condition and Borrower's consolidated results of operations. There has not been any material deterioration in Borrower's consolidated financial condition since the date of the most recent financial statements submitted to Lender.

(o)    [Omitted.]

(p)    This Loan Agreement is entered into by Borrower for the Business Purpose.

7.  <u>AFFIRMATIVE COVENANTS</u>.  From the date hereof and so long as any of the Loan Documents remains in effect or any of the Obligations shall be unpaid, each Borrower will:

(a)    Use best efforts to preserve, renew and keep in full force and effect its corporate existence, rights, licenses, permits and franchises and comply with all applicable laws, and operate its business in substantially the manner in which it is presently conducted and operated;

(b)    At all times preserve all Property (except for such property as is disposed of in the ordinary course of business) used or useful in the conduct of the Business and keep the same in good repair, working order and condition (subject to normal wear and tear), and from time to time make, or cause to be made, all necessary and proper repairs, whether pursuant to a warranty or otherwise, renewals, replacements, betterments and improvements thereto;

(c)    Execute such other documents and instruments as Lender may reasonably request, duly executed by Borrower, to further implement and effectuate the purposes of this Loan Agreement;

(d)    Keep the insurable Collateral and other properties insured at all times at the replacement value thereof,  by financially sound and reputable insurers, and maintain or cause to be maintained such other insurance to such extent and against such risks, including fire and other risks insured against by extended coverage, as is, the Borrower's best judgment, customary with companies in the same or similar business, and maintain in full force and effect public liability insurance against claims for personal injury, death or property damage occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by it and manufacturer's liability insurance against claims for personal injury or death occurring in connection with the use of any products assembled, manufactured or sold by it in such amount as the Borrower shall in good faith deem necessary, or as may be reasonably required by the Lender and maintain such additional insurance as may be required by law.  In respect of the Collateral, the Lender shall be loss payee under all policies of insurance maintained thereon. The Lender shall be entitled to at least 30 days' prior written notice of the insurer's intention to cancel or reduce any policies of insurance required by this Subsection (c), and, at its election and without any obligation whatsoever, shall have an opportunity to cure any defaults thereunder during such time. In addition, the Borrower shall deliver renewals of all such policies not less than 30 days prior to the expiration date of such policies. The Borrower shall furnish to the Lender full information as to the insurance carried (including a copy or the original, as required hereby, of all insurance policies), as well as proof of payment therefor, and pay for all insurance obtained in accordance herewith upon the terms of invoices therefor.

DocuSign Envelope ID: E2665BEE-4CC2-48E1-BAD4-5881F43DB2EB

(e)    [Omitted.]

(f)    Furnish to Lender on a monthly basis, balance sheets, statements of income and loss, and statements of cash flow, prepared in accordance with GAAP, and all such other information regarding the operation, business, affairs and financial condition of the Borrower as the Lender may reasonably request, including without limitation the ratio of cash on deposit in the Borrower's operating accounts to outstanding Obligations.

(g)    Give the Lender prompt telephonic, telex or telecopy notice (to be confirmed within 48 hours by written notice) of any Event of Default or of any event which, with notice or the passage of time, or both, would constitute such an Event of Default, specifying the nature and extent thereof and the action which the party giving such notice proposes to take with respect thereto.

(h)    Keep its place of business and chief executive office and the office where it keeps its records concerning Receivables at its current location.

(i)    Keep its deposit account(s) at the bank(s) presently utilized by Borrower as its operating account(s).

(j)    At all reasonable times during business hours and as often as the Lender may reasonably request, permit any authorized representative of the Lender to visit and inspect any of the properties of the Borrower, including, without limitation, the Collateral, and the books in respect thereof, and to make extracts from such books and to discuss the affairs, finances and accounts with any of their respective chief financial officers or such other person as may be designated by the chief executive officer of the Borrower.

(k)    Promptly, from time to time as the Lender may reasonably request, perform such acts and execute, acknowledge, deliver, file, register, deposit or record any and all further instruments, agreements and documents whether to continue, preserve, renew, record or perfect interests conferred by this Loan Agreement or any of the other Loan Documents, as well as the priority thereof, or otherwise in connection with the Obligations.

(l)    Pay all costs and expenses incurred from time to time by the Lender with respect to any modification, consent or waiver of the provisions of any Loan Document and any enforcement of the Note and the Loan Documents, including, without limitation, reasonable attorneys' fees and expenses, court costs, transcript costs, fees of experts, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other out-of-pocket disbursements or expenses of the types customarily incurred in connection with modifying terms and/or an action to collect payment, or an appeal from such action (collectively "Enforcement Costs").

(m)    Utilize the loan proceeds solely in connection with the Business for the Business Purpose

8.  <u>NEGATIVE COVENANTS</u>.  From the date hereof and so long as the Loan Agreement remains in effect and any of the Obligations shall be unpaid, each Borrower will not, without the prior written consent of the Lender:

(a)    Either,  directly or indirectly, incur, create, assume or permit to exist any Lien with respect to any Collateral now owned or hereafter acquired, or be bound by or subject to any agreement or option to do so, except liens granted, incurred or created in favor of the Lender in connection with the Loan Documents;

(b)    [Omitted.]

9.  <u>BORROWER'S INDEMNITY</u>.  Borrower shall indemnify, defend and hold harmless Lender and its members, agents, partners, employees and independent contractors, at all times from and after the Closing Date, from and against any and all claims, actions, damages, liabilities, losses (including consequential losses), judgments, penalties, interest, fines, expenses, and/or other costs (including attorneys' fees and court costs) arising from or relating to:

(a)    any negligent action or omission of Borrower or any of the Borrower's employees, contractors, agents or any other Person acting under Borrower's supervision or control prior to, as of, or following the Closing Date;

(b)    any inaccuracy or breach of any representation or warranty made by Borrower in this Loan Agreement or any other Loan Document, document or instrument executed or delivered by Borrower in connection with this Loan Agreement or any breach or non-performance of any covenant or agreement made by Borrower in this Loan Agreement or any other Loan Document, document or instrument executed or delivered by Borrower in connection with this Loan Agreement;

(c)    any Loan Document and the payments due thereunder, including without limitation Enforcement Costs;

(d)    the willful misconduct of Borrower, their agents or employees;

(e)    the misapplication or conversion by Borrower of any insurance proceeds paid by reason of any loss, damage or destruction to the Collateral;

(f)    Any state or local documentary stamp taxes, intangible taxes, personal property taxes and sales tax, if any, imposed by virtue of the execution and acceptance of this Loan Agreement, the Loan Documents, Lender's perfection of its security interest in the Collateral, including without limitation deeds of trust filed with regard to the Receivables, and the transactions contemplated hereby and thereby.

10. <u>WAIVER</u>.  The Borrower hereby waives diligence, presentment, protest, notice of protest, notice of dishonor, and notice of nonpayment of the Note, and specifically consents to and waives notice of any renewal or extension of this Loan Agreement.  The Borrower hereby waives the benefits of the statute of limitations to the maximum extent allowed by law.  No delay by the Lender in exercising any power or privilege hereunder, nor the single or partial exercise of any power or privilege hereunder, shall preclude any other or further exercise thereof, or the exercise of any other power or privilege hereunder.

11. <u>NOTICES</u>.  All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt

requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by reputable courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be:

| | |
|---|---|
| If to Borrower: | Generation Next Franchise Brands, Inc.<br>ATTN: Ryan Polk<br>2620 Financial Court, Suite 100<br>San Diego, CA 92117<br>T: 858-210-4200<br>F: |
| With a copy sent (which shall not constitute notice) to: | McDonald Hopkins<br>ATTN: Scott Opincar<br>600 Superior Avenue East, Suite 2100<br>Cleveland, OH 44114<br>T: 216-248-5753<br>F: 216-348-5474 |
| If to Lender: | Genext Loan LLC<br>Attn:   David L. Chessler<br>1991 Main Street, Suite 208<br>Sarasota, FL 34236<br>T: 941.957.8456<br>F: 941-952-3146 |
| With a copy sent (which shall not constitute notice) to: | McIntyre Thanasides PA<br>ATTN: David M. Saslow, Esq.<br>500 E. Kennedy Blvd., Suite 200<br>Tampa, FL 33602<br>T: 844-511-4800<br>F: 813-899-6069 |

Any party hereto may from time to time change its address for notices under this Section by giving at least ten (10) days' prior written notice of such changed address or facsimile number to the other party hereto.

12. <u>MISCELLANEOUS</u>.

(a)    THE PARTIES HERETO IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF ANY STATE, DISTRICT OR FEDERAL COURT SITTING IN HENDERSON COUNTY IN THE STATE OF NEVADA OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS LOAN AGREEMENT TO THE EXCLUSION OF ANY OTHER COURT OR TRIBUNAL.  THE PARTIES IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION, OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  The parties agree the substantive law of the State of Nevada shall govern this Loan Agreement exclusive of its Conflict of Laws doctrine. Final judgment in any such suit, action, or proceeding brought in any such court shall be conclusive and binding upon a party hereto and may be enforced in any court in which such party is subject to jurisdiction by a suit upon such judgment provided that service of process is effected upon such party as permitted by applicable law.

(b)    No modification or waiver of any provision of this Loan Agreement or any other Loan Document nor consent to any departure by the Borrower therefrom shall in any event be effective against the Lender unless the same shall be in writing and signed by all parties hereto, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on the Borrower in any case shall entitle such parties to any other or further notice or demand in the same, similar or other circumstances.

(c)    The remedies of the Lender contained in this Loan Agreement are cumulative with one another and with any other remedies which the parties hereto may have at law, in equity, under any agreements of any type or otherwise and no failure or delay on the part of the Lender in exercising any right, power or privilege under the Loan Documents shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise or the exercise of any other right, power or privilege.

(d)    In case any one or more of the provisions contained in the Loan Documents should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

(e)    In the event of any conflict, inconsistency or ambiguity between the provisions of this Loan Agreement and the provisions of any other Loan Document, the provision which best assures the payment and performance of the Obligations or enlarges the security interest of the Lender in and to the Collateral, shall prevail.

(f)    The name of this Loan Agreement, as well as Section headings used herein, are for convenience of reference only and are not to affect the construction of, or be taken into consideration, in interpreting this Loan Agreement.  No language in any Loan Document will be construed against any party as the drafter.

(g)    Any term used herein shall be equally applicable to both the singular and plural forms.

DocuSign Envelope ID: E2665BEE-4CC2-48E1-BAD4-5881F43DB2EB

(h)     This Loan Agreement, any schedules or exhibits hereto, constitute the entire understanding and agreement between Borrower and Lender and supersedes any and all prior or contemporaneous oral or written representation, understanding, agreement or communication relating thereto.

(i)     The covenants and agreements contained in this Loan Agreement shall be binding on, and shall inure to the benefit of, the legal and personal representatives, heirs, successors, and permitted assignees of the parties.  This Agreement may be executed in one or more facsimile or emailed PDFs, each of which will be deemed to be an original and all of which together will be deemed to be one and the same document.

*Remainder of page blank; Subsection (j) and signature page follows.*

DocuSign Envelope ID: E2665BEE-4CC2-48E1-BAD4-5881F43DB2EB

(j)    <u>Waiver of Right to Jury Trial</u>.    BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN. FURTHER, THE BORROWER HEREBY CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF THE LENDER NOR THE LENDER'S COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE LENDER WOULD NOT, IN THE EVENT OF SUCH LITIGATION, SEEK TO ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL PROVISION. FINALLY, THE BORROWER ACKNOWLEDGES THAT THE LENDER HAS BEEN INDUCED TO ENTER INTO THIS LOAN AGREEMENT BY, INTER ALIA, THE PROVISIONS OF THIS SECTION.

IN WITNESS WHEREOF, the Borrower and the Lender have entered into this Loan Agreement as of the date and year first above written.

**LENDER:**

Genext Loan LLC,
a Wyoming limited liability company

By:    David L. Chessler
Its:    Authorized Representative

**BORROWER:**

Generation Next Franchise Brands, Inc.,
a Nevada corporation

*Ryan Polk*
5C3EB19EAA334B9...

By: Ryan Polk
Its: CEO

EXHIBIT A

PROMISSORY NOTE

$300,000.00                                                      15 November 2019

THIS PROMISSORY NOTE is issued by Generation Next Franchise Brands, Inc., a Nevada corporation (the "Borrower")

FOR VALUE RECEIVED, the Borrower promises to pay to the order of [INSERT], LLC ("Lender"), at such place as the holder hereof may designate, in lawful money of the United States of America, the aggregate unpaid principal amount of THREE HUNDRED THOUSAND DOLLARS ($300,000), plus interest, at the rates and in accordance with the terms of the Loan and Security Agreement between Borrower and Lender of even date herewith, as amended from time to time (the "Loan Agreement") on or before the last calendar day of each month. The entire principal amount and all accrued interest shall be due and payable on or before the day before the 90-day anniversary of this Note, or on such earlier date, as provided for in the Loan Agreement.

Borrower irrevocably waives the right to direct the application of any and all payments at any time hereafter received by Lender from or on behalf of Borrower, and Borrower irrevocably agrees that Lender shall have the continuing exclusive right to apply any and all such payments against the then due and owing obligations of Borrower as Lender may deem advisable. In the absence of a specific determination by Lender with respect thereto, all payments shall be applied in the following order: (a) then due and payable fees and expenses; (b) then due and payable interest payments and mandatory prepayments; and (c) then due and payable principal payments and optional prepayments.

Borrower promise to pay Lender all Enforcement Costs (as defined in the Loan Agreement), whether or not suit is filed, unless a final court of competent jurisdiction finds in an unappealable ruling that the Lender acted with gross negligence or willful misconduct. Borrower waives presentment, demand, protest, notice of protest, notice of dishonor, notice of nonpayment, and any and all other notices and demands in connection with the delivery, acceptance, performance, default or enforcement of this Note, as well as any applicable statute of limitations. No delay by Lender in exercising any power or right hereunder shall operate as a waiver of any power or right. Time is of the essence as to all obligations hereunder.

This Note is issued pursuant to the Loan Agreement, which shall govern the rights and obligations of Borrower with respect to all obligations hereunder.

Borrower expressly acknowledges that the indebtedness evidenced by this Note is a "business loan" within the meaning of the Nevada Revised Statutes.

This Note shall be binding upon Borrower and Borrower's heirs, personal representatives, successors and assigns. This Note shall inure to the benefit of Lender, its successors and assigns, including any parties to whom this Note may be assigned.

If any provision of this Note is held to be invalid, illegal or unenforceable in any respect, or operates, or would if enforced operate to invalidate this Note, then that provision shall be deemed null and void. Nevertheless, its nullity shall not affect the remaining provisions of this Note, which shall in no way be affected, prejudiced or disturbed.

The law of the State of Nevada shall apply to this Note. BORROWER ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, UNCONDITIONALLY, THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN HENDERSON COUNTY, NEVADA IN ANY ACTION, SUIT, OR PROCEEDING OF ANY KIND, AGAINST IT WHICH ARISES OUT OF OR BY REASON OF THIS NOTE OR THE LOAN AGREEMENT.

BORROWER WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS (AS DEFINED IN THE LOAN AGREEMENT) OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. BORROWER RECOGNIZE AND AGREE THAT THE FOREGOING WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR IT TO ENTER INTO THIS LOAN AGREEMENT. BORROWER REPRESENTS AND WARRANTS THAT BORROWER HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

IN WITNESS WHEREOF, the Borrower has set its hand and seal to this Note as of 15 November 2019.

BORROWER:

Generation Next Franchise Brands, Inc.

*Ryan Polk*

—5C3EB19EAA334B9...

By: Ryan Polk
Its: CEO

# EXHIBIT 16

## PROMISSORY NOTE

$25,000.00                                                                                   3 December 2019

THIS PROMISSORY NOTE is issued by Generation Next Franchise Brands, Inc., a Nevada corporation (the "Borrower")

FOR VALUE RECEIVED, the Borrower promises to pay to the order of Genext Loan, LLC ("Lender"), at such place as the holder hereof may designate, in lawful money of the United States of America, the aggregate unpaid principal amount of TWENTY FIVE THOUSAND DOLLARS ($25,000), plus interest, at the rates and in accordance with the terms of the Loan and Security Agreement between Borrower and Lender dated as of the Effective Date (as defined in the Loan Agreement), as amended from time to time (the "Loan Agreement") on or before the last calendar day of each month. The entire principal amount and all accrued interest shall be due and payable on or before the day before the 90-day anniversary of this Note, or on such earlier date, as provided for in the Loan Agreement.

Borrower irrevocably waives the right to direct the application of any and all payments at any time hereafter received by Lender from or on behalf of Borrower, and Borrower irrevocably agrees that Lender shall have the continuing exclusive right to apply any and all such payments against the then due and owing obligations of Borrower as Lender may deem advisable. In the absence of a specific determination by Lender with respect thereto, all payments shall be applied in the following order: (a) then due and payable fees and expenses; (b) then due and payable interest payments and mandatory prepayments; and (c) then due and payable principal payments and optional prepayments.

Borrower promise to pay Lender all Enforcement Costs (as defined in the Loan Agreement), whether or not suit is filed, unless a final court of competent jurisdiction finds in an unappealable ruling that the Lender acted with gross negligence or willful misconduct. Borrower waives presentment, demand, protest, notice of protest, notice of dishonor, notice of nonpayment, and any and all other notices and demands in connection with the delivery, acceptance, performance, default or enforcement of this Note, as well as any applicable statute of limitations. No delay by Lender in exercising any power or right hereunder shall operate as a waiver of any power or right. Time is of the essence as to all obligations hereunder.

This Note is issued pursuant to the Loan Agreement, in addition to that Note dated as of the Effective Date (as defined in the Loan Agreement), which shall govern the rights and obligations of Borrower with respect to all obligations hereunder.

Borrower expressly acknowledges that the indebtedness evidenced by this Note is a "business loan" within the meaning of the Nevada Revised Statutes.

This Note shall be binding upon Borrower and Borrower's heirs, personal representatives, successors and assigns. This Note shall inure to the benefit of Lender, its successors and assigns, including any parties to whom this Note may be assigned.

If any provision of this Note is held to be invalid, illegal or unenforceable in any respect, or operates, or would if enforced operate to invalidate this Note, then that provision shall be

{8467188: }

deemed null and void. Nevertheless, its nullity shall not affect the remaining provisions of this Note, which shall in no way be affected, prejudiced or disturbed.

The law of the State of Nevada shall apply to this Note.  BORROWER ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, UNCONDITIONALLY, THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN HENDERSON COUNTY, NEVADA IN ANY ACTION, SUIT, OR PROCEEDING OF ANY KIND, AGAINST IT WHICH ARISES OUT OF OR BY REASON OF THIS NOTE OR THE LOAN AGREEMENT.

BORROWER WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS (AS DEFINED IN THE LOAN AGREEMENT) OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. BORROWER RECOGNIZE AND AGREE THAT THE FOREGOING WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR IT TO ENTER INTO THIS LOAN AGREEMENT. BORROWER REPRESENTS AND WARRANTS THAT BORROWER HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

IN WITNESS WHEREOF, the Borrower has set its hand and seal to this Note as of 3 December 2019.

BORROWER:

Generation Next Franchise Brands, Inc.

By:    Ryan Polk
Its:    Chief Executive Officer

# EXHIBIT 17

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Return Acknowledgement to:
Capitol Corporate Services, Inc.
PO Box 3100
Carson City, NV 89702
800.899.0490

CAPITOL
SERVICES

**Filed in the Office of**
Barbara K. Cegavske

Secretary of State
State Of Nevada

**Initial Filing Number**
2019055184-4
**Filed On**
November 19, 2019 10:00 AM
**Number of Pages**
1

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **Generation Next Franchise Brands, Inc.** | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **2620 Financial Court, Suite 100** | **San Diego** | **CA** | **92117** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **Genext Loan, LLC** | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **1991 Main Street, Suite 208** | **Sarasota** | **FL** | **34236** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

All Debtor assets, wherever located, whenever acquired and successions, accessions, attachments thereto and proceeds thereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)  ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Return Acknowledgement to:

CAPITOL SERVICES

Capitol Corporate Services, Inc.
PO Box 3100
Carson City, NV 89702
800.899.0490

| Filed in the Office of | Initial Filing Number |
|---|---|
| *Barbara K. Cegavske* | 2019055190-5 |
| | Filed On |
| Secretary of State | November 19, 2019 10:00 AM |
| State Of Nevada | Number of Pages |
| | 1 |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Reis & Irvy's, Inc. | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2620 Financial Court, Suite 100 | San Diego | CA | 92117 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Genext Loan, LLC | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1991 Main Street, Suite 208 | Sarasota | FL | 34236 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All Debtor assets, wherever located, whenever acquired and successions, accessions, attachments thereto and proceeds thereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional) | |
| B. E-MAIL CONTACT AT FILER (optional) | |
| C. SEND ACKNOWLEDGMENT TO: (Name and Address) | |

Return Acknowledgement to:

Capitol Corporate Services, Inc.
PO Box 3100
Carson City, NV 89702
800.899.0490

**CAPITOL SERVICES**

| Filed in the Office of | Initial Filing Number |
|---|---|
| *Barbara K. Cegavske* | 2019055188-2 |
| | Filed On |
| | November 19, 2019 10:00 AM |
| Secretary of State State Of Nevada | Number of Pages |
| | 1 |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME **Print Mates, Inc.** | | | | |
|---|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS **2620 Financial Court, Suite 100** | CITY **San Diego** | STATE **CA** | POSTAL CODE **92117** | COUNTRY **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME **Genext Loan, LLC** | | | | |
|---|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS **1991 Main Street, Suite 208** | CITY **Sarasota** | STATE **FL** | POSTAL CODE **34236** | COUNTRY **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

All Debtor assets, wherever located, whenever acquired and successions, accessions, attachments thereto and proceeds thereof.

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | | ☐ being administered by a Decedent's Personal Representative | |
|---|---|---|---|
| 6a. Check only if applicable and check only one box: | | 6b. Check only if applicable and check only one box: | |
| ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | | ☐ Agricultural Lien ☐ Non-UCC Filing | |
| 7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor | | | |
| 8. OPTIONAL FILER REFERENCE DATA: | | | |

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)     International Association of Commercial Administrators (IACA)

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Return Acknowledgement to:
Capitol Corporate Services, Inc.
PO Box 3100
Carson City, NV 89702
800.899.0490

CAPITOL SERVICES

| Filed in the Office of | Initial Filing Number |
|---|---|
| *Barbara K. Cegavske* | 2019055183-7 |
| | Filed On |
| | **November 19, 2019 10:00 AM** |
| Secretary of State | Number of Pages |
| State Of Nevada | 1 |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **19 Degrees, Inc.** | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **2620 Financial Court, Suite 100** | **San Diego** | **CA** | **92117** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **Genext Loan, LLC** | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **1991 Main Street, Suite 208** | **Sarasota** | **FL** | **34236** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
All Debtor assets, wherever located, whenever acquired and successions, accessions, attachments thereto and proceeds thereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

| 6a. Check only if applicable and check only one box: | | | 6b. Check only if applicable and check only one box: | |
|---|---|---|---|---|
| ☐ Public-Finance Transaction | ☐ Manufactured-Home Transaction | ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien | ☐ Non-UCC Filing |

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)     International Association of Commercial Administrators (IACA)

# EXHIBIT 18

## INTELLECTUAL PROPERTY SECURITY AGREEMENT

This INTELLECTUAL PROPERTY SECURITY AGREEMENT (as from time to time amended, restated, supplemented or otherwise modified, this "Agreement"), dated as of 4 December 2019, is made by Generation Next Franchise Brands, Inc., a Nevada corporation, Reis & Irvy's, Inc., a Nevada corporation, 19 Degrees, Inc., a Nevada corporation and Print Mates, Inc., fka Generation Next Vending Robots, Inc., a Nevada corporation (collectively, jointly and severally, the "Grantor") in favor of Genext Loan LLC, a Wyoming limited liability company ("Lender").

WHEREAS, the Grantor has agreed to execute and deliver to Lender this Agreement to secure the indebtedness of Grantor under the promissory notes (the "Notes") issued pursuant to the Loan Agreement (as defined herein).

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor hereby agrees as follows:

Section 1.    DEFINED TERMS; RULES OF CONSTRUCTION.

(a)    Capitalized terms used in this Agreement but not otherwise defined herein have the meanings given to them in the Notes or the Loan Agreement, as applicable.

(b)    When used herein the following terms shall have the following meanings:

"2019 Notes" mean the Notes issued pursuant to the Loan Agreement.

"Copyrights" means all copyrights (whether registered or unregistered), and all moral rights and all registrations, applications for registration, renewals, extensions and reversions of any of the foregoing.

"Copyright Licenses" means all agreements pursuant to which Grantor is licensor or licensee, granting any right under any Copyright, including rights to manufacture, reproduce, display, distribute, perform, modify or otherwise exploit, and sell materials embodying or derived from, any work protected by Copyright.

"Intellectual Property" means all intellectual property rights and related priority rights throughout the world, whether protected, created or arising under the Laws of the United States or any other jurisdiction or under any international convention, including any and all of the following: (i) Patents; (ii) Trademarks; (ii) Copyrights; (iii) Patent Licenses; (iv) Trademark Licenses; (v) Copyright Licenses; (vi) Trade Secrets, (vii) all intellectual property rights in or to Software, databases and data collections, and (viii) all domain names, together with the goodwill associated therewith, and all registrations, applications for registration, renewals and extensions for any of the foregoing.

"Loan Agreement" shall mean that certain Loan and Security Agreement made and entered into as of the 15th day of November, 2019, by and among the Grantor, and Lender (as amended, restated, supplemented and/or otherwise modified from time to time in accordance with its terms).

"Obligations" shall have the meaning provided thereto in the Loan Agreement.

"PTO" means the United States Patent and Trademark Office and any successor office or agency.

"Patents" means all patents and patent applications and invention disclosures, including all continuations, continuations-in-part, divisionals and provisionals and all patents issuing on any of the foregoing, and all reissues, reexaminations, substitutions, renewals and extensions of any of the foregoing.

"Patent Licenses" means all agreements pursuant to which Grantor is licensor or licensee, granting any right to manufacture, have made, import, use, or sell any invention claimed, in whole or in part, in a Patent.

"Software" means all (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons and (d) documentation, including user manuals and other training documentation, related to any of the foregoing.

"Technology" means all Software, works of authorship, compositions, content, information, designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, recordings, graphs, drawings, reports, analyses and other similar writings and materials.

"Trademarks" means all trade names, trademarks, service marks, trade dress, logos and other source or business identifiers (whether registered or unregistered), together with the goodwill associated with any of the foregoing, and all registrations, applications for registration, renewals and extensions for any of the foregoing.

"Trademark Licenses" mean all agreements pursuant to which Grantor is licensor or licensee, granting any right to use a Trademark.

"Trade Secrets" mean all trade secrets and all intellectual property rights in or to proprietary information, know-how, show-how or Technology.

"UCC" shall have the meaning provided thereto in the Loan Agreement

(c)     All Schedules, Addenda, Annexes and Exhibits hereto or expressly identified to this Agreement are incorporated herein by reference and taken together with this Agreement constitute but a single agreement. The words "herein", "hereof" and "hereunder" or other words of similar import refer to this Agreement as a whole, including the Exhibits, Addenda, Annexes and Schedules thereto, as the same may be from time to time amended, modified, restated or supplemented, and not to any particular section, subsection or clause contained in this Agreement. Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter. The term "or" is not exclusive. The term "including" (or any form thereof) shall not be limiting or exclusive. All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations. All references in this Agreement or in the Schedules, Addenda, Annexes and Exhibits to this Agreement to sections, schedules, disclosure schedules, exhibits, and attachments shall refer to the corresponding sections, schedules, disclosure schedules, exhibits, and attachments of or to this Agreement. All references to any instruments or agreements, including references to any of this Agreement or the Related Agreements shall include any and all modifications or amendments thereto and any and all extensions or renewals thereof.

(d)     The parties acknowledge that each party and its counsel have reviewed this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments, Schedules or Exhibits hereto.

(e)     In the event of an irreconcilable conflict between the terms of this Agreement and the terms of the Notes or the Loan Agreement, this Agreement shall govern with respect to each such conflict.

Section 2.     GRANT OF SECURITY INTEREST IN INTELLECTUAL PROPERTY COLLATERAL. To secure the prompt payment to the holder of the Notes of the Obligations of the Grantor now or hereafter existing from time to time, Grantor hereby pledges and grants to the Lender, for the benefit of the holder of the Notes, a continuing security interest in and Lien upon all of Grantor's right, title and interest in, to and under the following, whether presently existing or hereafter created or acquired (collectively, the "Collateral"):

(a)     Trademarks and Trademark Licenses to which Grantor is a party including those referred to on Schedule I hereto;

(b)     Patents and Patent Licenses to which Grantor is a party, including those referred to on Schedule II hereto;

(c)    Copyrights and Copyright Licenses to which Grantor is a party, including those referred to on <u>Schedule III</u> hereto;

(d)    Intellectual Property not covered by the foregoing, including those referred to on <u>Schedule IV</u> hereto;

(e)    Rights to sue third parties for past, present or future infringement, dilution, misappropriation, or other violation of rights in any Intellectual Property, including injury to the goodwill associated with any Trademark, and all causes of action for the same; and

(f)    All proceeds of all or any of the foregoing, tort claims and all claims and other rights to payment including (i) insurance claims against third parties for loss of, damage to, or destruction of, the foregoing Collateral and (ii) payments due or to become due under Copyright Licenses, Patent Licenses or Trademark Licenses and proceeds payable under, or unearned premiums with respect to, policies of insurance in whatever form regarding the foregoing Collateral;

provided, however, that, notwithstanding any of the foregoing or anything else in this Agreement or the Loan Agreement or otherwise, Collateral shall not include (i) any property or interests in property to the extent that the grant of a security interest therein is prohibited by any rule of Law, statute or regulation, requires a consent not obtained of any government, governmental body or official or is prohibited by, or constitutes a breach or default under or results in the termination of or requires any consent not obtained under, any contract, license, agreement, instrument or other document or shareholder or similar agreement, except to the extent that such rule of Law, statute or regulation or the term in such contract, license, agreement, instrument or other document or shareholder or similar agreement providing for such prohibition, breach, default or termination or requiring such consent is ineffective under applicable Law or (ii) any Trademark application filed in the PTO on the basis of Grantor's intent to use the Trademark that is the subject of such Trademark application, unless and until a statement of use or amendment to allege use under 15 U.S.C. Section 1051(d) or 15 U.S.C. Section 1051(c), respectively, has been filed in the PTO and examined and accepted or deemed in conformance with 15 U.S.C. Section 1051(a), respectively, by the PTO, in which event, such Trademark shall automatically be included in the Collateral.

Section 3.    <u>COVENANTS</u>. Grantor covenants and agrees with Lender, from and after the date of this Agreement, and in addition to the covenants in the Notes, that:

(a)    Grantor shall notify Lender reasonably promptly if it knows (i) that any application or registration for any Intellectual Property owned by Grantor may become abandoned, dedicated to the public or placed in the public domain or otherwise invalidated or unenforceable (unless, in any of the foregoing cases, Grantor shall have previously determined in its reasonable business judgment that such Intellectual Property is no longer necessary for or desirable in the conduct of Grantor's business), or (ii) of any adverse determination in any proceeding

(including the institution of any proceeding) in the PTO, the United States Copyright Office, or any similar agency of the United States, any State of the United States, or other country or political subdivision thereof, any Internet domain name registry or other registry, or any court, regarding Grantor's ownership of or right to use, register, keep and/or maintain any material Intellectual Property;

(b)    Grantor shall take all reasonable actions necessary to maintain and pursue each application for registration of the material Intellectual Property owned by Grantor from time to time, including filing applications for renewal, affidavits of use, affidavits of noncontestability and the commencement and prosecution of opposition and interference and cancellation proceedings (unless, in any of the foregoing cases, Grantor reasonably determines that any such action would be of negligible economic value or that any such action would jeopardize or harm any other Intellectual Property (including any application or registration therefor));

(c)    In the event that any Intellectual Property owned by Grantor (or exclusively licensed to Grantor such that Grantor has sufficient rights and standing under applicable Law to assert such Intellectual Property against any third party) is infringed, diluted, misappropriated, or otherwise violated by a third party, Grantor shall notify Lender reasonably promptly after Grantor learns thereof and shall, unless Grantor reasonably determines that any such action would be of negligible economic value or that any such action would jeopardize or harm any other Intellectual Property (including any application or registration therefor) or would otherwise be inadvisable, (i) reasonably promptly take reasonable actions to stop the same and enforce its rights in such Intellectual Property and (except where the failure to recover such damages could not reasonably be expected to have a material adverse effect on the business, assets, liabilities, condition (financial or otherwise), properties or operations of Grantor) to recover all damages therefor, including, when and where reasonably appropriate, the initiation of a suit for injunctive relief and/or damages and (ii) take such other actions as are reasonable under the circumstances to protect Grantor's rights in such Intellectual Property;

(d)    Grantor shall, when and where commercially reasonable and feasible, use statutory notice of registration in connection with its use of registered Trademarks, proper marking practices in connection with the use of Patents, appropriate notice of copyright in connection with the publication of materials protected by Copyright and any other legends or markings required by Law that are applicable to other Intellectual Property;

(e)    Grantor shall maintain the level of the quality of products sold and services rendered under any Trademarks owned by Grantor at a level at least substantially consistent with the quality of such products and services as of the date hereof, and, with respect any products sold or services rendered by Grantor's licensees of any Trademarks owned by Grantor, Grantor shall reasonably control the quality of

such products sold and services rendered under such Trademarks owned by Grantor;

(f)  Grantor shall take all reasonable steps necessary to protect the secrecy of all Trade Secrets material to its business (unless Grantor shall have previously determined in its reasonable business judgment that any such Trade Secret is of negligible economic value or is no longer necessary for or desirable in the conduct of Grantor's business).

Section 4.  LOAN AND SECURITY AGREEMENT.  The security interests granted pursuant to this Agreement are granted in conjunction with the security interests granted by Grantor to Lender, for the benefit of the holder of the Notes, pursuant to the Loan Agreement. Grantor hereby acknowledges and affirms that the rights and remedies of Lender with respect to the Collateral made and granted herein are more fully set forth in the Loan Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein. Any rights and remedies set forth herein are without prejudice to, and in addition to, those set forth in the Loan Agreement.

Section 5.  REINSTATEMENT.  This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against Grantor for liquidation or reorganization, should Grantor become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver or trustee be appointed for all or any significant part of Grantor's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Obligations, or any part thereof, is, pursuant to applicable Law, rescinded or reduced in amount, or must otherwise be restored or returned by Grantor, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

Section 6.  NOTICES.  Whenever it is provided herein that any notice, demand, request, consent, approval, declaration or other communication shall or may be given to or served upon any of the parties by any other party, or whenever any of the parties desires to give and serve upon any other party any communication with respect to this Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and shall be given in the manner, and deemed received, as provided for in the Master Recapitalization Agreement.

Section 7.  TERMINATION OF THIS AGREEMENT.  Subject to Section 5 hereof, this Agreement shall terminate upon payment in full of the Obligations.

Section 8.    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEVADA APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

[Signature Page to Follow]

IN WITNESS WHEREOF, Grantor has executed this Intellectual Property Security Agreement as of the date first written above.

Generation Next Franchise Brands, Inc.

By: _____

Name: Ryan Polk

Title: CEO

Reis & Irvy's, Inc.

By: _____

Name: Ryan Polk

Title: President

19 Degrees, Inc.

By: _____

Name: Ryan Polk

Title: President

Print Mates, Inc., fka Generation Next Vending Robots, Inc.

By: _____

Name: Ryan Polk

Title: President

ACCEPTED and ACKNOWLEDGED by:

GENEXT LOAN LLC

By: _____

Name:

Title:

[Signature Page to Intellectual Property Security Agreement]

SCHEDULE I
TO
INTELLECTUAL PROPERTY SECURITY AGREEMENT

I.    TRADEMARK

II.

| Trademark Name | Owner | Registration No. | Registration Date | Country |
|---|---|---|---|---|
| RĒIS & IRVY'S | Robofusion, Inc. | 4,530,264 | May 13, 2014 | U.S. |
| ROBOFUSION | Robofusion, Inc. | 4,199,598 | August 28, 2012 | U.S. |
| ROBOFUSION ICE CREAM | Robofusion, Inc. | 4,199,599 | August 28, 2012 | U.S. |

III.    INTERNET DOMAIN NAMES

- www.robofusion.com
- www.robofusionicecream.com

www.reisandirvys.com

## SCHEDULE II
## TO
## INTELLECTUAL PROPERTY SECURITY AGREEMENT

I.    PATENTS

| Title | Application No. | Application Date | Patent No. | Issuance Date |
|-------|----------------|------------------|------------|---------------|
| **Issued Patents (U.S.)** | | | | |
| Method and Apparatus for Dispensing Frozen Confectionary | 11/669,768 | 1-31-2007 | 7,896,038 | 3-1-2011 |
| Method and Apparatus for Dispensing Frozen Confectionary | 12/945,395 | 11-12-2010 | 8,989,893 | 3-24-2015 |
| Kiosk and Machine for Assembly of Frozen Confectionery | 29/379,002 | 11-12-2010 | D647,926 | 11-01-2011 |
| Kiosk and Machine for Assembly of Frozen Confectionery | 29/379,011 | 11-12-2010 | D643,861 | 08-23-2011 |
| **Pending Patent Applications (U.S. and non-U.S.)** | | | | |
| FRO-STYLE FLAVOR SYSTEM | PCT/US2016/0 19039 | 2-23-2016 | N/A | N/A |
| Fro-Style Flavor System | 15/050,992 | 2-23-2016 | N/A | N/A |
| Foodstuff Dispensing Station | 29/522,040 | 3-27-2015 | N/A | N/A |
| Dispensing Station Performance Area | 29/522,036 | 3-27-2015 | N/A | N/A |

<u>SCHEDULE III</u>
<u>TO</u>
<u>INTELLECTUAL PROPERTY SECURITY AGREEMENT</u>

II.    COPYRIGHT REGISTRATIONS

   None.

III.    COPYRIGHT APPLICATIONS

   None.

III.    COPYRIGHT LICENSES

| Name Of Agreement | Parties | Effective Date |
|---|---|---|
| Master License Agreement | GPS Industries, LLC and GPSI Leasing, LLC | October 14, 2009 |
| Master Intellectual Property License Agreement | GPS Industries, LLC and GPSI Leasing II - Accord, LLC | November 2, 2011 |

<u>SCHEDULE IV</u>
<u>TO</u>
<u>INTELLECTUAL PROPERTY SECURITY AGREEMENT</u>

OTHER INTELLECTUAL PROPERTY REGISTRATIONS AND APPLICATIONS.

None.