LARSON ZIRZOW KAPLAN & COTTNER
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
E-mail: zlarson@lzkclaw.com
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
E-mail: mzirzow@lzkclaw.com
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170
Fax: (702) 382-1169

MCDONALD HOPKINS LLC
SCOTT N. OPINCAR (Ohio Bar # 0064027)
*Admitted Pro Hac Vice*
E-mail: sopincar@mcdonaldhopkins.com
MICHAEL J. KACZKA (Ohio Bar # 0076548)
*Admitted Pro Hac Vice*
Email: mkaczka@mcdonaldhopkins.com
600 Superior Avenue, East, Suite 2100
Cleveland, Ohio 44114-2653
Tel: (216) 348-5400
Fax: (216) 348-5474

Attorneys for Debtors                                  Attorneys for Debtors

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>GENERATION NEXT FRANCHISE BRANDS, INC.,<br>☒ Affects this Debtor. | Case No. 19-17921-mkn<br>Chapter 11 (Lead Case)<br>(Jointly Administered) |
| In re:<br>REIS & IRVY'S INC.,<br>☒ Affects this Debtor. | Case No. 19-17922-mkn<br>Chapter 11 |
| In re:<br>PRINT MATES, INC.,<br>☒ Affects this Debtor. | Case No. 19-17923-mkn<br>Chapter 11 |
| In re:<br>19 DEGREES, INC.,<br>☒ Affects this Debtor. | Case No. 19-17924-mkn<br>Chapter 11<br><br>Date: January 24, 2020<br>Time: 10:30 a.m. |

**DEBTORS' MOTION TO CONVERT CHAPTER 11
CASES TO CHAPTER 7 PURSUANT TO 11 U.S.C. § 1112(a)**

Generation Next Franchise Brands, Inc., a Nevada corporation ("Generation Next"), Reis & Irvy's Inc., a Nevada corporation ("R&I"), Print Mates, Inc., a Nevada corporation ("Print Mates") and 19 Degrees Inc., a Nevada corporation ("19 Degrees" and collectively with Generation Next, R&I, and Print Mates, the "Debtors") in the above-referenced cases (the "Chapter 11 Cases"), submit their motion (the "Motion") to convert their chapter 11 reorganization cases voluntarily to chapter 7 liquidation cases pursuant to section 1112(a) of title

11 of the United States Code (the "Bankruptcy Code"). This Motion is made and based on the following points and authorities, the *Declaration of Ryan Polk* filed in support of the Motion, the *Omnibus Declaration of Ryan Polk in Support of Chapter 11 Petitions and First Day Motions* (the "Omnibus Declaration") [ECF No. 27], the papers and pleadings on file with the Court in these Chapter 11 Cases, judicial notice of which is requested, and any oral testimony or argument presented to the Court at a hearing on the Motion.

## I. JURISDICTION AND VENUE

1. On December 15, 2019 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thereby commencing their respective Chapter 11 Cases. The Debtors are authorized to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' Chapter 11 Cases are being jointly administered, and an Official Committee of Unsecured Creditors (the "Committee") has been appointed [ECF No. 78] and sought to retain counsel.

2. The Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Pursuant to Local Rule 9014.2, the Debtors consent to the entry of final orders and judgments by the bankruptcy judge. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. BACKGROUND

**A.    Overview of the Debtors' Businesses.**

3. The Debtors are a leading developer of unattended retail solutions and vending machines. In 2016, Generation Next's vending machine business acquired the intellectual property assets of Robofusion, Inc. ("RFI"), which included robotic-kiosk vending technology, including frozen yogurt and ice cream vending robots. Prior to the acquisition, Generation Next strategically acquired patents protecting the development of a frozen confectionary robot, and the acquisition allowed Generation Next to move into development mode. Since the acquisition, Generation Next, through its flagship brand R&I, has developed a state-of-the-art robotic soft serving vending robot that serves customized frozen yogurt treats using a fully automated,

2

patented system. This free-standing system can be placed in a mall, airport, hospital, tourist attraction, casino, resort, college campus, or other high foot-traffic area. The robots allow consumers to use the kiosk to select and customize a frozen yogurt treat with toppings without the need for on-site staff. A kiosk is a free-standing, 15 square foot machine that is self-cleaning and sanitizing, and can be serve up to 200 cups of frozen yogurt before a refill. Unlike other frozen yogurt systems, there is a lower cost of entry than traditional frozen yogurt systems, can be operated full or part time, there is no staff required, and the systems are installed in locations where there is already a captive audience. The proprietary software platform integrated into the vending robots allows the company to monitor sales from each of the machines remotely, including customer trends and purchasing behavior.

4. R&I sold franchise rights for the vending robots. In 2018, the first franchisees began operating their robots in the field, and 170 units were installed during the first half of fiscal year 2018. Franchise owners typically set the retail price and negotiate rent terms with locations hosting R&I's kiosks.

5. On March 28, 2019, the company entered into an Asset Purchase Agreement to purchase the Print Mates business, including intellectual property. Print Mates kiosks offer instant high-resolution printing of photographs from touchscreen kiosks. Print Mates kiosks are operated with a proprietary software interface that takes advantage of the kiosk's large touch-screen, allowing customers to swipe and scroll through various menus as well as edit and crop their images before printing. The company intended to own and operate the kiosks, collecting 100% of the revenues generated, and to sell kiosks and license software to business owners.

6. 19 Degrees is the managing member of 19 Degrees Corporate Service, LLC, a robot investment fund (the "Fund") that was to accredited investors (*i.e.* franchisees and other direct purchase investors) to contribute kiosks to the Fund and receive quarterly distributions of net proceeds from operating the robots. 19 Degrees provides services pursuant to a Management Services Agreement, and manages the Fund account. 19 Degrees was to earn a management fee of 1.5% from 19 Degrees Corporate Services. Although 19 Degrees Corporate Services is

3

managed by 19 Degrees, a variety of independent parties also own its membership units.

**B.    Problems with the Kiosks.**

7.    The company's aggressive growth, together with some external manufacturing and delivery issues, led to a large delay in delivery of kiosks.  In September 2017, Generation Next entered into a Design Services Agreement with Flextronics Industrial, Ltd., n/k/a Flex, Ltd. ("Flex"), to provide certain design and engineering services for its frozen yogurt kiosks, as well as a Manufacturing Services Agreement with Flex to perform various manufacturing services of those products.  Flex repeatedly missed delivery commitments throughout 2018, among other significant delays and issues.  These delays put Generation Next at least 18 months behind schedule delivering kiosks and caused substantial cash withdrawals, leading to research and development overruns at Flex, significant repair expenses from a third-party engineering firm, prepaid inventory in excess of production capacity, ongoing operating expenses, and certain refunds to franchisees who did not want to wait for the delay in the delivery of their units.

8.    In January 2018, the company entered into a Manufacturing Agreement with The Vollrath Company, LLC ("Stoelting") of Kiel, Wisconsin, through which Stoelting was to provide premium soft serve technology and a national service to R&I's branded frozen yogurt robots.  In May 2019, this relationship expanded such that Stoelting also included manufacturing and kiosk engineering services for an interim production period.  During Stoelting's interim production period, the company will be transferring assembly know-how to either back to Flex or a new partner such as Foxconn or Jabil.

9.    In January 2019, Generation Next and Flex entered into a Transition and Interim Production Agreement with Flex, which noted that a dispute had arisen between the production and development of the kiosks, and that the parties disagreed regarding their respective obligations under their agreements.  Additionally, this agreement noted that Flex had recently halted production and shipment of kiosks, components, replacement parts and kits designed to retrofit previously delivered kiosks with upgrades.  This agreement further provided that Generation Next would transition to a new manufacturer and terminate their relationship, but in

an effort to mitigate potential losses, they entered into an agreement to govern the manufacture and delivery of kiosks and related retrofit kits and materials between then and August 31, 2019.

10. Currently, the Debtors have approximately 15 finished kiosks with Pitney Bowes near the installation site, 21 kiosks at Flex, 5 kiosks at Service 1, and 46 kiosks that have been removed from locations and are being staged for inspection and repair, and certain parts that will be used in the assembly of finished kiosks. The company was also working on a refurbishment process to repair issues with kiosks. A significant portion of the kiosk components can be used for a variety of applications, and are not unique to the company's robot, increasing the potential to recover on these assets. As part of the RFI acquisition, the Company also acquired a patent portfolio relating to the robotic system, including utility and design patents relating to the dispensing stations and a method for assembly of frozen confectionary products.

## C. **Recent Operating Performance.**

11. For the year ending June 30, 2019, Generation Next recognized revenue on 426 kiosks; this equates to revenues of approximately $16.3 million from the sale of vending robots and $1.4 million in franchise fees, respectively. In order to assist franchisees with support and pay for certain administrative costs (such as merchant fees, software fees, etc.), R&I charges a monthly royalty fee of 12% of gross receipts. The company aggregates and controls the bank account that receives the credit card payments by kiosk customers, and this account is settled each month with the franchise owners. The royalties due from each franchisee are netted against the credit card receipts due to each franchise owner. The amount is deducted from the remittance checks R&I cuts to franchisees every month from sales at the kiosks. R&I does not charge a marketing fund fee or other fee. For the year ending June 30, 2019, the company recognized approximately $315,000 in franchise royalty revenue. The company also worked to negotiate certain rebates from consumable suppliers for yogurt sold at the kiosks, which Generation Next expects will turn into further revenue.

12. The company also received deposits from the sale of franchises. Typically, the company received a deposit of 40% to 60% of the contract value, and the remainder of the

contract value of each machine was typically received within 7 days before or after delivery. The company had use certain of those deposits to fund operating and debt service, purchase and deliver 430 kiosks, build inventory, and refund certain franchise deposits.

13. As of June 30, 2019, the company's total revenues were $18.3 million. For the year ended June 30, 2019, the company had a net loss totaling approximately $19 million with negative cash flows from operations totaling approximately $13.5 million. Through June 30, 2019 the company's production and installation of kiosks have been slower than anticipated, due to delays caused by engineering and manufacturing deficiencies, which have since been corrected. The impacts of production delays were decreased revenue recognition and less accounts receivable collections. Also, the company used cash on hand to retire liabilities associated with the franchise rescissions, for research, development and engineering expenditures related to its robotic soft serve vending kiosks, for warranty expenses and for the purchase of robot inventory. The combined result of these events was a substantial decrease in the company's cash balances and an increase in its outstanding liabilities.

14. As of the Petition Date, the company was also a defendant in at least thirteen (13) active lawsuits in state and federal court throughout the country brought by disappointed franchisees, among other matters, making a variety of claims, and at least that many additional franchisees were threatening potential litigation. The company simply lacks the resources to defend all of these active and potential litigations, and satisfy all the concerns raised in them, and these matters were a significant driving force behind the need to seek bankruptcy relief.

**D.    The Company's Attempt to Raise Additional Funding Pre-Petition.**

15. In early September 2019, the company hired Stout Risius Ross Advisors, LLC ("Stout") as an investment banker to assist in company's raise of bridge financing with the following goals: fund kiosk production sufficient to reasonably meet franchise backlog, restart production with Stoelting, and fund a permanent transition to Foxconn or Jabil. The company was also in the process of developing a larger equity raise for the spring of 2020 to complete the company's long term-goals. These goals included, but were not limited to, transitioning to a

6

hybrid model (including both franchise and corporately owned and operated units), launching certain customer loyalty and analytics programs, targeting global growth of R&I, and developing an additional unattended retail platform.

16.  Stout developed certain marketing materials for the bridge financing process, including a teaser and a confidential information memorandum (the "CIM"). Stout also worked to develop a targeted investor list and contacted parties that would be interested in providing bridge financing only or bridge financing only with a "follow on" equity investment. Upon information and belief, Stout contacted 81 parties about the opportunity, and 33 parties received the teaser. While 21 parties received the CIM and signed a non-disclosure agreement, 18 parties passed upon review and receipt of the CIM (the remaining three were unresponsive), and Stout did not receive any term sheets as a result of the process.

**E.     The Debtors' Prepetition Indebtedness.**

17.  **Socially Responsible.**  On October 27, 2015, Generation Next, then known as Fresh Healthy, as borrower entered into a loan arrangement (the "SR Loan") with Socially Responsible Brands, Inc. ("Socially Responsible"), as lender. Nicholas Yates, the former CEO and Chairman of the company, is the 20% owner of Socially Responsible. The SR Loan was set forth in two Secured Promissory Notes (the "SR Notes"), evidencing indebtedness in the original principal amount of $250,000 each, and $500,000 in the aggregate, and have terms of eighteen months and one year, respectively. The SR Loan was secured by a Security Agreement (the "SR Security Agreement") granting a security interest in all of Generation Next's assets. The SR Loan was also accompanied by a Subordination Agreement (the "SR Subordination Agreement") granting Socially Responsible priority over certain other existing indebtedness. On November 12, 2015, Socially Responsible filed a financing statement indicating that the debtor's names was Fresh Healthy, however, the company is not aware of any amendment thereto having ever been filed by Socially Responsible after Fresh Healthy changed its name to Generation Next in or about March 2016.

18.  On January 20, 2017, Socially Responsible agreed to extend the maturity date on

7

their note until December 31, 2017. In connection with the loan extension, the holder may convert their SR Notes into shares of the company's stock at $.16 per share. Furthermore, on September 18, 2017, the SR Notes were amended whereby the interest rate was modified to a rate of 20% per annum effective October 1, 2016 and the maturity date was further extended until December 31, 2019 (collectively, the "SR Notes Amendments").

19. **Presto Yogurt.** In February 2019, R&I entered into a Rescission Agreement (the "Presto Rescission Agreement") with Presto Yogurt Vending, LLC ("Presto Yogurt"), which provided that R&I would pay the sum of $70,000 to Presto Yogurt. On February 14, 2019, R&I entered into a Security Agreement with Presto Yogurt (the "Presto Security Agreement"), which granted Presto Yogurt a security interest in two (2) specific robotic soft-serve vending kiosks (identified by serial number) (the "Presto Collateral").

20. **Brett Hall.** Dated as of October 22, 2019, Generation Next and R&I, as borrowers, and Brett Hall ("Hall"), as lender, entered into a Business Loan and Security Agreement (the "Hall Loan Agreement") and related Secured Promissory Note (the "Hall Note"). Hall is an individual residing in Carlsbad, California. The Hall Note was in the original principal amount of $25,000.00 and executed by Generation Next, as borrower. The Hall Loan Agreement granted Hall a security interest in and to substantially all of the applicable debtors' assets, but subordinate to the interests of GLL (as hereinafter defined). On December 6, 2019, Hall filed a UCC-1 financing statement to perfect his security interest in and to any collateral.

21. **CK Green Partners**. Dated as of November 12, 2019, Generation Next and R&I, as borrowers, and CK Green Partners, LLC, an Ohio limited liability company ("CK Green"), as lender, entered into a Business Loan and Security Agreement (the "CK Green Loan Agreement") and related Secured Promissory Note (the "CK Green Note"). The CK Note was in the original principal amount of $103,725.00 and executed by Generation Next, as borrower. The CK Green Loan Agreement provided that the CK Green Note would bear interest at the rate of 15% per annum, no monthly payments were required, and was due in full in 180 days. The CK Green Loan Agreement granted CK Green a security interest in and to substantially all of the

8

Debtor's assets, but subordinate to the interests of GLL (discussed below). On November 27, 2019, CK Green filed a UCC-1 financing statement to perfect its security interest in and to any collateral.

22. **Ken Cascarella.** Dated as of November 12, 2019, Generation Next and R&I, as borrowers, and Kenneth D. Cascarella ("Cascarella"), as lender, entered into a Business Loan and Security Agreement (the "Cascarella Loan Agreement") and related Secured Promissory Note (the "Cascarella Note"). The Cascarella Note was in the original principal amount of $100,000.00 and executed by Generation Next, as borrower. The Cascarella Loan Agreement provided that the Cascarella Note would bear interest at the rate of 15% per annum, no monthly payments were required, and was due in full in 180 days. The Cascarella Loan Agreement granted Cascarella a security interest in and to substantially all of the Debtor's assets, but subordinate to the interests of GLL (as hereinafter defined). On December 6, 2019, Cascarella filed a UCC-1 financing statement to perfect its security interest in and to any collateral.

23. **GLL Prepetition Loans.** On or about November 15, 2019, the Debtors, as borrowers, entered into a loan arrangement with GLL as lender. GLL's loan was evidenced by a Business Loan and Security Agreement (the "GLL Loan Agreement") that granted GLL a security interest in substantially all of Debtors' assets.

24. The GLL Loan Agreement included a Promissory Note in the amount of $300,000 (the "First GLL Note") executed by Generation Next, as borrower, that was due in full in 90 days, plus interest payable of 20% per annum, and with interest payments payable on the last day of each calendar month, in arrears, commencing on the last day of the first full calendar month, in kind by an automatic increase to the principal amount of the Note by the amount of such interest due. The GLL Loan Agreement granted GLL a security interest in all of Generation Next's assets, wherever located, whenever acquired and successions, accession, attachments thereto and proceeds thereof. On November 19, 2019, GLL perfected its security interest in all of its collateral by filing a UCC-1 financing statements with the Nevada Secretary of State.

25. On or about December 3, 2019, the Debtors, as borrowers, and GLL, as lender,

9

entered into an additional Secured Promissory Note (the "Second GLL Note") in the principal amount of $25,000. The additional loan per the Second GLL Note was secured pursuant to the existing GLL Security Agreement.

26. On December 5, 2019, the Debtors entered into an Intellectual Property Security Agreement with GLL, which confirmed that GLL had been granted a security interest in all of the Debtors' intellectual property assets under the original loan documents.

27. Prior to the Petition Date, the GLL Loan is in senior secured position in and to all of the Debtors' property pursuant to various subordination agreements and/or as a matter of law given the timing of the filing of their financing statement prior to other secured loans to the Debtors' businesses.

28. After tapping what resources it could for potential financing pre-petition, the Debtors lacked access to further capital without a bankruptcy filing needed to continue operating, and were in imminent danger of failing and being forced to immediately cease all operations. As a result, the Debtors commenced their Chapter 11 Cases to explore strategic alternatives to maximize the value of their estates and the recoveries of their stakeholders, including a sale of all or substantially all of their assets as a going concern.

F.   **The Debtors' DIP Financing and Potential Sale.**

29. On the Petition Date, the Debtors filed their *Motion for Interim and Final Orders: (I) Authorizing the Debtors to Obtain Senior Secured, Superpriority Postpetition Financing; (II) Granting Liens and Superpriority Claims; (III) Approving Loan Documents Relating to the Foregoing; (IV) Modifying the Automatic Stay; (V) Scheduling Final Hearing; and (V) Granting Other Related Relief* (the "DIP Financing Motion") [ECF Nos. 22 and 39], and sought emergency approval thereof on an interim basis, pending a final hearing. The DIP Financing Motion sought postpetition financing from GLL, as lender, on a first-priority secured, superpriority basis, pursuant to the terms of the Revolving Line of Credit Secured Promissory Note and the Secured Loan and Security Agreement (the "DIP Loan Agreement"), of additional indebtedness up to $2,535,000.00, with up to $500,000.00 of that being drawn on an emergency

interim basis pending a final hearing. The DIP Loan Agreement was secured in substantially all of the Debtors' assets, except for Avoidance Actions.

30. Among other matters, the DIP Loan Agreement impose the following Milestone Requirements: (i) the Debtors were to file a motion to approve bidding and sale procedures (including break-up fee, qualified bidder requirements, bid, sale hearing, auction and closing deadlines, and bidding rules), all in the form acceptable to GLL, no later than 21 days after the Petition Date (by January 6, 2020)[1]; (ii) the Debtors shall obtain approval of the Bid Procedures Motion no later than 55 days after the Petition Date (by Saturday, February 8, 2020); (iii) the Borrowers shall conduct an auction no later than 90 days after the Petition Date (by Saturday, March 14, 2020); (iv) the Debtors shall obtain final approval of any 363 Sale transaction no later than 100 days after the Petition Date (by Tuesday, March 24, 2020). The Debtors' failure to comply with the Milestone Requirements is an event of default under the DIP Loan Agreement. See DIP Loan Agreement, p. 21, § 8.1(g).

31. On December 26, 2019, the Court entered an *Interim Order* (the "Interim DIP Financing Order") [ECF No. 62] approving the DIP Financing Motion, and pending a final hearing scheduled on January 16, 2020 at 1:30 p.m.[2] On an interim basis, the definition of Collateral subject to GLL's liens was subject to a Carve-Out and specifically excluded all Avoidance Actions under chapter 5 of the Bankruptcy Code. See id. p. 17, ¶ 9(c), and DIP Loan Agreement, p. 11, ¶ 5.16(d). As a result, potential Avoidance Actions remain unencumbered property that may be available to provide a return to creditors.

32. A potential credit bid from GLL was the only potential offer that had been received for the Debtors' assets. Therefore, the Debtors' commenced intense good-faith

---

[1] The date that is 21 days after the Petition Date technically fell on Saturday, January 4, 2020, and thus GLL agreed that the deadline was actually the following business day, Monday, January 6, 2020.

[2] The DIP Loan Agreement technically required that a final order approving the DIP Loan be entered by no later than January 15, 2020, see DIP Loan Agreement, p. 21, § 8.1(g), however, GLL agreed that that deadline was extended to at least January 16, 2020 in light of the Court's scheduling of the final hearing on the DIP Financing Motion until then.

11

negotiations with GLL as a potential stalking horse bidder. In support of that potential sale process and in order to comply with the Milestone Requirements, on January 6, 2020, the Debtors filed their *Motion for Entry of Order (A) Approving Bid Procedures for Sale of Debtors' Assets, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Auction for, and Hearing to Approve, Sale of Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction and Sale Hearing, and (E) Approving Assumption and Assignment Procedures* [ECF No. 77]. Notwithstanding the foregoing, the Debtors, with the assistance of their investment banker, continued to market its assets for sale after the filing of these Chapter 11 Cases, which to date, attracted two potentially interested parties that have signed non-disclosure agreements.

33. Final approval of the proposed DIP Financing Motion drew significant opposition from both the Office of the United States Trustee and the Committee [ECF Nos. 91 and 97], and the Court held an evidentiary hearing with respect to final approval of it on January 16, 2020. After hearing evidence, including substantial cross-examination by the Committee of the Debtors' CEO, Ryan Polk, the proposed DIP Lender made an offer of certain concessions from the currently proposed terms of the DIP Financing, however, those were not accepted by the Committee in full resolution of its objection, and thus the Court directed the Debtors to prepare and file a written submission of those proposed concessions by 12:00 p.m. the following day, which the Court would then review and rule on approval of the proposed financing.

34. By the Court-imposed deadline, however, the Debtors were unable to provide such a list of financing concessions because the DIP Lender indicated that it no longer wanted to fund the DIP Financing given, among other matters, the Committee's opposition to approval of it at the final hearing and the demands asserted by the Committee to change the financing material to the detriment of the DIP Lender, concerns that the collateral securing its DIP Financing was insufficient to adequately secure the total amount of indebtedness, concerns that the Court would not approve the proposed financing even as revised and without further adverse revisions to the terms and conditions required by the DIP Lender. As a result, and in order to advise the Court and all other parties in interest of the deteriorating situation, the Debtors filed a status report

12

[ECF No. 120], which advised that the DIP Lender was unwilling to proceed with the balance of the DIP Loan on a final basis, and that the Debtor lacked any available funding in order to proceed with its reorganization case. The Court thereafter entered an order setting a status hearing on January 21, 2020 [ECF No. 121].

35. At the status hearing on January 21, 2020, the Debtors advised the Court that they were unable to resolve issues with the Committee and the DIP Lender to secure additional funding to continue operations, were unable to fund a payroll due immediately, and otherwise lacked funds to continue operating as a debtor in possession under chapter 11, and as a result, lacked an ability to reorganize. As a result, the Court invited parties to file a motion seeking relief pursuant to section 1112 of the Bankruptcy Code, and discussed which relief might be most appropriate, including the appointment of a chapter 11 trustee, appointment of an examiner, conversion of the cases to chapter 7, or dismissal, was in the best interests of all creditors and parties in interest.

36. Also as of January 21, 2020, the Debtors filed their completed bankruptcy schedules and statement of financial affairs [ECF Nos. 126-137] to provide a full disclosure of its assets and liabilities.

37. On January 22, 2020, the Court heard and orally approved the Debtors' retention of its various professionals, including Debtors' general reorganization counsel, Larson Zirzow Kaplan & Cottner and McDonald Hopkins, LLC; the Debtors' investment banker, Sutter Securities, Inc.; and the Debtors' contract accountant, Signature Analytics. Also at this hearing, the Debtors advised the Court that they would be filing this Motion seeking to convert their cases to Chapter 7 that same day. In light of the impending conversion, the Debtors also advised the Office of the United States Trustee that they would not be attending the continued initial debtor interview (scheduled for January 22, 2020) or the first meeting of creditors pursuant to section 341 of the Bankruptcy Code (scheduled for January 23, 2020).

38. The Debtors file this Motion seeking to convert their cases to chapter 7 because they lack sufficient funds to be able to support a reorganization under chapter 11, including even

a very expedited sale process, and do not otherwise generate sufficient cash from operations to continue with that process. Additionally, the Debtors continue to accrue post-petition payables, including obligations to employees and their own professionals, which they simply lack the funds to pay.

### III. LEGAL ARGUMENT

39. A debtor's voluntary request to convert a chapter 11 bankruptcy case to a liquidation under chapter 7 is governed by section 1112(a) of the Bankruptcy Code, which provides as follows:

> (a) The debtor may convert a case under this chapter to a case under chapter 7 of this title unless--
>
> (1) the debtor is not a debtor in possession;
>
> (2) the case originally was commenced as an involuntary case under this chapter; or
>
> (3) the case was converted to a case under this chapter other than on the debtor's request.

11 U.S.C. § 1112(a) (emphasis added).

40. None of the three (3) statutory exceptions in section 1112(a)(1) through (3) of the Bankruptcy Code apply in the case at hand, and thus the Debtors' request should be granted. Further, there is no "extreme circumstances" exception to a debtor's ability to convert its case voluntarily to chapter 7 pursuant to section 1112(a) of the Bankruptcy Code, and even to the extent the Court determines that there is such an exception -- which determination would be against the weight of authority -- there is no bad faith, improper purpose, or abuse of the Bankruptcy Code present evident in the case at hand to deny the requested conversion to chapter 7. See In re Kimrow, Inc., 534 B.R. 219 (Bankr. M.D. Ga. 2015).

41. Good cause exists to approve the Debtors' voluntary request to convert their Chapter 11 Cases to chapter 7 liquidations because the estates have been unable to obtain sufficient financing necessary to remain in a chapter 11 reorganization and also do not otherwise

14

generate sufficient funds from operations to sustain such a process as well.  Further, the Debtors are incurring continuing ongoing losses on a post-petition basis that they are unable to pay, and otherwise lack an ability to reorganize.  Conversion of the cases to chapter 7 is in the best interests of the Debtors, their estates, and all creditors and parties in interest, and indeed given the situation, there is no other reasonable or practical solution that exists.  For example, a chapter 7 trustee may still seek authority to operate the Debtors' business pursuant to section 721 of the Bankruptcy Code, can determine independently, and without interference from a Committee, what is in the best interests of all creditors, and can pursue a recovery of potential assets, including potential Avoidance Actions, for the benefit of all creditors.  Conversion is preferable to the appointment of a chapter 11 trustee or examiner, because the estates lack sufficient funds to support such appointments, and a dismissal of the bankruptcy cases is not preferable because the Debtors are clearly insolvent, and a dismissal would just leave all creditors in limbo and subject the Debtors to dismemberment from a wide variety of state and federal court lawsuits throughout the country, whereas a chapter 7 process could allow for an orderly liquidation in a unified bankruptcy proceeding and under the control of a neutral trustee, thereby avoiding the proverbial "race to the courthouse" contest among potentially competing creditors for what remains of the Debtors outside of bankruptcy if the cases were simply dismissed.

42. Additionally, although the Debtors assert that their cases should be converted to chapter 7 as a result of their voluntary request herein, and on the basis that none of the statutory limitations on such a request in section 1112(a)(1) through (3) of the Bankruptcy Code apply, to the extent the Court determines that a further analysis is needed, good and sufficient "cause" also exists to convert the case pursuant to section 1112(b)(4)(A) of the Bankruptcy Code for "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," to the extent a creditor or party in interest were to file such a motion for conversion or dismissal.  Although such considerations are generally the focus of a motion brought by a creditor or party in interest pursuant to section 1112(b) of the Bankruptcy Code, not a voluntary motion to convert brought by a debtor pursuant to section 1112(a) such as the instant

15

Motion, such considerations, to the extent appropriately made in this context, also weigh in favor of allowing the requested conversion to chapter 7.  See In re Premier Golf Properties, LP, 564 B.R. 710, 723 (Bankr. S.D. Cal. 2016); Rand v. Porsche Fin. Servs. (In re Rand), No. AZ-10-1160-BaPaJu, 2010 WL 6259960, *10 n.14 (B.A.P. 9th Cir. Dec. 7, 2010) (citing 7 Collier on Bankruptcy ¶ 1112.04[7] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed., 2010)).

## IV.  CONCLUSION

WHEREFORE, the Debtors request that the Court convert their Chapter 11 Cases to chapter 7.  The Debtors also request such other and further relief as is just and proper.

DATED:  January 22, 2020.

 /s/ Matthew C. Zirzow
LARSON ZIRZOW KAPLAN & COTTNER
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
E-mail: zlarson@lzkclaw.com
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
E-mail: mzirzow@lzkclaw.com
850 E. Bonneville Ave.
Las Vegas, Nevada 89101

-and-

MCDONALD HOPKINS LLC
SCOTT N. OPINCAR (Ohio Bar# 0064027)
*Admitted Pro Hac Vice*
E-mail:  sopincar@mcdonaldhopkins.com
MICHAEL J. KACZKA (Ohio Bar# 0076548)
*Admitted Pro Hac Vice*
E-mail:  mkaczka@mcdonaldhopkins.com
600 Superior Avenue, East, Suite 2100
Cleveland, Ohio 44114-2653

Attorneys for Debtors